# 23-7370(L)

## 23-7463(XAP), 23-7614(XAP)

IN THE

# United States Court of Appeals

FOR THE SECOND CIRCUIT

PETERSEN ENERGIA INVERSORA S.A.U. and PETERSEN ENERGIA S.A.U.,

*Plaintiffs-Appellees-Cross-Appellants,*

—v.—

ARGENTINE REPUBLIC,

*Defendant-Appellant-Cross-Appellee,*

YPF S.A.,

*Defendant-Conditional Cross-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
(NO. 1:15-CV-02739) (HON. LORETTA A. PRESKA)

**PAGE-PROOF RESPONSE AND PRINCIPAL BRIEF FOR DEFENDANT-CONDITIONAL CROSS-APPELLANT YPF S.A.**

MARK P. GOODMAN
SHANNON ROSE SELDEN
J. ROBERT ABRAHAM
WENDY B. REILLY
CARL RIEHL
SOL CZERWONKO
DEBEVOISE & PLIMPTON LLP
66 Hudson Boulevard
New York, New York 10001
(212) 909-6000

*Counsel to Defendant-Conditional Cross-Appellant YPF S.A.*

# CORPORATE DISCLOSURE STATEMENT

Defendant-Appellee YPF S.A. is a publicly held corporation organized under the laws of the Republic of Argentina. It has no publicly held parent corporation, and no publicly held corporation owns 10% or more of YPF S.A.'s stock.

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................1
JURISDICTIONAL STATEMENT ..................................................................6
STATEMENT OF THE ISSUES ......................................................................8
STATEMENT OF THE CASE..........................................................................9
I. Factual Background ......................................................................................9
A. The Republic Privatizes YPF.....................................................................9
B. YPF's Bylaws Impose Tender-Offer Requirements on Certain Acquirers of Shares, But Not on YPF. ..............................................11
C. The Public Interest Law Declares 51% of YPF's Shares Subject to Expropriation and Mandates the Executive to "Exercise All of the Rights Conferred Upon the Shares." ............................................12
II. Procedural History ......................................................................................14
A. The District Court Grants in Part and Denies in Part YPF's Motion to Dismiss. ..............................................................................14
B. This Court Affirms, on Interlocutory Appeal, that the "Gravamen of Petersen's Claims" Falls Within the FSIA's Commercial-Activity Exception. ..................................................................................16
C. The District Court Grants Summary Judgment for YPF, Concluding that the Bylaws Do "Not Impose an Obligation on YPF to Enforce" the Tender-Offer Provisions. ....................................................16
SUMMARY OF ARGUMENT ........................................................................18
STANDARD OF REVIEW ............................................................................22
ARGUMENT ..................................................................................................23
I. The District Court Was Correct to Grant Summary Judgment for YPF on Plaintiffs' Contract Claims. .........................................................23
A. The District Court Correctly Held that the Bylaws Are Unambiguous and Do Not Impose Any Obligation on YPF to Compel a Tender Offer or Impose Penalties. ..................................................23
1. Argentine Law Requires that Contracts Are Interpreted According to Their Plain and Unambiguous Terms. ..........................24

2. Sections 7 and 28 of the Bylaws Did Not Obligate YPF to Enforce the Tender-Offer Requirement or Penalties..........................26

3. Plaintiffs' Attacks on the District Court's Interpretation Fail. ..........................................................................................33

4. This Appeal Is the Court's First Time Deciding the Merits of This Issue...........................................................................42

B. Alternatively, Plaintiffs' Breach-of-Contract Claims Fail for Lack of Causation. ..........................................................................45

C. Alternatively, Plaintiffs' Contract Claims Are Not Cognizable Under Argentine Law. ....................................................................49

II. The District Court Was Correct to Dismiss Petersen's Promissory-Estoppel Claim. .........................................................................52

III. The District Court Calculated Damages Improperly, Including by Failing to Apply New York's Statutory Judgment-Day Rule for Currency Conversion...............................................................................57

A. The Bylaws Price Mandatory Tender Offers in Pesos. ...........................60

B. Plaintiffs Were Not Entitled to Receive Dollars in a Hypothetical Tender Offer. ............................................................................62

1. The Bylaws Did Not Require the Republic to Offer to Buy ADRs. ..........................................................................................63

2. Nothing Else Required Bidders to Include ADRs in a Hypothetical Tender Offer. ..............................................................65

C. The Tender-Offer Obligation is a Monetary Obligation Within the Scope of the Judgment-Day Rule. .........................................................67

CONCLUSION .....................................................................................70

# TABLE OF AUTHORITIES

**U.S. CASES** **PAGE(S)**

*Animal Sci. Prod., Inc. v. Hebei Welcome Pharm. Co.*,
585 U.S. 33 (2018)....22

*Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samurk-Kazyna JSC*,
813 F.3d 98 (2d Cir. 2016)....43

*Bartenwerfer v. Buckley*,
598 U.S. 69 (2023)....35

*Branch of Citibank, N.A. v. De Nevares*,
74 F.4th 8 (2d Cir. 2023)....22

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)....22

*Creative Waste Mgmt., Inc. v. Capitol Envl. Servs.*, Inc.,
429 F. Supp. 2d 582 (S.D.N.Y. 2006)....46

*Doe v. Trump Corp.*,
6 F.4th 400 (2d Cir. 2021)....57

*E. I. Du Pont de Nemours & Co. v. Train*,
430 U.S. 112 (1977)....35

*Goldberg v. Pace Univ.*,
88 F.4th 204 (2d Cir. 2023)....53

*Havlish v. 650 Fifth Avenue*,
934 F.3d 174 (2d Cir. 2019)....45

*In re Gulf Oil/Cities Serv. Tender Offer Litig.*,
725 F. Supp. 712 (S.D.N.Y. 1989)....55

*In re Publ'n Paper Antitrust Litig.*,
690 F.3d 51 (2d Cir. 2012)....46

*Intellivision v. Microsoft Corp.*,
484 F. App'x 616 (2d Cir. 2012)....55

*Iroquois Master Fund, Ltd. v. Quantum Fuel Sys. Techs. Worldwide, Inc.*,
641 F. App'x 24 (2d Cir. 2016) ....................22

*Jaramillo v. Weyerhaeuser Co.*,
536 F.3d 140 (2d Cir. 2008) ....................22

*Kaytor v. Elec. Boat Corp.*,
609 F.3d 537 (2d Cir. 2010) ....................22

*Med. Computer Sys., Inc. v. United States*,
480 F.3d 621 (2d Cir. 2007) ....................40

*Nat'l Petrochemical Co. of Iran v. M/T Stolt Sheaf*,
930 F.2d 240 (2d Cir. 1991) ....................57

*Nature's Plus Nordic A/S v. Nat. Organics, Inc.*,
78 F. Supp. 3d 556 (E.D.N.Y. 2015) ....................68

*OBB Personenverkehr AG v. Sachs*,
577 U.S. 27 (2015)....................43

*Petersen Energía Inversora S.A.U. v. Argentine Republic*,
895 F.3d 194 (2d Cir. 2018) ....................*passim*

*Pohl v. United Airlines, Inc.*,
213 F.3d 336 (7th Cir. 2000) ....................56

*Sacerdote v. N.Y. Univ.*,
9 F.4th 95 (2d Cir. 2021) ....................56

*Sompo Japan Ins. Co. of Am. v. Norfolk S. Ry. Co.*,
762 F.3d 165 (2d Cir. 2014) ....................45

*Tolbert v. Smith*, 790 F.3d 427
(2d Cir. 2015)....................23

*Tr. for Certificate Holders of Merrill Lynch Mortg. Investors, Inc. v. Love Funding Corp.*,
496 F.3d 171 (2d Cir. 2007) ....................6

*United States v. Restrepo*,
986 F.2d 1462 (2d Cir. 1993) ....................56

*Vishipco Line v. Chase Manhattan Bank, N.A.*,
660 F.2d 854 (2d Cir. 1981) ....................................................................58

*Weiss v. La Suisse, Societe d'Assurances Sur La Vie*,
293 F. Supp. 2d 397 (S.D.N.Y. 2003) ......................................................68

*Weiss v. Nat'l Westminster Bank*,
993 F.3d 144 (2d Cir. 2021) ......................................................................7

*Will v. Hallock*,
546 U.S. 345 (2006).....................................................................................43

**ARGENTINE CASES**

*Mevopal S.A. v. Banco Hipotecario Nacional*,
Argentine Supreme Court of Justice, 1985 .................................................25

*Motta v. Abraxas Construcciones*,
Argentine National Commercial Court of Appeals, 1997 ...........................25, 34

*Juan Carlos Sicaro v. YPF*,
Argentine Supreme Court of Justice, 1991 .................................................25

**U.S. STATUTES**

28 U.S.C.
§ 1291...........................................................................................................6
§ 1330(a) .......................................................................................................6

New York's Judiciary Law § 27(b) ..............................................................*passim*

**ARGENTINE STATUTES**

Argentine Civil Code .....................................................................................39

Argentine General Corporate Law
Article 251 .....................................................................................21, 36, 51
Article 254 .....................................................................................21, 36, 51

YPF Intervention Decree No. 530/2012 ........................................................12

Public Interest Law .........................................................................................*passim*

**OTHER AUTHORITIES**

Fed R. Civ. P.
R. 12(b)(1)....15, 43
R. 12(b)(6)....15
R. 15(b)(2)....57

## INTRODUCTION

Plaintiffs' enterprise-threatening claims against YPF S.A. ("YPF" or "the Company"), the publicly traded company that is the subject of Plaintiffs' dispute with the Republic of Argentina (the "Republic"), fail on appeal for the same straightforward reason they did before the district court: the claims have no basis in YPF's Bylaws or Argentine law.

Plaintiffs are former holders of YPF ADRs who contend that when the Republic intervened in YPF, temporarily occupied 51% of YPF's capital stock held by Repsol S.A., and declared it subject to expropriation, the Republic was required to make a tender offer to buy out Plaintiffs' interests in YPF. On the argument that the Republic should have but did not make that offer, Plaintiffs sued the Republic for damages and obtained judgment in the district court. Plaintiffs acknowledged that YPF had no obligation to make a tender offer itself but claimed that, as the corporation whose securities and Bylaws were at issue, YPF also was financially liable for the amount of the absent offer. The district court flatly, and correctly, rejected that claim. It entered judgment for YPF and against Plaintiffs, dismissing YPF from the case.

This Court should affirm. Plaintiffs' claims have no basis in the Bylaws or in Argentine law. YPF is the issuer of the shares that were subject to expropriation and the target of the alleged takeover, but it had no obligation to make, enforce,

compel, or guarantee a tender offer, to impose penalties, or otherwise to intercede in the disputed actions. The Company does not guarantee its investors' financial expectations, and it is not responsible for the actions of acquirers of its stock. It would be wholly unprecedented and an utter disregard of core concepts of Argentine law to hold the Company liable on these facts.

Most fundamentally, Plaintiffs' claims have no basis in the text of the Bylaws on which they rely. The Bylaws are plain and unambiguous. They say ***nothing*** that provides any basis to hold YPF liable here. Plaintiffs do not point to a single provision that imposes any of the obligations they seek to enforce on YPF, and their experts have conceded that no such obligation can be found.

Plaintiffs broadly rely on the Bylaws' tender-offer provisions, which provide that when acquiring more than a certain set percentage of YPF's Class D shares or capital stock, the acquirer (or "Bidder") must conduct a tender offer on specified terms. Any tender-offer obligations apply only to such a "Bidder," not to YPF. YPF's sole obligation in the text is to provide "notice" of a bid to its shareholders if it receives notice from the Bidder. Nothing in the Bylaws' text requires YPF to compel an acquirer to make a tender offer or to guarantee that its shareholders receive one. Nor do the Bylaws require YPF to impose penalties or otherwise act if an acquirer conducts a "Takeover" without making such an offer. It is up to the shareholders, not the Company itself, to challenge the actions of an acquirer who

fails to make a required tender offer or votes shares in violation of the Bylaws. As the district court concluded, the Bylaws are "quite clear when an affirmative obligation is imposed and on whom it is imposed," and their unambiguous text "demonstrates that the Bylaws impose no affirmative obligation requiring YPF to enforce the relevant Bylaw provisions when the Bylaws do not say so." SA111–12.

On appeal, not surprisingly, Plaintiffs still cannot locate any obligation in the text of the Bylaws that would support their claims for damages against YPF. Instead, they disregard the central principles of contract interpretation that bind and limit the parties to a contract's terms, and attempt to conjure an obligation out of non-existent "promises" and self-defined "common sense." That is far from enough for a contract claim (even if such a claim were cognizable here, which it is not). Plaintiffs still cannot establish the most foundational element of their claims: a clear contractual obligation on the part of YPF. This Court should affirm for that reason alone.

Plaintiffs' claims also fail for independent, alternative reasons that the district court did not need to reach. Causation is another required element of Plaintiffs' contract claims — and another striking failure of their theory. Plaintiffs cannot show that any conduct or inaction ***by YPF*** caused them not to receive and be paid in a tender offer, or that any action ***by YPF*** could have changed that

outcome. And although Plaintiffs' breach-of-contract claims fail when considered on the merits, an Argentine court would not even recognize such claims — and this Court could affirm on that basis too.

Plaintiffs' belated attempt to revive Petersen's promissory estoppel claim on appeal is also meritless. It fails as a matter of law and on Plaintiffs' own admission: as the district court noted, "Plaintiffs' own expert acknowledges that, in Argentina, the doctrine of estoppel is not an autonomous source of obligation," SA46 (emphasis and quotation marks omitted), particularly where the parties are alleged to have a contractual relationship. In any event, the "promises" on which Petersen bases its claim merely summarize the Bylaws' provisions and do not impose separate obligations. Promissory estoppel was properly dismissed because it cannot create broader rights than the Bylaws themselves, and it provides no additional basis for relief.

In short, the district court was correct to dismiss YPF, and nothing in Plaintiffs' appeal warrants reversal or vacatur of that decision.

* * * * *

This Court should not reinstate any claims against YPF. If it did, however, it would risk exposing the Company to Plaintiffs' damages claims. Those claims are overstated as a result of legal error. Faced with voluminous briefing and numerous disputed issues, the district court's decision omitted consideration of the Bylaws'

pricing terms, resulting in an incorrect application of New York law on conversion of damages. Specifically, in assessing damages against the Republic, the district court failed to recognize that the Bylaws price the tender obligation in Argentine pesos, and thus failed to correctly apply New York's judgment-day rule, which requires conversion of damages from breaches of obligations "denominated in a currency other than currency of the United States" to dollars on the judgment day, rather than the breach day. YPF should never be liable for any share of any damages awarded, as it owed no obligation and caused no loss, but if those issues are returned to the district court, YPF should not be required to litigate further under the cloud created by this incorrect calculation, which so materially alters the scale of the dispute. In an abundance of caution, then, YPF conditionally cross-cross-appeals the district court's incorrect ruling on that issue, which should not apply in the event of remand.

## JURISDICTIONAL STATEMENT

The district court asserted jurisdiction over these cases under 28 U.S.C. § 1330(a), and this Court affirmed, on interlocutory appeal, the district court's finding that the FSIA does not bar subject-matter jurisdiction. *Petersen Energía Inversora S.A.U. v. Argentine Republic*, 895 F.3d 194, 210 (2d Cir. 2018).

This Court has appellate jurisdiction under 28 U.S.C. § 1291 to review the district court's final judgment, entered on September 15, 2023. JA__ [Dkt.418]. The Republic filed timely notices of appeal on October 10, 2023. JA__ [Dkt.504]. Plaintiffs filed timely notices of cross-appeals on October 18, 2023. JA__ [Dkt.509]. YPF filed timely notices of conditional cross-cross-appeals on October 23, 2023. JA__ [Dkt.511].

This Court has appellate jurisdiction over YPF's conditional cross-cross-appeals because the risk that the "prevailing party" before the district court "might become aggrieved upon reversal of the direct appeal" establishes standing for a cross-appeal. *Tr. for Certificate Holders of Merrill Lynch Mortg. Investors, Inc. v. Love Funding Corp.*, 496 F.3d 171, 173–74 (2d Cir. 2007) (per curiam) (citation omitted). YPF may "file a protective, conditional cross-appeal" so that "any errors against [its] interests are reviewed" in case "the main appeal results in modification of the judgment." *Id.* at 173. If this Court affirms the district court's judgment as to YPF — as it should — this Court's "usual procedure is to dismiss the cross-

appeal as moot." *Weiss v. Nat'l Westminster Bank*, 993 F.3d 144, 159 (2d Cir. 2021) (citation omitted).

## STATEMENT OF THE ISSUES

1. Whether summary judgment for YPF on Plaintiffs' breach-of-contract claims was proper (A) based on the plain terms of the Bylaws, which did not obligate YPF to take the actions contemplated by Plaintiffs, as the district court held; or, in the alternative, because (B) Plaintiffs have not introduced evidence sufficient to establish that YPF's alleged breaches caused Plaintiffs' purported harms, or (C) Plaintiffs' contract claims are not cognizable under Argentine law?

2. Whether the district court properly dismissed Petersen's promissory estoppel claim against YPF?

3. On conditional cross-cross-appeal, whether the district court should have assessed damages in Argentine pesos rather than U.S. dollars as of the breach date?

## STATEMENT OF THE CASE

### I. Factual Background

#### A. The Republic Privatizes YPF.

YPF S.A. is a corporation (*sociedad anónima*) incorporated under the laws of Argentina and headquartered in Buenos Aires. JA__ [Dkt.370, ¶1]. YPF is the largest energy producer in Argentina and employs over 20,000 people. JA__ [*Id.*, ¶¶1–2]; JA__ [Dkt.390, ¶2]. Apart from the 51% of the Company's equity that was expropriated, more than 99% of its remaining equity is privately owned, including by major U.S. funds, U.S. institutional and retail investors, and YPF employees. JA__ [Dkt.370, ¶2]; JA__ [Dkt.390, ¶2]; JA__ [Dkt.377-2, pp.196–97].

Argentina founded YPF as a state-run energy company in 1922. It owned and operated YPF until 1993, when it sold approximately 80% of its ownership interest in YPF via a transfer of shares to Argentine provinces and YPF employees and an initial public offering of 59% of YPF's Class D shares (the "IPO"). JA__ [Dkt.370, ¶¶1, 4, 6]; JA__ [Dkt.112-2, p.7]. The shares were listed on the Buenos Aires Stock Exchange, and corresponding American Depositary Receipts ("ADRs"), each evidencing an American Depositary Share ("ADS") representing an interest in a deposited Class D share, were listed on the New York Stock Exchange. JA__ [Dkt.370, ¶¶7–8].

Contrary to Plaintiffs' misleading assertion that YPF "reap[ed] the benefit of billions of dollars in international investment" in the IPO, Pls. Br. 87, all proceeds from the IPO went to the Republic and Argentine provinces, not to YPF, JA__ [Dkt.112-2, p.3]. YPF has been a publicly traded company since the IPO. JA__ [Dkt.370, ¶2]; JA__ [Dkt.390, ¶2]. As of the date of this brief, YPF's market capitalization is roughly $8 billion.[1]

In 2008, Petersen began to acquire YPF ADRs from YPF's then-controlling shareholder, Repsol. JA__ [Dkt.370, ¶¶19–23]. By 2012, following a series of highly leveraged transactions in which Petersen financed roughly 95% of its purchase through loans from Repsol and commercial banks secured by pledges of purchased ADRs, Petersen held ADRs reflecting a beneficial interest in approximately 25% of YPF's Class D shares. *See* JA__ [*Id.*, ¶¶22, 28–30]; JA__ [Dkt.390, ¶¶29–30]. In order to make the requisite payments on the massive loans it used to purchase the YPF ADRs, Petersen entered into a shareholders' agreement with Repsol that provided for Repsol and Petersen to cause YPF to distribute dividends of 90% of YPF's profits, along with a special dividend of $850 million, half to be paid in 2008 and the other half in 2009. JA__ [Dkt.378, ¶32]. Eton Park first acquired YPF ADRs in November 2010, and continued to acquire them through March 2012. JA__ [Dkt.370, ¶¶25–28]; JA__ [Dkt.390, ¶27].

---

[1] *See* https://www.nasdaq.com/market-activity/stocks/ypf.

### B. YPF's Bylaws Impose Tender-Offer Requirements on Certain Acquirers of Shares, But Not on YPF.

During the relevant period, YPF operated pursuant to its Bylaws, which are governed by Argentine law and include the two sections on which Plaintiffs rely: Sections 7 and 28. Section 7 requires anyone other than the Republic who seeks to acquire more than certain percentages of YPF's capital stock or Class D shares to make a tender offer (referred to as a "takeover bid") for the acquisition of all YPF shares and securities convertible into shares. JA__ [Dkt.377-1, §7(d)]. Section 7 provides that shares acquired in breach of the tender-offer provisions "shall not grant any right to vote or collect dividends or other distributions" or "be computed to determine the presence of the quorum at any of the shareholders' meetings." JA__ [*Id.*, §7(h)]. Section 28 extends certain requirements of Section 7 to certain acquisitions by the Republic. JA__ [*Id.*, §28(A)]. Neither Section 7 nor Section 28 makes any reference to any obligation of YPF, with the exception of one provision requiring YPF to perform the administrative task of forwarding to shareholders an acquirer's tender-offer notice at the acquirer's expense. JA__ [*Id.*, §7(f)(iii)]; *see generally* JA__ [*Id.*, §§7, 28].

The 1993 IPO Prospectus (the "Prospectus") included "a brief summary of certain significant provisions of the By-laws" and summarized the tender-offer requirements in Sections 7 and 28 of the Bylaws. JA__ [Dkt.112-2, pp.81–84]. The summary noted, among other things, that, "[p]ursuant to the By-laws," certain

acquisitions of stock by the Republic will be "deemed to be Control Acquisitions"; prior to consummating any Control Acquisition, the Republic would be required to make a public tender offer "for all outstanding Class D Shares"; "[t]he tender offer must be carried out in accordance with a procedure specified in the By-laws"; and violation of such provisions would result in the suspension of the "voting, dividend and other distribution rights of any shares acquired[.]" JA__ [*Id.*, pp.82–84]. The Prospectus underscored that its summary of the Bylaws "does not purport to be complete and is qualified by reference to the By-laws." JA__ [*Id.*, p.81]. Like the Bylaws, the summary did not identify any obligation of YPF other than that the "Company will send" shareholders a copy of the acquirer's tender-offer notice. JA__ [*Id.*, p.83]. The Prospectus also explained that the "By-laws are governed by Argentine law and any action relating to enforcement of the By-laws or a shareholder's rights thereunder is required to be brought in an Argentine court." JA__ [*Id.*, p.90].

### C. The Public Interest Law Declares 51% of YPF's Shares Subject to Expropriation and Mandates the Executive to "Exercise All of the Rights Conferred Upon the Shares."

On April 16, 2012, the Executive Branch of the Republic issued Decree No. 530/2012, under which an intervenor appointed by the Republic was temporarily granted the powers of YPF's Board of Directors and President. JA__ [Dkt.370, ¶32]. The Argentine government also introduced a bill to the Argentine Congress

to have 51% of YPF's share capital, which was held by Repsol, declared of public interest and "subject to expropriation" (the "Public Interest Law"), which it emphasized was necessary to promote the Republic's national and public interests. JA__ [*Id.*, ¶33]. At that time, YPF's shares were owned approximately 57.5% by Repsol, 25.5% by Petersen, and 17.0% by other minority investors, including Eton Park, with an equity interest of 3.0%.[2] JA__ [Dkt.377-10, p.141].

The Public Interest Law required that the Argentine Executive Branch "exercise all of the rights conferred upon the shares subject to expropriation." JA__ [Dkt.370, ¶37]. On May 7, 2012, the Public Interest Law became effective, making 51% of YPF's shares held by Repsol "subject to expropriation" and under "temporary occupation" by the Republic. JA__ [*Id.*, ¶¶36–37].

The Public Interest Law also required the Argentine agency responsible for regulating the national stock market, the Comisión Nacional de Valores ("CNV"), to "call a shareholders' meeting," which was held on June 4, 2012. JA__ [*Id.*, ¶¶37–40]. The then-President of the CNV presided over the shareholders' meeting as required by Article 13 of the Public Interest Law. JA__ [*Id.*, ¶40].

At the shareholders' meeting, multiple YPF shareholders — but not Plaintiffs — objected to the Republic voting the occupied YPF Class D shares,

[2] Eton Park owned 11.95 million of YPF's 393.312793 million outstanding shares. JA__ [Dkt.364-29, ¶13, Ex. 2 n.[C]] (Fischel).

including on the basis that the shares did not grant any voting right under Bylaws Section 7(h) because the Republic had not conducted a tender offer. JA__ [*Id.*, ¶¶41–42]; JA__ [Dkt.390, ¶41]. The CNV's then-President explained that the requirements and purpose of the Public Interest Law provided for the Republic's vote. JA__ [Dkt.370, ¶41]; JA__ [Dkt.390, ¶41]. Some shareholders — again, not Plaintiffs — then pursued claims in Argentine courts, including for a court order to compel the Republic to make a tender offer. Rep. Br. 15–17.

A few months later, in July 2012, Petersen filed for insolvency, having defaulted in May 2012 on the loans financing its acquisition of YPF shares. JA__ [Dkt.370, ¶49]; JA__ [Dkt.389, ¶¶84–89]. Its insolvency administrator did not name YPF as a potential defendant in its liquidation plans, which were filed in October 2014. JA__ [Dkt.370, ¶¶50–51].

The Republic's expropriation of the 51% of YPF shares held by Repsol was completed in May 2014 pursuant to a settlement agreement with Repsol. JA__ [*Id.*, ¶48]; JA__ [Dkt.390, ¶48]. The Republic did not conduct a tender offer under Sections 7 and 28 of the Bylaws. JA__ [Dkt.370, ¶44].

## II. Procedural History

### A. The District Court Grants in Part and Denies in Part YPF's Motion to Dismiss.

On March 4, 2015, Petersen, a former holder of YPF ADRs, sold all claims related to the expropriation to Prospect Investments LLC, a wholly-owned

subsidiary of Burford Capital LLC, which is pursuing the claims on Petersen's behalf. JA__ [Dkt.370, ¶54]. Just a month later, on April 8, 2015, Petersen filed suit against the Republic and YPF for breach and anticipatory breach of contract, breach of the implied duty of good faith and fair dealing, and promissory estoppel. JA__ [Dkt.377-43, ¶¶50–85]. Petersen alleged that YPF breached supposed obligations to enforce the tender-offer provisions and penalties on shares acquired in violation of those provisions. SA42–43.

YPF filed a motion to dismiss Petersen's complaint, which the district court granted in part and denied in part. SA1. The district court granted YPF's Rule 12(b)(6) motion to dismiss the promissory estoppel claim because Petersen had not identified a promise "distinct from the obligations imposed by the Bylaws" and because Petersen's expert conceded that "in Argentina, the doctrine of estoppel is not an autonomous source of obligation[s]." SA46 (emphasis omitted). The district court also dismissed the implied duty of good faith and fair dealing claim (which Plaintiffs have since abandoned), but permitted the contract claim to proceed to discovery. SA42–45. The district court denied YPF's Rule 12(b)(1) challenge to jurisdiction under the FSIA, finding "the substance of the allegations" and "gravamen of the Complaint" fell within the FSIA's commercial-activity exception. SA11–19. Two months after the district court's ruling, Eton Park, another former holder of YPF ADRs, brought claims against the Republic and YPF

that track Petersen's, except that Eton Park did not file a claim for promissory estoppel. JA__ [Dkt.377-44, ¶¶47–74].

### B. This Court Affirms, on Interlocutory Appeal, that the "Gravamen of Petersen's Claims" Falls Within the FSIA's Commercial-Activity Exception.

The district court's rulings on the motion to dismiss were non-appealable with the exception of YPF's "immunity from suit under the FSIA," which this Court reviewed "under the collateral order doctrine." *Petersen*, 895 F.3d at 211. Consistent with its limited scope of review, this Court assessed the "gravamen of Petersen's claims" as pleaded and its "theory of the case" and affirmed the district court's legal determination that the complaint's allegations against YPF concerned commercial activity with a direct effect in the United States. *Id.* at 210. The Court declined to reach the act-of-state defense, which the district court had certified for appeal, because it involved "a merits determination that turns on the facts." *Id.* at 212.

### C. The District Court Grants Summary Judgment for YPF, Concluding that the Bylaws Do "Not Impose an Obligation on YPF to Enforce" the Tender-Offer Provisions.

Following discovery, Plaintiffs and YPF cross-moved for summary judgment as to Plaintiffs' claims against YPF. SA91–92. The district court granted YPF's motion, and denied Plaintiffs', dismissing Plaintiffs' claims against YPF in full. SA151. Applying Argentine law, the district court concluded that the

unambiguous language of the Bylaws does "not impose an obligation on YPF to enforce Sections 7 and 28." SA108. The district court reasoned that "the Bylaws are quite clear when an affirmative obligation is imposed and on whom it is imposed" and "are careful to specify who owes what obligations and under what circumstances — including as to 'the Corporation' itself," and that Plaintiffs did not "point to any language imposing an affirmative obligation on YPF." SA110–12. The court concluded that "Sections 7 and 28 are unambiguous and do not impose any duty on YPF." SA112.

In granting YPF summary judgment, the district court rejected each of Plaintiffs' contentions regarding how to interpret the Bylaws. The district court rejected Plaintiffs' contention that this Court had decided the merits of Plaintiffs' contract claims on interlocutory review, reasoning that this Court had only "considered whether [the District] Court's denial of YPF's motion to dismiss on sovereign immunity grounds was proper, not whether the claims themselves were meritorious." SA108. The district court also rejected Plaintiffs' argument that "nobody" would enforce the tender-offer provisions if not YPF, explaining that the absence of an obligation on YPF "does not mean those provisions were unenforceable or without consequence." SA112. The district court also found that Plaintiffs had identified no basis to hold YPF liable as a "guarantor" under Argentine law. SA114.

The district court also "decline[d] to consider whether Plaintiffs' promissory estoppel claims should be revived absent a proper application and briefing." SA113 n.6. But it expressed skepticism that Plaintiffs would be able to reassert promissory estoppel claims, in part because their expert had previously acknowledged that Argentine law does not recognize promissory estoppel as an autonomous source of obligations. *Id.*

Following YPF's dismissal, the district court held a trial on a limited set of contested factual issues necessary to determine damages against the Republic. After the district court found in favor of Plaintiffs and awarded judgment, JA__ [Dkt.418], the Republic noticed its appeal, JA__ [Dkt.504]. Plaintiffs' cross-appeal and YPF's conditional cross-cross-appeal from the district court's decision on damages followed. SA89–152, 188–91; JA__ [Dkt.509]; JA__ [Dkt.511].

## SUMMARY OF ARGUMENT

The district court was correct to grant summary judgment in favor of YPF on Plaintiffs' breach-of-contract claims and to dismiss Petersen's promissory-estoppel claim.

**I.A.** The district court properly concluded that, under the plain and unambiguous terms of the Bylaws, YPF was not obligated to make a tender offer, to force an acquirer to make a tender offer, or to penalize an acquirer who failed to make a tender offer. Even assuming that Plaintiffs' breach-of-contract claims are

cognizable under Argentine law, a claim for breach of contract is governed by the plain terms of the operative agreement. Courts enforce contracts according to their terms and will not import obligations that are not specified in the text.

Plaintiffs fail to identify any language in the Bylaws imposing the obligations that they claim YPF breached. They ask this Court to disregard the text itself, and rely on Plaintiffs' version of "common sense" or extra-contractual "context" to conclude that YPF had unwritten obligations, including to "enforce" the tender-offer provisions. This self-serving argument contravenes the primacy of unambiguous text under Argentine law. The Bylaws' text is clear. Under the Bylaws — including their particular terms and overall structure, read as a whole and on their face as contract law requires — YPF had none of the obligations that Plaintiffs allege, including with respect to "enforcement." Plaintiffs' additional argument that this Court already decided the merits in their favor when deciding YPF's jurisdictional appeal is plainly wrong. That is not something this Court did, or could do, on its interlocutory, collateral-order review.

**I.B.** Alternatively, although not reached by the court below, this Court could affirm summary judgment for YPF on Plaintiffs' contract claims because as a matter of law and undisputed fact, Plaintiffs cannot show that any breach of an obligation by YPF caused them harm.

Causation is an essential element of Plaintiffs' claims. To prevail, Plaintiffs must show not only a contractual obligation by YPF and its breach, but a direct causal link between YPF's alleged breach and their purported damages. That is something Plaintiffs cannot prove. Plaintiffs' own expert testified that YPF had no ability to force the Republic to make a tender offer, and Plaintiffs have no evidence of any action that YPF could have taken that would have caused Plaintiffs to receive a tender offer. ***As to YPF***, they cannot prove causation because they cannot identify any evidence to suggest that ***if*** YPF had performed any obligation, ***then*** Plaintiffs would have received the benefit of a tender offer — and any causation argument lacks credibility in light of Plaintiffs' position that any action would have been "futile." No contract claim against YPF can survive on this record; the absence of any causal link between YPF's alleged breach and Plaintiffs' purported harm independently warrants dismissal.

**I.C.** This Court can affirm judgment in YPF's favor on the further alternative ground that Plaintiffs' claims are not cognizable under Argentine law. The district court rejected Plaintiffs' claims on their own terms, assuming they could bring breach-of-contract claims against YPF under Argentine law and dismissing them for lack of merit. Under Argentine law and in Argentine courts, however, the claims fail at the very threshold for at least two additional reasons: ***first***, Argentine law does not recognize a breach-of-contract claim against a

corporation under its bylaws for money damages; shareholders alleging bylaw violations must sue under the Argentine General Corporate Law ("GCL"), not for breach of contract; and ***second***, Argentine public law provided for the Republic's vote of the shares, which superseded enforcement of any alleged obligation to enforce the Bylaws' penalty provision against the Republic. Either of these fundamental defects warrants dismissal under Argentine law.

**II.** The district court properly dismissed Petersen's promissory-estoppel claim as duplicative, and the subsequent decision granting YPF summary judgment on Plaintiffs' breach-of-contract claims did not revive it. Promissory estoppel is not an autonomous source of obligation under Argentine law in these circumstances, as Plaintiffs' expert has conceded.

**III.** As to YPF's conditional cross-cross-appeal, the district court should have approached any damages award by assessing damages in pesos on the breach date and converting to dollars on the judgment date, pursuant to New York's statutory judgment-day rule. This issue should not affect YPF, as it has no liability and its dismissal should be affirmed, but the quantum is sufficiently significant that YPF conditionally cross-cross-appeals to safeguard against even a low risk of corporate exposure to the district court's approach to damages.

## STANDARD OF REVIEW

This Court reviews a grant of summary judgment *de novo*, applying the same standard that the district court applied when it granted summary judgment. *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 546 (2d Cir. 2010). Plaintiffs bear the burden of proof on the elements of their claims against YPF, and summary judgment is mandated against Plaintiffs where they have "fail[ed] to make a showing sufficient to establish the existence of an element essential to [their] case, and on which [they] will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). To survive summary judgment, Plaintiffs must come forward with "admissible evidence sufficient to raise a genuine issue of fact for trial" or demonstrate that YPF is not entitled to "judgment as a matter of law." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008).

The interpretation and application of foreign law is a legal question, which this Court reviews *de novo*. *Animal Sci. Prod., Inc. v. Hebei Welcome Pharm. Co.*, 585 U.S. 33, 42 (2018); *Branch of Citibank, N.A. v. De Nevares*, 74 F.4th 8, 14 (2d Cir. 2023). This Court reviews *de novo* legal questions and mixed questions of law and fact regarding damages. *Iroquois Master Fund, Ltd. v. Quantum Fuel Sys. Techs. Worldwide, Inc.*, 641 F. App'x 24, 25 (2d Cir. 2016) (citing *Roberts v. Royal Atl. Corp.*, 542 F.3d 363, 367 (2d Cir. 2008)).

This Court "may affirm on any basis that finds support in the record." *Tolbert v. Smith*, 790 F.3d 427, 434 (2d Cir. 2015).

## ARGUMENT[3]

### I. The District Court Was Correct to Grant Summary Judgment for YPF on Plaintiffs' Contract Claims.

The district court correctly concluded that, even assuming that Plaintiffs could bring breach-of-contract claims against YPF under the Bylaws, Plaintiffs cannot show a contractual obligation on the part of YPF. For that reason alone, this Court should affirm.[4]

#### A. The District Court Correctly Held that the Bylaws Are Unambiguous and Do Not Impose Any Obligation on YPF to Compel a Tender Offer or Impose Penalties.

Plaintiffs' core claims against YPF are for alleged breach of contract based on YPF's Bylaws. The district court reviewed and rejected Plaintiffs' contract claims against YPF because, even when accepting the premise that the Bylaws could give rise to contractual obligations against the corporation (which under Argentine law, as explained below, they do not), the court found that they do not impose on the Company the particular obligations that Plaintiffs assert here. Examining the plain and unambiguous terms of the Bylaws, the court concluded

---

[3] YPF adopts and incorporates by reference the Republic's arguments in its briefs on appeal.

[4] It is undisputed that Plaintiffs' claims are governed by Argentine law. *See* SA85 ("All agree that Argentine law applies to this action[.]").

that they impose no duty on the Company to enforce a tender offer, penalize acquired shares, or otherwise compel an alleged tender-offer obligation. The district court's conclusion that "YPF was not obligated to enforce Sections 7 and 28" of the Bylaws is correct and should be affirmed. SA114.

Plaintiffs now disregard this analysis and the text of the Bylaws in favor of a broad retelling of YPF's history and their own supposed expectations. Although Plaintiffs ask this Court to find that YPF made its "own commitment" under the Bylaws in connection with the tender offer, they never identify or quote any such "commitment" in that text, much less any provision that ***the Company*** "shall" enforce the tender-offer provisions or penalties. Pls. Br. 83, 85–86. Instead, Plaintiffs appeal to a self-serving notion of "common sense" and speculate that a company obligation is "obvious" and "so clear from context" that the Bylaws do not need to spell it out. *Id.* at 85, 87–88. But assumptions and guesswork are no substitute for plain and unambiguous terms. Under Argentine law, the utter lack of textual basis for Plaintiffs' claims is fatal. If the Bylaws are to be enforced as a contract, as Plaintiffs contend, they must be read as one and limited to their terms.

**1. Argentine Law Requires that Contracts Are Interpreted According to Their Plain and Unambiguous Terms.**

This Court — like the district court — should interpret the Bylaws' provisions according to their plain and unambiguous terms, in assessing Plaintiffs' claims for breach of contract against YPF. Plaintiffs do not dispute that "to

determine the parties' obligations" under a contract, "Argentine law looks first to the plain language of the agreement, interpreted in the context of the agreement as a whole[.]" SA109–10 (citing JA__ [Dkt.377-54, Arts.217–18]); JA__ [Dkt.377-56, p.23] (Argentine Supreme Court of Justice, *Mevopal S.A. v. Banco Hipotecario Nacional*, 1985). A clear and unambiguous provision must be enforced according to its literal terms and "cannot be modified by interpretations based on the spirit of the clauses, presumed intention of the parties or the purposes pursued[.]" JA__ [Dkt.377-57, p.4] (Argentine National Commercial Court of Appeals, *Motta v. Abraxas Construcciones*, 1997); *see also* JA__ [Dkt.377-55, p.6] (Argentine Supreme Court of Justice, *Juan Carlos Sicaro v. YPF*, 1991) ("When the terms or expressions used in a contract are clear and conclusive, one has no option but to apply them, without the need for additional interpretative work."); JA__ [Dkt.377-56, p.17] (*Mevopal*) ("When the terms or expressions used in a contract are clear and final[,] one should only restrict oneself to application thereof, an additional hermeneutical task being unnecessary."); JA__ [Dkt.377-31, ¶¶20–22, 24, 37] (Manóvil) (explaining "the primacy of ordinary meaning" for "interpreting commercial contracts" and that, absent ambiguity, "[r]eference to purpose and intent is impermissible").

These principles have particular import when construing a company's bylaws. Extrinsic assertions of intent or purpose are illogical because bylaws are

plurilateral. *See* JA__ [Dkt.377-31, ¶18] (Manóvil) (explaining that it is "impracticable" to consider "what every shareholder understood or could have understood about the impersonal set of rules in the Bylaws when they purchased or transferred shares"); JA__ [Dkt.377-30, 159:6–25] (Kemelmajer) (explaining that the intention of the parties is even less relevant to interpreting bylaws because they "may change over time so the original shareholders may not be there anymore"). In no case has an Argentine court "***inferred*** a company's obligations from its bylaws." JA__ [Dkt.377-27, ¶45] (Kemelmajer) (emphasis added). Rather, it is "fundamental" to "see what the bylaws say and who the bylaws hold liable." JA__ [Dkt.377-30, 105:20–24] (Kemelmajer).

#### 2. Sections 7 and 28 of the Bylaws Did Not Obligate YPF to Enforce the Tender-Offer Requirement or Penalties.

Plaintiffs rely on Sections 7(d)–(f), 7(h), and 28 of the Bylaws to say that "YPF's contractual obligation to enforce the tender-offer requirements is clear," Pls. Br. 85, but those provisions include no such obligation on YPF.

##### a. Section 7(d)–(f)

Section 7(d) addresses the acquisition of YPF shares and provides that:

> [i]f the terms of subsections e) and f) of this section are not complied with, it shall be forbidden to acquire shares or securities of the Corporation . . . if, as a result of such acquisition, the purchaser becomes the holder of, or exercises the control of, class D shares of stock of the Corporation [which together with its prior holdings exceed certain percentages]

JA__ [Dkt.377-1, §7(d)]. Section 7(d) specifies only that a "***purchaser***" may not exceed the specific thresholds without complying with sections 7(e) and 7(f); it imposes no obligation on YPF, the issuer. JA__ [*Id.*, §7(d)] (emphasis added).

Next, Section 7(e) specifies that "[t]he person wishing to [] Takeover," through an acquisition of shares, defined as "***the Bidder***," must do two things: "(i) Obtain the prior consent of the special shareholders' meeting of class A shareholders; and (ii) Arrange a takeover bid for the acquisition of all the shares of all classes of the Corporation and all securities convertible into shares." JA__ [*Id.*, §7(e)] (emphasis added). Under its plain terms, Section 7(e) makes no reference to any action to be taken by YPF, and it imposes no obligations on YPF. Even Plaintiffs' expert acknowledged that Section 7(e) applies to "the Bidder," not YPF. JA__ [Dkt.377-32, 154:11–155:6] (Rovira).

Section 7(f) lays out the required tender-offer procedures and imposes only one administrative obligation on YPF. It provides that "[e]ach takeover bid shall be conducted in accordance with the procedure herein stipulated," and enumerates, in Subsections 7(f)(i)–(ix), the specific procedures required for the tender offer. JA__ [Dkt.377-1, §7(f)]. Among other things, Section 7(f)(i) specifies that:

- "***The Bidder*** shall notify ***the Corporation*** in writing about the takeover bid at least fifteen business days in advance to the starting date thereof," and

- "***The Corporation*** shall be notified about all terms and conditions of any agreement . . . that the Bidder might have entered into or might intend to enter into" prior to launching the bid.

JA__ [*Id*., §7(f)(i)] (emphasis added). Subsections 7(f)(i)(A)–(G) specify what the Bidder's notice to the Corporation must include. And Subsections 7(f)(ii)–(iv) provide for certain events to follow after the Company receives notice from the Bidder, including that:

- "***The Board of Directors*** shall call [a] special meeting of class A shares of stock . . . to be held ten business days following the receipt by the Corporation of the notice";
- "***The Corporation*** shall send by mail to each shareholder or holder of securities convertible into stock, at the Bidder's cost and expense, and with reasonable due diligence, a copy of the notice delivered to the Corporation"; and
- "***The Bidder*** shall send by mail or otherwise deliver, with reasonable due diligence, to each shareholder or holder of securities convertible into stock who shall so request, a copy of the notice delivered to the Corporation and shall publish a notice containing substantially the [same] information" in major newspapers in Argentina and New York City.

JA__ [*Id*., §7(f)(ii)–(iv)] (emphasis added). The only obligation applicable to YPF is that it shall, if it receives a notice of tender offer, perform the administrative task of mailing that notice to shareholders. Plaintiffs' expert admitted that the Bylaws do not "identif[y] the corporation here as a specific subject of an obligation in 7(f)" other than the limited administrative duty to forward the Bidder's notice after receipt. JA__ [Dkt.377-33, 355:5–356:4, 359:10–360:13, 360:21–361:2] (Garro).

Sections 7(d), (e), and (f) are clear and unambiguous and impose no obligation on YPF to act in the absence of notice by a Bidder or, on receipt of notice of a bid, to do anything other than a narrow administrative task. JA__ [Dkt.377-1, §7(d), (e), (f)]; *see also* JA__ [Dkt.377-27, ¶¶25–26, 32] (Kemelmajer) (explaining the absence of any provision "imposing the purported obligations on YPF"); JA__ [Dkt.377-58, ¶6] (Manóvil) ("YPF's obligations with regard to the tender offer were exclusively limited to administrative duties set forth in Section 7(f)(iii)"). The provisions plainly and explicitly state at every step who is obligated to do what — "[t]he Board of Directors shall," "[t]he Corporation shall," "[t]he Bidder shall" — and do not impose an obligation on YPF to conduct or enforce a tender offer.

**b. Section 7(h)**

Section 7(h) provides that "***[s]hares of stock and securities*** acquired in breach of the provisions of subsections 7(c) through 7(g), both included, of this section, ***shall not grant any right*** to vote or collect dividends or other distributions[.]" JA__ [Dkt.377-1, §7(h)] (emphasis added). Again, this section imposes no obligation on YPF. The provision itself strips voting and certain other rights from shares acquired in excess of the established limits; no action by YPF is specified or required.

### c. Section 28

Section 28 extends certain requirements of Section 7 to certain acquisitions of YPF securities by the Republic. JA__ [Dkt.370, ¶14]. It states that "[t]he provisions of subsections (e) and (f) of Section 7 . . . shall apply to all acquisitions made by the National Government [of Argentina], whether directly or indirectly . . . if, as a consequence of such acquisition, the National Government becomes the owner, or exercises the control of, the shares of the Corporation, which . . . represent, in the aggregate, at least 49% of the capital stock[.]" JA__ [Dkt.377-1, §28(A)]. Section 28 also applies the penalties provision of Section 7(h) to the National Government. JA__ [*Id.*, §28(C)]. Section 28 focuses on obligations of the Republic and says nothing about any obligation or requirement directed at YPF.

### d. The Bylaws Are Clear When Specifying Obligations and Impose No Relevant Obligations on YPF.

As evidenced above, the Bylaws consistently and explicitly specify ***who*** is obligated to do ***what***, without imposing any of the obligations alleged by Plaintiffs on YPF. When the Bylaws imposed an obligation on YPF, or on anyone else, they said so. For example: "***the Bidder*** . . . shall . . . [a]rrange a takeover bid" and "notify the Corporation in writing"; "***[t]he Corporation*** shall send" the notice by mail; and "***[t]he Board of Directors*** shall call [a] special meeting of class A shares of stock[.]" JA__ [Dkt.377-1, §7(e)(ii), (f)(i)–(iii)] (emphasis added). The same is

true elsewhere in the Bylaws. For example: "***[e]ach Regular Director*** shall furnish a bond"; "***[t]he Board*** shall meet at least once a quarter"; "***the Chairman of the Board*** . . . shall call a meeting of the Board at any of the director's request." JA__ [*Id*., §§12, 15] (emphasis added).

By consistently and explicitly naming who is obligated to do what, the Bylaws limit each party's affirmative obligations to those specified by its terms. As the district court explained:

> The fact that the Bylaws are careful to specify who owes what obligations and under what circumstances — including as to "the Corporation" itself — demonstrates that the Bylaws impose no affirmative obligation requiring YPF to enforce the relevant Bylaw provisions when the Bylaws do not say so. Read in context, Sections 7 and 28 are unambiguous and do not impose any duty on YPF.

SA111–12. The district court's interpretation did not "negate[]" any "promises" in the Bylaws, *contra* Pls. Br. 83; it held only that, consistent with the Bylaws' text, the "promises" Plaintiffs allege and attempt to enforce would belong to others, not to YPF.

Plaintiffs ignore this reasoning in quoting a litany of "shall" clauses — none of which imposed obligations on YPF. Plaintiffs quote segments of provisions stating that the tender-offer provisions "shall apply to all acquisitions made by ***the National Government***;" "[e]ach ***takeover bid*** shall be conducted in accordance with the procedure herein stipulated and, to the extent . . . applicable . . . additional

or stricter requirements shall be complied with;" "it shall be forbidden to acquire shares or securities of the Corporation . . . if, as a result of such acquisition, ***the purchaser***" exceeds percentages of holdings without complying with the tender-offer requirement; and "in the case of ***the National Government***," absent certain exceptions, "[t]he penalties provided for in subsection (h) of Section 7 shall be" applied. *See* JA__ [Dkt.377-1, §§7(d), 7(f), 28(A), 28(C)] (emphasis added); *see also* JA__ [Dkt.363-1, pp.6–7, 12, 29–30]; Pls. Br. 85–86 (quoting JA__ [Dkt.363-1, pp.6–7, 12, 29–30]). That these provisions were "written in mandatory terms," Pls. Br. 85–86, is of no moment, as they mandated obligations on ***others***, not YPF.

None of Plaintiffs' Argentine-law experts, *see* Pls. Br. 85, could identify any affirmative obligation on YPF under the Bylaws or Argentine law regarding Plaintiffs' tender-offer claims. They offered nothing more than generalized obligations wholly untethered to the Bylaws. Professor Rovira asserted that YPF had an obligation to "alert[]" the Republic of the tender-offer requirement, JA__ [Dkt.377-28, ¶27] (Rovira), or to "tr[y] to separate itself or distance itself from the actions carried out by Argentina," JA__ [Dkt.377-32, 142:7–10] (Rovira), and Professor Garro suggested that YPF should have made "a statement" reminding the Republic of the tender-offer requirement, JA__ [Dkt.377-33, 403:9–25] (Garro). Understandably, Plaintiffs do not repeat these musings to this Court, as they provide no support for their claims.

#### 3. Plaintiffs' Attacks on the District Court's Interpretation Fail.

##### a. Plaintiffs Rely on Conjecture and Do Not Identify Any Textual Basis for Their Claims.

Plaintiffs' appeal disregards both the text of the Bylaws and the district court's opinion, and asks this Court to rely on Plaintiffs' intuition and guesswork instead. This Court should reject that invitation, as it is flawed at every step.

To start with, Plaintiffs' core argument that the district court based its decision on the Bylaws' supposed use of the "passive voice," Pls. Br. 86–89, mischaracterizes the opinion below. The district court entered judgment dismissing YPF not because of the "passive voice," *id.*, but because it found that the plain and unambiguous text of the Bylaws, considered on their face and as a whole, do not impose the obligations on YPF that Plaintiffs allege, SA109–12. In dismissing the claims, the court did precisely the kind of interpretation of plain and unambiguous terms that contract claims require. *Id.* It noted that none of the provisions on which Plaintiffs rely obligate YPF to take the actions Plaintiffs allege, and that Plaintiffs did not "point to any language imposing an affirmative obligation on YPF." SA110.

Plaintiffs attempt to avoid this clear textual barrier to their contract claims by arguing that the YPF obligation is "so clear from context" that it needs no statement in the text. Pls. Br. 88. They argue that "context" alone made it clear

that YPF was the party obligated to enforce Section 7(h)'s penalties because YPF was, in their view, "the only party that could do so." Pls. Br. 87.

That argument, too, is meritless. The relevant "context" for any claim for breach of contract is the four corners of the alleged agreement — which Plaintiffs contend is the Bylaws. *See* Pls. Br. 83–85. The Bylaws are what the district court examined, and correctly found provide no basis for these claims. SA109–12. The district court did not stop when it found that Plaintiffs had failed to point to any affirmative obligation. SA109. It ***continued*** its analysis of the particular terms and overall structure of the Bylaws to find that "in both the relevant provisions and the Bylaws more generally, the Bylaws are quite clear when an affirmative obligation is imposed and on whom it is imposed, and this context renders those provisions unambiguous." SA111. It adhered to Argentine law, which holds that unambiguous text like this "cannot be modified by interpretations based on the spirit of the clauses, presumed intention of the parties or the purposes pursued." JA__ [Dkt.377-57, p.5] (*Motta*). It considered each provision in turn — and who it specified to act — and found that by their plain text the "Bylaws impose no affirmative obligation requiring YPF to enforce the relevant Bylaw provisions when the Bylaws do not say so." SA112. It recognized that the Bylaws are "silent" as to Plaintiffs' alleged obligation of YPF and that "[s]ilence does not generally create ambiguity." SA110–11. The district court examined the entire

Bylaws and recounted, as shown above, that they "are careful to specify who owes what obligations and under what circumstances." *Id*. ***That*** is the "context" to which a court may refer on a contract claim, and "[r]ead in context, Sections 7 and 28 are unambiguous and do not impose any duty on YPF." SA112.[5]

Plaintiffs' attempt to impute obligations to YPF that are not specified in the Bylaws is not only improper under Argentine law but also unsupported and wrong. Contrary to Plaintiffs' conclusory argument, YPF was not "obligated to strip rights" under Section 7(h). Pls. Br. 87. The Bylaws govern and impose no such obligation on YPF. Rather, Section 7(h) provides that "[s]hares of stock and securities acquired in breach of the [tender-offer] provisions . . . shall not grant any right to vote or collect dividends or other distributions[.]" JA__ [Dkt.377-1, §7(h)]. The Bylaws deprive shares of voting rights when they are "acquired in breach of the [tender-offer] provisions," JA__ [*Id*.], without any action on the part of the Company. Just as the Bylaws provide that shares, as a default, are entitled to vote and receive dividends, JA__ [*Id*., §6], Section 7(h) provides for the

---

[5] Plaintiffs' citation to U.S. cases interpreting U.S. statutes using "passive voice," *see* Pls. Br. 87, is not only inapposite to the interpretation of an unambiguous purported contract under Argentine law, it is also unavailing because the "context" used to interpret the passive-voice statutory provision was "other parts of the statute." *E. I. Du Pont de Nemours & Co. v. Train*, 430 U.S. 112, 128 (1977); *see also Bartenwerfer v. Buckley*, 598 U.S. 69, 78 (2023) (cited by Plaintiffs but explaining that the "inference to be drawn" from "the absence of [a specific reference to an actor] that is present elsewhere in a statute" is that it "excludes [the actor's] culpability . . . given that [other provisions] expressly hinge on it").

suspension of those rights in specified circumstances. Plaintiffs' expert conceded this point, admitting that Section 7(h) "does not expect the corporation to take explicitly any action." JA__ [Dkt.377-33, 378:19–23] (Garro).

Nor are Plaintiffs correct in asserting that "it is plainly incumbent on the company itself" to enforce Section 7(h) because the district court's reading would "not require ***anyone*** to enforce the tender-offer provisions." Pls. Br. 88 (emphasis in original). Plaintiffs' argument ignores that ***all*** shareholders have the right to enforce the Bylaws, to raise objections, and to pursue remedies under the GCL. Enforcement of penalties "is a matter for YPF's shareholders (not the Company)[.]" JA__ [Dkt.377-27, ¶35] (Kemelmajer). To the extent an acquirer votes a share that has been stripped of its voting rights pursuant to Section 7(h), shareholders "can challenge the meeting's resolutions before Argentine courts pursuant to Article 251 of the GCL." JA__ [*Id.*].[6] Plaintiffs did not take that action, with Petersen admitting that it chose "not to bring a lawsuit against Argentina" in the Argentine courts, including before the statute of limitations expired. JA__ [Dkt.389, ¶¶80–82]; JA__ [Dkt.363-6, p.16]. That Argentine law leaves enforcement to shareholders is not a basis to impute unspoken obligations to YPF.

---

[6] If the Argentine court annuls the resolution pursuant to Article 251 of the GCL, "a dissenting shareholder can seek compensation under Article 254 of the GCL" — though not "from the company." JA__ [Dkt.377-27, ¶36] (Kemelmajer).

Plaintiffs' further objection that the district court "would unreasonably allow YPF to reap the benefit of billions of dollars in international investment without incurring any legal obligations" is false and contradicted by their own admissions. Pls. Br. 87; *see also id.* at 81 (claiming IPO "allowed YPF to raise over a billion dollars from NYSE investors"). Plaintiffs have acknowledged that all proceeds from the IPO went to the Republic and the provinces, not to YPF. *See* JA__ [Dkt.112-2, p.3]; JA__ [Dkt.377-43, ¶13] (alleging IPO "generated proceeds of more than $1.1 billion directly to Argentina as selling shareholder"). Likewise, what investors may have thought about Argentina, its debt, or its government-owned companies in or before the early 1990s does not alter the YPF Bylaws' plain terms; and bald, unfounded assertions that investors "required more than just promises from Argentina itself" and that YPF "[r]ecogniz[ed] [that] problem," Pls. Br. 82, cannot establish liability for breach of contract.[7]

Nor can Plaintiffs impose obligations on YPF with the circular assertion that "every corporation is obligated to abide by its bylaws" (for which Plaintiffs quote this Court's reference to Delaware law, without addressing governing Argentine

[7] Plaintiffs cite no facts in support of this argument, and the record shows that investors placed no importance on the Bylaws' tender-offer provisions. *See, e.g.*, JA__ [Dkt.398-7, ¶¶52, 56, 62, 67, 70] (reviewing contemporaneous analyst reports, press reports, books, and articles and describing absence of discussion of tender-offer provisions as providing significant protection for minority investors in event of expropriation, let alone that compensation would come from YPF directly).

law). *Id*. at 86–87. Plaintiffs' argument disregards the essential legal difference between "abiding by" one's own obligations and "enforcing" the obligations of others; as the district court recognized: "if [YPF] was not obligated to enforce Sections 7 and 28, it could fail to do so and still 'abide' by its Bylaws." SA109.

Plaintiffs' reliance on the Board of Directors' "wide powers" to manage the Company, Pls. Br. 86, is also misplaced. The Board's powers to manage the Company do not create an obligation on the corporation to enforce the tender-offer provisions. Plaintiffs provide no support for this conflation of Directors' duties and obligations on the corporation, relying only on a misleading citation to a footnote in a Plaintiffs' expert report that the "Board of Directors must ensure that shareholders comply with the bylaws" under Argentine law. *Id*. at 85 (quotation marks omitted). Even if the Board had such an obligation, YPF — the corporation — would not, because under Argentine law "a breach of any [directors'] obligation might make the director liable . . . but not the company itself." *See* JA__ [Dkt.377-27, ¶32] (Kemelmajer) (adding that "[e]ven if a company's ***directors*** were required . . . to ensure that the company's shareholders abide by the bylaws, this does not mean that the ***company itself*** has the same obligation, or that the directors' failure to comply with such obligation is attributable to the company" (emphasis in original)).

Purported promises in the Prospectus have no bearing on the interpretation of the Bylaws, contrary to Plaintiffs' suggestion. *See* Pls. Br. 89–90. A court interpreting the Bylaws under Argentine law is limited to its unambiguous text and may not consider extrinsic evidence, as explained above. *See* SA109–10. Plaintiffs do not cite any precedent under Argentine law for a court using extrinsic evidence to interpret corporate bylaws. Nor, as the district court found, do Plaintiffs identify any purported promise that is distinct from the text of the Bylaws: "the alleged representations in these extraneous documents were substantially similar to the alleged promises in the Bylaws," and "are necessarily not inconsistent with YPF's current position." SA112–13. Plaintiffs' suggestion that YPF is "preclude[d]" by "*actos propios*" thus lacks any basis in fact — or in Argentine law, as YPF is not "bringing a claim." Pls. Br. 90.

**b. Plaintiffs' Further Assertions that YPF "Guaranteed" a Tender Offer Are False and Insufficient.**

Unable to locate any textual basis for their contract claims, Plaintiffs rely on vague assertions that YPF "guaranteed" or "assumed responsibility" for an acquirer's tender-offer obligations, but do not even attempt to meet the requirements for guarantor liability. *See* Pls. Br. 82–83 (citing articles of Argentine Civil Code relevant only to the extent a party expressly guarantees another's obligations). As the district court recited, "a company is not a guarantor for its shareholders" under Argentine law "unless: (i) the company expressly

agrees to serve as guarantor; (ii) the company takes a unilateral act that is later ratified by the obligee; or (iii) there is a judicial or statutory mandate requiring the company to act as guarantor." SA113–14; *accord* JA__ [Dkt.377-27, ¶30] (Kemelmajer). Plaintiffs failed to put forward evidence of any such guarantee, and the district court thus found "that YPF was not a guarantor for the Republic's obligations." SA113. Plaintiffs do not contest that determination on appeal, and so it is waived.[8]

To the extent Plaintiffs suggest that YPF nonetheless "guarantee[s]" compensation for bylaw violations generally, apart from the specific bases for guarantor liability, that amorphous theory has no place in corporate law, in Argentina or elsewhere. "[V]iolations of charters or bylaws do not give rise to damages claims against the corporation" because corporations "are regulated by their charters and bylaws; they are ***not*** guarantors of charter or bylaws provisions." JA__ [Dkt.400-1, ¶22] (Pargendler) (emphasis in original). "Under Argentine law, a company is not a guarantor of its shareholders' obligations under the Bylaws." JA__ [Dkt.377-27, ¶¶17(b), 32, 46–48] (Kemelmajer). Plaintiffs' experts

---

[8] *See Med. Computer Sys., Inc. v. United States*, 480 F.3d 621, 625 n.1 (2d Cir. 2007) (argument not raised in opening brief on appeal is waived).

conceded that they were not aware of any Argentine case to the contrary,[9] and Plaintiffs do not say otherwise on appeal.

#### c. Plaintiffs' Position Is Illogical and At Odds with Core Principles of Corporate Law.

Plaintiffs' position is illogical as well as atextual. YPF is a publicly traded company, owned by thousands of shareholders. When shares of YPF are exchanged, YPF is not involved; it does not control when the sale occurs or receive its proceeds. If the Bylaws obligated YPF to backstop an acquirer's tender-offer obligations, they would create a material obligation utterly out of the corporation's control as to timing and funding. Such an unpredictable, material obligation on the corporation would be extraordinary and would have to be crystal clear (as are other, far less consequential obligations).

Plaintiffs' attempt to impose such an obligation on YPF radically departs from core principles of corporate law. "Corporate law conspicuously does ***not*** protect shareholders by giving them far-reaching financial claims against the corporation's assets (*i.e.*, the right to sue the corporation for ***damages*** based on any charter or bylaws violation)"; that would "hurt other shareholders, suppliers, workers, and creditors, as well as jeopardize the corporation's ability to serve as a credible counterparty to other constituencies." JA__ [Dkt.400-1, ¶31] (Pargendler)

---

[9] *See* JA__ [Dkt.377-32, 75:8–12, 77:11–81:22, 82:3–10, 82:18–83:8] (Rovira); JA__ [Dkt.377-33, 142:1–19, 143:5–23, 150:1–17] (Garro).

(emphasis in original). YPF's current "public investors could not have expected to be injured financially by a contract damages claim . . . that is entirely unusual in comparative corporate law and not even facially required by YPF's bylaws." JA__ [*Id.*, ¶46] (Pargendler). Plaintiffs' attempt to hold the target company liable for an acquirer's failure to tender for other shares is extraordinary in its overreach and its disregard for these core corporate principles. Even Plaintiffs' expert acknowledged that Plaintiffs' position is inconsistent with the need to "prevent the company and the shareholders from being exposed to . . . the harmful effects" of one shareholder's non-compliance. JA__ [Dkt.377-32, 87:9–88:7] (Rovira).

This Court should not expose YPF to liability on the basis of a purported obligation absent from the Bylaws' text. Reversal would be wrong as a matter of law, harmful for YPF's current investors, and a dramatic shift in the balance of corporate stakeholders.

**4. This Appeal Is the Court's First Time Deciding the Merits of This Issue.**

The lack of a factual or legal basis for Plaintiffs' breach-of-contract claims against YPF is underscored by Plaintiffs' principal reliance on the erroneous contention that this Court decided the merits of their claims on interlocutory appeal in *Petersen*. *See* Pls. Br. 83–85. Far from "declar[ing] itself free to ignore" *Petersen*, Pls. Br. 84, the district court reviewed the decision and determined that,

not surprisingly, this Court understood the limits to its review and did not purport to decide the ultimate merits. SA108–09.

In *Petersen*, this Court's sole remit — and sole basis for appellate jurisdiction — was to review the district court's denial of the Republic's and YPF's Rule 12(b)(1) motions to dismiss for lack of subject-matter jurisdiction under the FSIA pursuant to the collateral-order doctrine. *See* 895 F.3d at 211 (noting that "we have appellate jurisdiction over the issue of the defendants' immunity from suit under the FSIA under the collateral order doctrine"). Under that doctrine, review is available only to resolve an issue "completely separate from the merits of the action." *Will v. Hallock*, 546 U.S. 345, 349 (2006). Consistent with that limitation, the FSIA jurisdictional determination is based on the "gravamen" of the plaintiff's claim, which are "those elements of a claim that, ***if proven***, would entitle a plaintiff to relief ***under his theory of the case***." *OBB Personenverkehr AG v. Sachs*, 577 U.S. 27, 34–35 (2015) (emphasis added, quotation marks omitted). A court reviewing the application of the FSIA on a Rule 12(b)(1) motion thus only determines whether a complaint "allege[s] facts sufficient to establish an exception to sovereign immunity[.]" *Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*, 813 F.3d 98, 107–08 (2d Cir. 2016). As Petersen itself argued, a "merits defense" "would not properly be before

this Court on interlocutory appeal from a denial of sovereign immunity." JA__ [16-3303, Dkt.80, pp.46–47].

This Court's decision in *Petersen* followed that required non-merits approach and assessed solely the "gravamen of Petersen's claims" and its "theory of the case" to determine whether the FSIA's commercial-activity exception applied to YPF. *Petersen*, 895 F.3d at 210. Plaintiffs mischaracterize this Court's recitations of Petersen's "theory" of liability and what "[t]he complaint alleges," *id*., as "holding[s]," Pls. Br. 83–84. This Court determined only whether the claims as alleged constituted commercial activity with a direct effect in the United States, not whether Plaintiffs had proven those alleged claims under Argentine law. *Contra id.* at 84–85. As Judge Winter noted in his concurrence, the majority concluded "that the facts alleged in the complaint do not state a claim that implicates a sovereign, rather than commercial, act[.]" *Petersen*, 895 F.3d at 213 (Winter, J., concurring in part, dissenting in part). As the district court concluded, *Petersen* did not consider "whether the claims themselves were meritorious" and did not make any "binding conclusion that YPF had, pursuant to the language of the Bylaws and as a matter of Argentine law, the obligation to enforce the relevant Bylaws provisions." SA108–09.

Because this Court could not and did not determine whether Plaintiffs had proved the merits of their "theory" of liability under Argentine law, Plaintiffs'

attempt to avoid their burden of proof via law of the case is misplaced. That doctrine applies only to matters "decided by the appellate court" and "resolved by the appellate court's mandate." *Sompo Japan Ins. Co. of Am. v. Norfolk S. Ry. Co.*, 762 F.3d 165, 175 (2d Cir. 2014) (quotation marks omitted). Plaintiffs' citation to *Havlish v. 650 Fifth Avenue* is not to the contrary,[10] as it applied law of the case not to any purported interlocutory merits determination but instead to a determination that the FSIA barred certain claims. Now that this Court is presented for the first time with the substantive merits of Plaintiffs' claims, it should affirm their dismissal.

### B. Alternatively, Plaintiffs' Breach-of-Contract Claims Fail for Lack of Causation.

In the alternative, and as an independent basis for affirmance, Plaintiffs' contract claims also fail because Plaintiffs cannot possibly establish causation as to YPF. It is undisputed that causation is an element of a contract claim under Argentine law; as Plaintiffs' expert stated, "any contractual claim for civil liability requires . . . that the breach was the cause of the detrimental effect to the prejudiced party[.]" JA__ [Dkt.377-28, ¶22] (Rovira). Plaintiffs bear the "burden to prove a causal link between YPF's conduct and their alleged damages." JA__

[10] Pls. Br. 85 (citing *Havlish v. 650 Fifth Avenue*, 934 F.3d 174, 182 (2d Cir. 2019)).

[Dkt.377-27, ¶60] (Kemelmajer).[11] Plaintiffs' contract claims against YPF fail because they have no evidence to support, and cannot prove, that if YPF had performed any alleged obligation, then "in the natural and ordinary course of things," Plaintiffs would have received and executed on a tender offer from the Republic. *See* JA__ [*Id.*, ¶101] (Kemelmajer); *see also* JA__ [*Id.*, ¶¶46, 60–65, 78–81] (Kemelmajer) (Plaintiffs must show that YPF was "able to prevent and avoid" Plaintiffs' claimed harm).

In opposing YPF's motion for summary judgment on causation, and on appeal, Plaintiffs have not pointed to ***any*** evidence suggesting, much less proving, that the Republic would have conducted a tender offer if only YPF had "alerted" the Republic of its purported obligations, attempted to "enforce" the purported obligations, or "distanced itself" from the Republic's conduct, or if it had somehow acted to penalize the Republic pursuant to Bylaws Section 7(h). Plaintiffs' expert, Professor Garro, admitted that YPF "could not force Argentina to do anything."

---

[11] At the very least, Plaintiffs' failure to prove causation requires that, if this Court disagrees with the district court's determination on YPF's lack of a contractual obligation, it should vacate instead of reverse. As YPF argued to the district court, summary judgment that Plaintiffs have established causation would be inappropriate because, among other reasons, the question of the ability to finance the tender offer Plaintiffs allege was required is both material and vigorously disputed by YPF. *See* JA__ [Dkt.399, p.16]; *see, e.g.*, *In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 69 (2d Cir. 2012) (denying summary judgment given disputed issue of material fact as to causation); *Creative Waste Mgmt., Inc. v. Capitol Envl. Servs.*, Inc., 429 F. Supp. 2d 582, 610–11 (S.D.N.Y. 2006) (same).

JA__ [Dkt.377-33, 403:7–25] (Garro). YPF's expert, Dr. Kemelmajer, agreed: "YPF had no means of forcing the Republic to offer to purchase the remaining outstanding shares for a set price." JA__ [Dkt.377-27, ¶80] (Kemelmajer). Dr. Kemelmajer was "not aware of any legal avenue that the Company could have taken to compel the sovereign republic to tender to purchase shares[.]" JA__ [*Id.*] (Kemelmajer). Plaintiffs have not identified any. And Plaintiffs have not come forward with any facts — much less undisputed facts — to show that any action or inaction by YPF could have altered the outcome here. *See* Pls. Br. 85–89. They again resort to hypotheticals and disregard the record and expert testimony that create material questions of fact as to the timing and terms of any hypothetical tender offer. As Argentina's former Secretary of Finance, Daniel Marx, opined, considerations outside of YPF's control or ability to influence factored largely in whether any such offer would be made. *See generally* JA___ [Dkt.364-51, ¶¶91–161] (Marx). Plaintiffs offer no evidence to meet their burden to prove that the Republic would have issued a tender offer notwithstanding those consequences if only ***the Company*** had taken some alleged action. Under Argentine law, Plaintiffs' failure to show causation by YPF "is fatal to their claims against YPF." JA__ [Dkt.377-27, ¶60] (Kemelmajer).

Nor can Plaintiffs show that YPF could have imposed penalties under Section 7(h) in the first place. In any event, it is up to the shareholders — not the

Company — to enforce the penalties in Section 7(h) of the Bylaws if necessary. JA__ [*Id.*, ¶35] (Kemelmajer). Plaintiffs made a conscious decision not to object to or challenge the intervention or the Republic's exercise of voting rights at the June 4, 2012 shareholders' meeting or elsewhere — an act they could have taken at the time, but did not. Moreover, the relevant shareholders' meeting was called and presided over by the then-President of the CNV, who determined that the Public Interest Law provided for the Republic to vote the shares under temporary occupation. JA__ [Dkt.370, ¶¶37–41]; JA__ [Dkt.390, ¶¶37–41]. The mandate of CNV "to convene and preside" over the shareholders' meeting, in which YPF took no part, further "removed any causal link between YPF's alleged misconduct and the alleged Tender Offer Damages." JA__ [Dkt.377-27, ¶82] (Kemelmajer).[12]

In their opening brief to this Court, Plaintiffs all but admit that they cannot prove causation against YPF. Plaintiffs do not allege and offer no facts to show that any action or inaction ***by the Company*** drove their receipt (or not) of a tender offer; they argue just the opposite, repeatedly contending that "the record makes unambiguously clear" that it would have been "futile" for YPF to try to cause the

[12] Plaintiffs initially alleged that YPF breached duties to them by "failing to distribute dividends to YPF's shareholders," JA__ [Dkt.377-43 ¶ 71], but abandoned the claim because any distribution of dividends is subject to authorization by a vote of YPF's shareholders, and no such authorization occurred at the time, JA__ [Dkt.377-34, ¶¶131–33] (Manóvil).

Republic to tender for Plaintiffs' shares. Pls. Br. 60. On their own theory, Plaintiffs cannot show that YPF's alleged breach caused their harm.

### C. Alternatively, Plaintiffs' Contract Claims Are Not Cognizable Under Argentine Law.

As another alternative basis for affirmance, this Court could and should reject the premise of Plaintiffs' claims because they are not cognizable under Argentine Law for at least two fundamental reasons, both of which require dismissal of Plaintiffs' contract claims against YPF.

#### 1. Argentine Law Does Not Recognize a Breach-of-Contract Claim Against a Corporation Under its Bylaws for Money Damages.

Argentine law does not recognize a contractual cause of action against a corporation for damages based on breach of its Bylaws. *See generally* JA__ [Dkt.377-27, ¶¶18–20] (Kemelmajer); JA__ [Dkt.377-65, ¶¶11–22] (Kemelmajer); JA__ [Dkt.400-1, ¶¶28–44] (Pargendler); JA__ [Dkt.377-23, ¶¶66–95] (Manóvil). "[U]nder Argentine law, bylaws do not create a private right of action for a shareholder to bring damages claims against the company for breach of contract." JA__ [Dkt.377-65, ¶15] (Kemelmajer). Corporate bylaws cannot support a breach-of-contract claim for damages against a corporation "because they cannot be enforced in the same way that bilateral contracts are enforced." JA__ [Dkt.377-27, ¶18] (Kemelmajer).

Permitting shareholder "damages claims against the corporation" for bylaw violations is "inimical to the economic logic of the corporate form and the nature of shareholder rights." JA__ [Dkt.400-1, ¶39] (Pargendler).[13] Shareholders are "residual claimants" on a corporation's assets, but the premise of Plaintiffs' claims "would allow shareholders to transform themselves into standard creditors of the corporation (*i.e.*, fixed claimants against the corporation's assets)." JA__ [*Id.*, ¶38] (Pargendler). Corporate law "does not give individual shareholders credit rights" against the corporation because it would "undermine the ability of other shareholders, creditors, workers and other constituencies to rely on the corporation's obligations." JA__ [*Id.*] (Pargendler). That is of particular importance in regimes like Argentina's, where "the shareholder meeting can unilaterally amend the bylaws without the approval of the board of directors" and thus "corporations would not be able to operate as credible contract counterparties" and "long-term economic institutions" if "shareholders were allowed to create fixed monetary claims against corporations for themselves through bylaw provisions." JA__ [*Id.*, ¶8] (Pargendler).

---

[13] Professor Pargendler is a leading expert on comparative corporate law and has "never encountered a precedent allowing a shareholder to sue a corporation for contract damages for failing to ensure that its directors or shareholders comply with a charter or bylaws provision" and knows "of no precedent in any jurisdiction allowing shareholders to sue the corporation for contract damages due to an alleged violation of a tender offer requirement or similar provision included in the corporation's bylaws." JA__ [Dkt.400-1, ¶¶28, 43] (Pargendler).

Under Argentine law, the proper way for shareholders to contest alleged bylaws violations — such as a shareholder improperly voting shares — is an action pursuant to Article 251 of the GCL. *See* JA__ [Dkt.377-23, ¶¶101–03] (Manóvil); JA__ [Dkt.377-37, pp.79–80] (GCL Arts. 251, 254); JA__ [Dkt.377-65, ¶16] (Kemelmajer). If a shareholder fails to challenge a violation of bylaws in accordance with Article 251, that shareholder is barred from pursuing money damages pursuant to Article 254 of the GCL. Even if a shareholder satisfied Article 251 and could seek damages under Article 254, the damages claim would be restricted to proceeding against the shareholder who violated the bylaws; the shareholder would not be permitted to pursue a damages claim against the corporation. It is undisputed that Plaintiffs, unlike other YPF shareholders, did not pursue any claim under the GCL, and Plaintiffs cannot cite a single precedent under Argentine law permitting a claim like theirs. That, too, is a reason to affirm.

### 2. Argentine Public Law Required the Republic to Vote the Disputed Shares.

The Public Interest Law superseded the Bylaws and provided for the Republic to vote the disputed shares.[14] *See generally* JA__ [Dkt.377-22, ¶¶33–73] (Comadira). Under Argentine law, "private rights" cannot be "enforced against any public order laws," and a company's bylaws "cannot contradict, alter or render

[14] The Public Interest Law took effect on May 7, 2012, before the June 4, 2012 shareholders' meeting at which the Republic voted. JA__ [Dkt.370, ¶¶36, 40–41].

ineffective laws and decrees of 'public order.'" JA__ [Dkt.377-22, ¶40] (Comadira); JA__ [Dkt.377-39, 59:17–20] (Bianchi). The conflict between the Public Interest Law's requirement that the Republic "shall exercise all of the rights conferred upon the shares subject to expropriation," JA__ [Dkt.377-15, §13], and the (purported) Bylaws obligation to prevent the Republic from voting those shares is irreconciliable, and Argentine law mandates that the "public interest prevails over private interests," JA__ [Dkt.377-22, ¶¶35–38, 40] (Comadira). Even if the Bylaws had obligated YPF to prevent such a vote (they did not), the Public Interest Law would have superseded and excused any such obligation.

## II. The District Court Was Correct to Dismiss Petersen's Promissory-Estoppel Claim.

Plaintiffs' last-ditch effort to bring back a claim against YPF via a baseless and long-rejected promissory-estoppel theory fails as a matter of Argentine law. *See* Pls. Br. 90–92. The notion that the 1993 IPO Prospectus constitutes "promises" enforceable at common law notwithstanding the clear limitations of the referenced Bylaws has no legal basis and is radically at odds with settled expectations for publicly traded companies making IPO disclosures.

Argentine law does not recognize estoppel as "an autonomous source of an obligation." JA__ [Dkt.36, ¶48]. Because Plaintiffs insist that the Bylaws are a contract binding on YPF and because "Plaintiffs' own expert acknowledges that, in Argentina, the 'doctrine of estoppel is not an ***autonomous*** source of obligation,'"

SA46 (quoting JA__ [Dkt.47, ¶¶92–93] (emphasis in original)); SA113 n.6, the claim was correctly dismissed and should not be reinstated.

On appeal, Plaintiffs try to resurrect this theory as a backstop, arguing that if the Bylaws do not impose the broad obligations they allege, then a promissory estoppel claim might arise somehow from other statements. But that argument ignores black-letter Argentine law holding that the ***existence*** of a written agreement governing the relationship between parties — not the scope of the particular terms — precludes a promissory estoppel claim. *See* JA__ [Dkt.36, ¶47]. Plaintiffs may not like the limits of YPF's Bylaws, but they do not deny that they exist — and that bars the estoppel claim.

Plaintiffs resort to New York law, *see* Pls. Br. 91–92 (quoting *Goldberg v. Pace Univ.*, 88 F.4th 204, 214–15 (2d Cir. 2023)), but it does not apply and is no more helpful.[15] Under New York law, including as applied in *Goldberg*, where an agreement "'govern[s]' the relevant 'subject matter,'" the promissory estoppel claim is duplicative and therefore fails. 88 F.4th at 214 (citation omitted); *see* SA46 (noting that promissory-estoppel claim was duplicative even under New York law).

[15] As the district court explained, "[a]ll agree that Argentine law applies to this action[.]" SA85.

Plaintiffs' argument also ignores that the "promises" they rely on in the Prospectus are nothing more than summaries of the Bylaws. The Prospectus cautions that it includes "a brief summary of certain significant provisions of the By-laws" and advises that "[t]his description does not purport to be complete and is qualified by reference to the By-laws, which have been filed as an exhibit to the Registration Statement[.]" JA__ [Dkt.112-2, p.79]; *see also* JA__ [*Id.*, pp.80–81] (noting that the tender-offer obligation described is "[p]ursuant to the By-Laws" and "[u]nder the By-laws"). Based on this language, Plaintiffs themselves argued before the district court that "the promotional prospectus was emphatic that its terms were 'summary' in nature and not controlling." JA__ [Dkt.125, p.4]. Although Plaintiffs now assert that "YPF told investors repeatedly that it would enforce the Bylaws' tender-offer obligations" in some manner beyond the terms of the Bylaws, nothing in the record they cite supports that claim. Pls. Br. 89; *see also* Pls. Br. 92.[16] The district court correctly concluded that no such claim exists where "Plaintiffs have not identified a promise . . . that is distinct from the obligations imposed by the Bylaws." SA46; *accord* SA112–13 (noting that "the representations in these documents are substantively similar to the Bylaws").

[16] Plaintiffs also cite two pages of an SEC filing from 2011 but do not quote any language from it. *See* Pls. Br. 92 (citing JA__ [Dkt.364-109, pp.180–81]). Regardless, that filing's summary of the Bylaws copies the Prospectus and likewise provides no support for Plaintiffs' claims.

Plaintiffs cannot pursue an estoppel claim based on the Prospectus in this Court in any event, since U.S. courts do not allow parties to invoke "an equitable measure" and then "pick and choose which statements they prefer to hear," *In re Gulf Oil/Cities Serv. Tender Offer Litig.*, 725 F. Supp. 712, 735 (S.D.N.Y. 1989), or to prevail on an argument and then contradict it. The Prospectus states that "any action relating to enforcement of the By-laws or a shareholder's rights thereunder is required to be brought ***in an Argentine court***." JA__ [Dkt.112-2, p.88] (emphasis added). In response, Plaintiffs previously urged the district court to ignore that language in the Prospectus, arguing that "the ***operative*** contract is the bylaws themselves [and] [t]he bylaws themselves contain no forum-selection clause." JA__ [Dkt.125, p.14] (emphasis in original). Having ignored the Prospectus requirement by suing in a U.S. court, Plaintiffs cannot now invoke equitable claims based on the Prospectus in a court the Prospectus rejects. *See Intellivision v. Microsoft Corp.*, 484 F. App'x 616, 619 (2d Cir. 2012) (explaining that judicial estoppel prevents a party from taking a new position that is "'clearly inconsistent' with its earlier position" when it "previously persuaded a court to accept its earlier position" (quoting *New Hampshire v. Maine*, 532 U.S. 742, 750–51 (2001))).

Regardless, Plaintiffs have forfeited their argument that "if this Court were to conclude that . . . YPF was not contractually bound by the tender-offer

provisions . . . then estoppel should provide an alternative basis" for liability under Argentine law. Pls. Br. 91. In opposing YPF's motion to dismiss, Petersen argued generally that Argentine law "recognizes promissory estoppel," JA__ [Dkt.49, pp.20–22], but did not assert the alternative argument it now raises. At summary judgment, Plaintiffs mentioned in a footnote, without substance, that dismissal of their contract claims may warrant revival of the estoppel claim. JA__ [Dkt.392, pp.43 n.22, 47 n.23]. But the district court correctly deemed the issue "not properly before the Court" and "decline[d] to consider whether Plaintiffs' promissory estoppel claims should be revived absent a proper application and briefing," SA113 n.6, which Plaintiffs never made.

Plaintiffs may not raise this argument now. *See Sacerdote v. N.Y. Univ.*, 9 F.4th 95, 118 (2d Cir. 2021) (noting the "well-established general rule that a court of appeals will not consider an issue raised for the first time on appeal" (citation omitted)); *cf. United States v. Restrepo*, 986 F.2d 1462, 1463 (2d Cir. 1993) (holding that "an argument mentioned only in a footnote" is not "adequately raised or preserved for appellate review"). It is no excuse that Plaintiffs' forfeited argument is phrased in the "alternative," as it was "foreseeable" that they "could lose" on their contract claims and "should present any alternative arguments." *Pohl v. United Airlines, Inc.*, 213 F.3d 336, 340 (7th Cir. 2000); *see, e.g.*, *Doe v.*

*Trump Corp.*, 6 F.4th 400, 418 (2d Cir. 2021) (argument raised "in the alternative" was forfeited because party "failed to raise [it] before the district court").[17]

## III. The District Court Calculated Damages Improperly, Including by Failing to Apply New York's Statutory Judgment-Day Rule for Currency Conversion.

This Court has no basis to reverse or vacate YPF's dismissal. If it did, however, it would risk reinstating claims for potentially enterprise-threatening damages that have been inflated by the district court's misapplication of black-letter New York law governing currency conversion of damages. While Plaintiffs cannot establish any liability at all on the part of YPF, the quantum resulting from the error is so high as to warrant the precaution of review by this Court.[18] YPF conditionally cross-cross-appeals that error, which requires reversal of the district

[17] Vacating the dismissal of Petersen's promissory-estoppel claim would not be a basis to vacate the final judgment for YPF on Eton Park's claims, which do not include promissory estoppel. Contrary to Plaintiffs' suggestion, *see* Pls. Br. 90 n.12, Eton Park cannot add a belated promissory-estoppel claim post-judgment pursuant to Rule 15(b)(2), because promissory estoppel was dismissed early in the case and not "tried by the parties' express or implied consent," Fed. R. Civ. P. 15(b)(2). If Eton Park wishes to add a new claim at this late hour, it must seek relief from final judgment before the district court. *See Nat'l Petrochemical Co. of Iran v. M/T Stolt Sheaf*, 930 F.2d 240, 245 (2d Cir. 1991) ("Unless there is a valid basis to vacate the previously entered judgment, it would be contradictory to entertain a motion to amend the complaint.").

[18] Indeed, Plaintiffs' efforts to enforce their outsize judgment against the Republic are already causing burdens on the Company despite its dismissal; those burdens and enforcement efforts are disproportionate to the correct calculation of damages.

court's assessment of damages in U.S. dollars, rather than Argentine pesos, as of the breach date.

YPF is an Argentine company, and its shares are priced and traded in Argentine pesos. Not surprisingly, the Bylaws' formula for determining the tender-offer price underlying Plaintiffs' claims sets the price in pesos, not dollars. It requires inputs in pesos, and generates tender-offer prices in pesos. Plaintiffs' own expert, Professor Daniel Fischel, followed this formula and used peso-denominated inputs to generate a peso-denominated tender-offer price, before converting that price to dollars for the purpose of pursuing a damages award. This is undisputed.

Obligations denominated in non-U.S. currency must be converted to U.S. dollars when they are the subject of U.S.-court judgments, and the specifics of the currency conversion are governed by the law of the forum. *Vishipco Line v. Chase Manhattan Bank, N.A.*, 660 F.2d 854, 865 (2d Cir. 1981). The parties agree that Section 27 of New York's Judiciary Law controls here. JA__ [Dkt.405, p.66 n.30]. Section 27(b) of the Judiciary Law provides that "[i]n any case in which the cause of action is based upon an obligation denominated in a [foreign] currency" — like the Bylaws tender-offer obligation — judgment must be entered "in the foreign

currency of the underlying obligation" and then converted into U.S. dollars "at the rate of exchange prevailing on the date of entry of the judgment[.]"[19]

In assessing damages, the district court mistakenly stated that "the Bylaws are silent as to denomination[.]" SA147. That is not so. The Bylaws require a tender offer to be made in an amount of pesos determined by the Bylaws for each YPF Class D share and for the offeror to pay that price in pesos in exchange for each Class D share tendered. Because the tender-offer obligation is denominated in pesos, Section 27(b) of New York's Judiciary Law applies, and damages must be assessed in pesos as of the breach date and converted to dollars as of the judgment date. Through its error as to the currency of the Bylaws' obligation, the court imposed a damages award on the Republic that is much higher than what otherwise would have resulted.

---

[19] Section 27 of New York's Judiciary Law provides in relevant part:

> (a) Except as provided in subdivision (b) of this section, judgments and accounts must be computed in dollars and cents[.]
> (b) In any case in which the cause of action is based upon an obligation denominated in a currency other than currency of the United States, a court shall render or enter judgment or decree in the foreign currency of the underlying obligation. Such judgment or decree shall be converted into currency of the United States at the rate of exchange prevailing on the date of entry of the judgment or decree.

SA193.

### A. The Bylaws Price Mandatory Tender Offers in Pesos.

The Bylaws' formulae for pricing tender offers do so in pesos: they rely on YPF share prices "as quoted by the Buenos Aires Stock Exchange," JA__ [Dkt.377-1, §7(f)(v)(B)], which quotes YPF share prices only in pesos, JA__ [Dkt.489, 154:10–155:11].[20] Plaintiffs' damages expert, Professor Fischel, acknowledged that the Bylaws require "***calculating in pesos in the first instance***," JA__ [Dkt.398-22, 66:1–7] (Fischel) (emphasis added), a concession Plaintiffs repeated at trial.

At the damages trial against the Republic, Plaintiffs presented a "Step-by-Step Methodology for Calculation of Damages," JA__ [PDX-3, p.5], showing (in Step 2) that they calculated the tender-offer price per the Bylaws by multiplying (i) the net income per class D share during the four most recent quarters; with (ii) the highest price-to-income ratio for YPF during the preceding two-year period. *See* JA__ [PDX-3, p.5] (slide showing Step 2 of Plaintiffs' calculation of damages as "Calculation of Tender Offer Price (***in Pesos***)" (emphasis added)).

In his "Steps for Calculation of Damages for April 16, 2012," JA__ [PDX-3, p.6] (highlighting and red boxes added below), Plaintiffs' expert Professor Fischel showed again that Plaintiffs calculated the tender-offer price in pesos, as the Bylaws provide. Professor Fischel used peso-denominated inputs to calculate in

[20] *See* https://www.labolsa.com.ar/capacitacion/preguntas-frecuentes/.

pesos the tender-offer price that the district court adopted. In particular, Professor Fischel multiplied the net income per Class D share measured in pesos (14.16 pesos per Class D share) by the 27.10x Price-to-Income ratio that he described as "the exact calculation of the Argentinian stock exchange," JA__ [Dkt.489, 206:10–12], to obtain the required "Tender Offer Price" in pesos (383.88 pesos per Class D share):

## Steps for Calculation of Damages for April 16, 2012

| | | Illustration of Damages Calculations for: Petersen | Illustration of Damages Calculations for: Eton Park |
|---|---|---|---|
| Step 1: | Identification of Notice and Pricing Dates | April 16, 2012 *minus*: 40 Argentine Business Days *equals*: **Notice Date: February 13, 2012** **Pricing Date: February 12, 2012** | |
| Step 2: | Calculation of Tender Offer Price (in Pesos) | Net Income per Class D share: 14.16 pesos per Class D share *multiplied by*: Highest Price-to-Income Ratio: 27.10x *equals*: **383.88 pesos per Class D share** | |
| Step 3: | Conversion of Tender Offer Price as of the Pricing Date (in U.S. Dollars) | 383.88 pesos *divided by* 4.35 *equals*: **$88.35 per Class D share** | |
| Step 4: | Calculation of Damages Per Share (in U.S. Dollars) | $88.35 *minus* $13.12 (as of April 18, 2012) *equals*: **$75.23 per Class D share** | |
| Step 5: | Calculation of Tender Offer Damages, excluding Prejudgment Interest (in U.S. Dollars) | $75.23 *times* 100.15 million shares *minus* $0.53 million dividends *equals*: **$7.5 billion** | $75.23 *times* 11.95 million shares *minus* $1.23 million dividends *equals*: **$898 million** |
| Step 6: | Calculation of Total Damages, including Prejudgment Interest using annual simple interest rates of 6%, 7%, and 8% (in U.S. Dollars) | $7.5 billion Tender Offer Damages *plus* Prejudgment Interest of $5.1 to $6.8 billion *equals*: **$12.6 billion to $14.3 billion** | $898 million Tender Offer Damages *plus* Prejudgment Interest of $608 to $811 million *equals*: **$1.5 billion to $1.7 billion** |

Offer and payment of that price per share in pesos is the "obligation" Plaintiffs seek to enforce and what they claim they were entitled to receive.

Although Professor Fischel performed an additional "Step 3" of "Conversion of Tender Offer Price as of the Pricing Date" to compare the price in pesos with an ADR price in dollars, nothing in the Bylaws requires converting the pesos price into dollars, and the Bylaws create no obligation to offer or pay any currency other than pesos.

In light of the plain terms of the Bylaws setting out a formula to be calculated in pesos, and Plaintiffs' own acknowledgement that the tender-offer price they claim they were entitled to receive was to be calculated in pesos, the district court's assumption that the Bylaws were "silent" as to denomination was erroneous.

### B. Plaintiffs Were Not Entitled to Receive Dollars in a Hypothetical Tender Offer.

Plaintiffs try to avoid the implications of a peso-denominated obligation and damages calculation by arguing that the Republic was required to include ADRs in a tender offer and pay them in U.S. dollars. Pls. Br. 73–77. But that argument fails as a matter of law: the Republic had no obligation either to offer to purchase Plaintiffs' ADRs or to offer dollars for the shares underlying their ADRs.[21]

---

[21] Plaintiffs' assertion that "it is undisputed that if Argentina had carried out its tender-offer obligations, Plaintiffs would have been paid for their ADRs in dollars, not pesos," Pls. Br. 74, is false and misrepresents the record. Defendants have consistently maintained that if the Republic had carried out its purported tender-offer obligation: (i) Plaintiffs would not have been paid dollars or pesos for their ADRs, because they would not have received an offer for their ADRs; and (ii) if

### 1. The Bylaws Did Not Require the Republic to Offer to Buy ADRs.

Plaintiffs' unsustainable argument turns on two related assertions: that Bylaws Section 7(e)(ii) required the Republic to make a tender offer for "all securities convertible into shares," not just shares; and that their ADRs are "securities convertible into shares." Pls. Br. 73–74 (quoting JA__ [Dkt.377-1, §7(e)(ii)]).[22] Neither assertion is correct.

Bylaws Section 28(b) expressly limits the required scope of tender offers by the Republic to Class D shares only, stating that "[t]he purchase offer provided for in [the case of acquisitions made by the National Government] ***shall be limited*** to the aggregate amount of Class D shares of stock." JA__ [Dkt.377-1, §28(b)] (emphasis added). Other acquirers may fall under Section 7(e)(ii) and be required to tender for "all securities convertible into shares," but not the Republic. JA__ [Dkt.377-1, §7(e)(ii)].

ADR holders like the Plaintiffs were on express notice of this limit. Consistent with Section 28(b), the Prospectus for the initial ADS offering informed

---

Plaintiffs had participated in the tender offer, it would have been by surrendering their ADRs to withdraw the underlying Class D shares and tendering those shares in exchange for pesos. *See* JA__ [Dkt.402, pp.44–48].

[22] Although Plaintiffs at one point refer incorrectly to "ADR shares," Pls. Br. 73, ADRs are ***not*** shares. Section 6 of the Bylaws specifies that YPF's capital stock consists of book-entry "shares" of four enumerated classes that do not include ADRs. JA__ [Dkt.377-1, §6].

investors that "[w]ith respect to acquisitions by the Argentine Government [pursuant to Section 28(a)], the required tender offer need only be conducted for all outstanding Class D Shares." JA__ [Dkt.112-2, pp.80, 82].

ADRs are not "securities convertible into shares" in any event, and thus do not fall under Section 7(e)(ii). "Securities convertible into shares," as defined by the Bylaws, consist of the kinds of securities that, upon conversion, require issuance of ***new*** equity, namely convertible "debentures, corporate bonds, and stock coupons." JA__ [Dkt.377-1, §7(c)]; JA__ [Dkt.377-1, §7(d)]. Unlike ADRs, each of these securities is a corporate obligation that can be converted into new equity upon some trigger. An ADR, by contrast, is tied, from inception, to existing Class D shares. An ADR is, legally and literally, a receipt evidencing an "American Depositary Share," JA__ [Dkt.363-4, §1.11], which in turn represents an interest in a Deposited Security, JA__ [Dkt.363-4, §1.01], which is an existing YPF Class D share, JA__ [Dkt.363-4, §1.07]; JA__ [Dkt.363-4, §1.15], held in the account of the custodian, JA__ [Dkt.363-4, §2.02]. Per Plaintiffs' ADR expert, "ADRs represent actual ownership of the underlying foreign security with the foreign security held by a local custodian bank on behalf of the ADR holder." JA__ [Dkt.377-6, ¶15] (Lissemore).

When the "receipt," or ADR, representing ownership is surrendered, the underlying share is transferred from the custodial account to the ADR holder's

account at the Caja de Valores, without any change to the ADR holder's ultimate ownership right.[23] The ADR is not converted into a new share or a new interest.

Petersen has even admitted that ADRs are not "securities convertible into shares." In its own 2008 tender offer, it submitted a no-action letter to the SEC representing that YPF had "[n]o securities convertible into Shares." It cannot credibly reverse course now. JA__ [Dkt. 364-83, p.3 n.3].

#### 2. Nothing Else Required Bidders to Include ADRs in a Hypothetical Tender Offer.

Plaintiffs' vague assertions that unspecified NYSE "requirements" or "established" or "common" practice somehow required the Republic to include Plaintiffs' ADRs in a tender offer, Pls. Br. 31, 73–74, have no basis in fact or law and are contradicted by their own expert.

Plaintiffs' ADR expert, Nancy Lissemore, confirmed at her deposition that there are ***no*** NYSE requirements that would have obligated the Republic to include ADRs. Ms. Lissemore testified that (i) no NYSE "rule or regulation" would prevent "the making of a tender offer for the Class D shares alone," JA__ [Dkt.398-27, 231:6–11] (Lissemore), and (ii) "the New York Stock Exchange

[23] When an ADR holder surrenders the ADR, it "withdraws" the Class D share evidenced by the ADR, which entails transfer of the share from the custodian's account to the ADR holder's account at the Caja de Valores. JA__ [Dkt.363-4, §2.05].

would not have even had regulations that pertained to a non-ADR tender [offer]," JA__ [Dkt.398-27, 228:12–14] (Lissemore).

Defendants' securities expert, Professor Steven Davidoff Solomon, confirmed that there is no such requirement and provided real-world examples of tender offers that have been made only in non-U.S. currency and only for the shares — and not the ADRs — of companies that listed both ADRs and non-U.S. shares. ADR holders who wished to participate in those tender offers could do so, by surrendering their ADRs to withdraw the underlying shares and then tendering the shares in exchange for payment in the non-U.S. currency. *See* JA__ [Dkt.377-63, ¶¶162–67] (Solomon). Ms. Lissemore agreed that Professor Solomon had provided at least one "example of an actual tender offer made for shares and not extended to ADRs and not made in U.S. dollars." JA__ [Dkt.398-27, 241:17–22] (Lissemore); *see also* JA__ [*Id.,* 227:12–19] (Lissemore). Even if "established" or "common" practice were relevant (they are not), Professor Solomon has shown that at the time of the YPF IPO, the custom and practice in cross-border tender offers was to exclude U.S. security holders. JA__ [Dkt.377-63, ¶¶171–77] (Solomon). The Bylaws are consistent with that standard practice.

The Bylaws do not require tender offers to include ADRs, but they do not forbid it either. Given the choice, the fact that Repsol and Petersen opted to

include ADRs in their YPF tender offers, Pls. Br. 74, in no way supports Plaintiffs' allegation that the Republic was ***required*** to offer to buy their ADRs.

### C. The Tender-Offer Obligation is a Monetary Obligation Within the Scope of the Judgment-Day Rule.

Plaintiffs ask this Court to make two illogical leaps to avoid the obvious conclusion that a mandatory tender offer for Class D shares priced in pesos is "an obligation denominated in a currency other than the currency of the United States" subject to the judgment-day rule of Section 27(b). First, they contend that the tender-offer obligation was a "performance" obligation rather than a payment obligation; and, second, they contend that the tender-offer obligation was not for a "sum certain." Pls. Br. 68–69. These are distinctions the statute does not draw; neither argument has any basis in New York law.

***First***, Section 27(b) does not distinguish between a "payment" obligation, on the one hand, and a "performance" obligation, on the other. It applies to any "obligation denominated in a currency other than currency of the United States," regardless of the nature of that obligation. SA193.

Plaintiffs provide no credible basis to exclude a binding tender-offer obligation from Section 27(b)'s terms. A mandatory tender offer entails both a ***binding offer*** to pay pesos and ***actual payment*** of pesos upon acceptance of the offer. Plaintiffs' calculations of their damages — and the amount of the district court's judgment adopting those calculations — are not based on the value of some

non-monetary harm but on the amount of money they claim the Republic was required to pay them in a tender offer. JA__ [Dkt.371, pp.34–35].

The tender-offer obligation is nothing like the obligation that was breached in *Nature's Plus Nordic A/S v. Nat. Organics, Inc.*, which the court there characterized as a "non-monetary" obligation. 78 F. Supp. 3d 556, 557 (E.D.N.Y. 2015). There, the relevant obligation was not one to pay or offer to pay money, but to provide notice and an opportunity to cure before terminating a contract. *See id.* at 557–58. Here, the consequence of the alleged breach on Plaintiffs' theory is that they were not paid money in the "compensated exit at the predetermined price that the Bylaws set." Pls. Br. 52–53.

***Second***, Section 27(b) does not have a "sum certain" requirement. Even if "[t]he majority of the cases applying the judgment-day rule have done so in the context of confirmed arbitration awards and agreements identifying payment for a sum certain and denominated in the foreign currency expressly," as the district court observed, SA147, the statute governs "obligations" in non-U.S. currency regardless of context.

Plaintiffs do not cite any authority for the notion that Section 27(b) applies only to obligations for a sum certain fixed in advance, and in fact the judgment-day rule is applicable when the sum was ***not*** certain. *See Weiss v. La Suisse, Societe d'Assurances Sur La Vie*, 293 F. Supp. 2d 397, 403, 409 (S.D.N.Y. 2003) (an

obligation to pay insurance dividends "calculated as a percentage of the profit generated from a particular policy group" — and thus in an amount not knowable in advance — was "denominated in a currency other than currency of the United States" and subject to New York's judgment-day rule). That most plaintiffs do not pursue foreign-law claims under foreign-law Bylaws denominated in foreign currencies in U.S. district courts does not exempt Plaintiffs (who chose to do so) from New York's rule governing foreign obligations adjudicated in U.S. courts, or the associated currency risk.

Plaintiffs seek to enforce a tender offer obligation that requires acquirers to offer and, if accepted, pay a certain amount of Argentine pesos per Class D share of YPF. That is an obligation denominated in a non-U.S. currency as to which New York's judgment-day rule clearly applies. The district court erred first by overlooking that the Bylaws were not silent but in fact specified the currency in Argentine pesos, and then by adopting a damages award calculated as of the breach date and not the judgment date, as Section 27(b) of New York's Judiciary Law requires. That error is legally simple but financially consequential and should be corrected.

## CONCLUSION

For the foregoing reasons, this Court should affirm the district court's judgments in favor of YPF. If this Court instead reverses or vacates the district court's judgments dismissing all claims against YPF, it should also reverse certain of the district court's rulings that informed its assessment of damages against the Republic.

Dated: June 24, 2024

Respectfully submitted,

/s/ *Mark P. Goodman*
Mark P. Goodman
Shannon Rose Selden
J. Robert Abraham
Wendy B. Reilly
Carl Riehl
Sol Czerwonko
DEBEVOISE & PLIMPTON LLP
66 Hudson Boulevard
New York, New York 10001
(212) 909-6000
mpgoodman@debevoise.com
srselden@debevoise.com
jrabraham@debevoise.com
wbreilly@debevoise.com
criehl@debevoise.com
sczerwonko@debevoise.com

*Counsel to Defendant-Appellee YPF S.A.*

**Certificate of Compliance with**
**Federal Rule of Appellate Procedure 32(a)**

This brief complies with the type-volume limitations of Fed. R. App. Proc. 32(a)(7)(B) and Local Rule 32.1(a)(4)(A) because it contains 15,871 words, exclusive of the parts of the brief exempted by Fed. R. App. Proc. 32(f).

This brief complies with the typeface requirements of Fed. R. App. Proc. 32(a)(5) and the type style requirements of Fed. R. App. Proc. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman font.

I certify under penalty of perjury that the foregoing statements are true.

Dated: June 24, 2024

/s/ *Mark P. Goodman*

Mark P. Goodman

## Certificate of Service

I hereby certify that on June 24, 2024, I filed the foregoing Brief with the Clerk of Court of the United States Court of Appeals for the Second Circuit through the ACMS system. I certify that all participants in these cases are registered ACMS users and that service will be accomplished by the ACMS system.

Dated: June 24, 2024

/s/ *Mark P. Goodman*

Mark P. Goodman