# 23-7370(L)

## 23-7463(XAP), 23-7614(XAP)

### UNITED STATES COURT OF APPEALS
### FOR THE SECOND CIRCUIT

PETERSEN ENERGIA INVERSORA, S.A.U., PETERSEN ENERGIA S.A.U.,

*Plaintiffs-Appellees-Cross-Appellants*,

v.

ARGENTINE REPUBLIC,

*Defendant-Appellant-Cross-Appellee*,

YPF S.A.,

*Defendant-Conditional Cross-Appellant.*

On Appeal from the United States District Court for the
Southern District of New York, No. 15-cv-2739

### PAGE-PROOF RESPONSE AND REPLY BRIEF FOR
### PLAINTIFFS-APPELLEES-CROSS-APPELLANTS

MARK C. HANSEN
DEREK T. HO
ANDREW E. GOLDSMITH
KELLOGG, HANSEN, TODD,
FIGEL, & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, DC 20036

(*additional counsel on inside cover*)

PAUL D. CLEMENT
 *Counsel of Record*
C. HARKER RHODES IV
NICHOLAS M. GALLAGHER*
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

*Supervised by principals of the firm who are members of the Virginia bar

*Counsel for Plaintiffs-Appellees-Cross-Appellants*

July 24, 2024

RANDY M. MASTRO
KING & SPALDING LLP
1185 Avenue of the Americas, 34th Floor
New York, NY 10036

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................... iii

INTRODUCTION ............................................................................. 1

ARGUMENT .................................................................................. 5

I.    The District Court Erred In Granting Summary Judgment For YPF ............. 5

    A.    The District Court Erred in Concluding That the Bylaws Impose No Obligation on YPF to Deny Improperly Acquired Shares Voting Rights and Dividends .................................................... 6

        1.    This Court has already made clear that the Bylaws obligated YPF to enforce the tender-offer requirements and their consequences ............................................. 7

        2.    The text and context of the Bylaws confirm that YPF was obligated to enforce the tender-offer requirements and their consequences ............................................. 10

    B.    YPF's Causation Argument Is Wrong and Provides No Alternative Basis for Affirming the Judgment for YPF .................... 24

    C.    YPF's Argentine Law Arguments Are Wrong and Provide No Alternative Basis for Affirming the Judgment for YPF .............. 32

        1.    Plaintiffs have breach-of-contract claims against YPF ........... 33

        2.    The YPF Expropriation Law does not bar Plaintiffs' claims against YPF .................................................. 36

II.    The District Court Erred In Dismissing Plaintiffs' Promissory Estoppel Claims ......................................................................... 38

III.    The District Court Correctly Calculated Plaintiffs' Damages ..................... 44

    A.    YPF's Obligations Under the Bylaws Were Not Denominated in Any Foreign Currency ............................................ 46

    B.    Plaintiffs Were Entitled to a Tender Offer in Dollars ........................ 54

CONCLUSION ............................................................................... 61

i

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME
    LIMITATION

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*Baldwin v. Express Oil Change, LLC*,
 87 F.4th 1292 (11th Cir. 2023)............................................................49

*Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*,
 589 U.S. 327 (2020)..........................................................................30

*Competex, S.A. v. Labow*,
 783 F.2d 333 (2d Cir. 1986).............................................................49

*E.I. du Pont de Nemours & Co. v. Train*,
 430 U.S. 112 (1977)...........................................................................16

*Goldberg v. Pace Univ.*,
 88 F.4th 204 (2d Cir. 2023)..............................................................42

*Havlish v. 650 Fifth Ave. Co.*,
 934 F.3d 174 (2d Cir. 2019)........................................................ 9, 10

*Huang v. INS*,
 436 F.3d 89 (2d Cir. 2006) ...............................................................19

*Jingrong v. Chinese Anti-Cult World All. Inc.*,
 16 F.4th 47 (2d Cir. 2021)................................................................25

*Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*,
 523 U.S. 26 (1998).............................................................................12

*Maine Cmty. Health Options v. United States*,
 590 U.S. 296 (2020)...........................................................................12

*Malmberg v. United States*,
 816 F.3d 185 (2d Cir. 2016)........................................................ 48, 49

*Nature's Plus Nordic A/S v. Nat. Organics, Inc.*,
 78 F.Supp.3d 556 (E.D.N.Y. 2015)................................. 47, 48, 50, 51

*New York v. United Parcel Serv., Inc.*,
 942 F.3d 554 (2d Cir. 2019) .............................................................18

*Newmont Mines Ltd. v. Hanover Ins. Co.*,
    784 F.2d 127 (2d Cir. 1986) ................................................48

*Oden v. Chemung Cnty. Indus. Dev. Agency*,
    661 N.E.2d 142 (N.Y. 1995) ..............................................48

*Petersen Energía Inversora S.A.U. v. Argentine Republic*,
    895 F.3d 194 (2d Cir. 2018) ....................................... *passim*

*Price Waterhouse v. Hopkins*,
    490 U.S. 228 (1989) ...........................................................29

*Sargeant v. Barfield*,
    87 F.4th 358 (7th Cir. 2023) ..............................................43

*United States v. Burris*,
    29 F.4th 1232 (10th Cir. 2022) .........................................43

*Young v. Hawaii*,
    142 S.Ct. 2895 (2022) ........................................................43

*Young v. Hawaii*,
    992 F.3d 765 (9th Cir. 2021) .............................................43

## Constitutional Provisions

U.S. Const. amend. I ................................................................20

U.S. Const. amend. IV ..............................................................20

## Statutes

N.Y. Jud. Law §27 ........................................................ *passim*

Pub. L. No. 102-166, 105 Stat. 1075 .......................................29

## Other Authorities

*Black's Law Dictionary* (12th ed. 2024) .............................. 50, 57

Passive Voice, *Fowler's Dictionary of Modern English Usage*
    (J. Butterfield ed., 4th ed. 2015) .........................................21

## INTRODUCTION

Given its checkered financial past and its penchant for economic nationalism, the Argentine Republic ("Argentina") and its state-controlled energy company YPF S.A. ("YPF," and together with Argentina, "Defendants") faced a distinct challenge in convincing foreign investors to participate in the planned initial public offering ("IPO") of YPF. In particular, investors needed strong assurances that a renationalization a few years down the line would not leave them trapped as minority shareholders in a state-owned enterprise. For those purposes, an assurance from Argentina alone—the precise fox whose undoubted sovereign power to renationalize the henhouse was what worried investors—would not cut it.

Thus, to reassure those skeptical investors and raise much-needed foreign capital, Defendants amended YPF's Bylaws to adopt tender-offer provisions that provided strong protections for would-be investors by imposing clear obligations on *both* Argentina *and* YPF. Those provisions required Argentina, if it ever re-acquired control of a majority of YPF's shares, to make a tender offer to other investors at a price that would guarantee them a compensated exit from their investment, typically at an above-market price. To ensure those protections were not illusory, the amended Bylaws imposed separate obligations on YPF to prevent an acquirer from simply disregarding the tender-offer requirements, including obligations to deny voting and dividend rights to any shares acquired in violation of those requirements. Argentina

and YPF emphasized those protections to investors on the NYSE, through promises made in their IPO prospectus and repeated in later SEC filings. And those promises had their intended effect, as YPF's IPO raised billions of dollars, including more than a billion from investors on the NYSE alone.

But when the feared renationalization came to pass and investors needed those mutually reinforcing protections most, Argentina and YPF both abandoned their obligations. In 2012, Argentina seized back majority control of YPF just as investors feared, without making the tender offer it had promised. Instead of respecting the Bylaws' protections against a violative takeover, Defendants openly derided the Bylaws' tender-offer provisions as a "bear trap" that only "fools" could think Argentina would honor. And investors, who were not so foolish as to rely exclusively on promises from Argentina, were doubly disappointed when YPF granted voting rights and paid dividends to the improperly acquired shares in direct violation of the Bylaws' contrary instruction. The carefully designed Bylaws provisions that YPF had successfully marketed to investors ultimately failed to protect those shareholders because YPF violated them.

The district court correctly held Argentina to its contractual obligations and the consequences of its breach—but let YPF off the hook, reasoning that the Bylaws did not impose any obligations on YPF because the Bylaws described those mandatory obligations in the passive voice. Neither that reasoning nor any of YPF's

attempts to improve upon it justify YPF's clear and affirmative breach of its Bylaws obligations. The Bylaws provisions making the tender-offer requirements mandatory and disabling the voting and dividend rights of shares acquired in derogation of those requirements were not empty words. The use of the passive voice reflects not an effort to render clear promises illusory, but the simple reality that YPF was the only entity with the authority to grant or deny voting rights and dividends. Indeed, the undisputed facts of this case bore that out: following the takeover, and despite Argentina's open defiance of the tender-offer requirements, it was none other than YPF that granted Argentina voting control and paid it dividends in direct violation of the Bylaws. In so doing, YPF not only failed to carry out its promises to investors to police Argentina's violations, but independently breached the Bylaws by taking actions that the Bylaws expressly prohibited. The district court erred by refusing to give effect to these Bylaws provisions and refusing to hold YPF accountable for its unequivocal breach.

YPF's purported alternative grounds for affirmance are equally unavailing. The record provides copious evidence that YPF's breach caused Plaintiffs' injury—which is hardly surprising, given that under the Bylaws YPF was obligated to serve as the last line of defense in the event of an acquirer's breach of the tender-offer requirements. Indeed, it would be impossible for *any* shareholder who acquired a majority interest without a tender offer to achieve its objectives and harm other

3

shareholders if YPF respected the Bylaws and denied those shares voting and dividend rights. YPF can hardly abandon that last redoubt and deny that its breach caused Plaintiffs' injuries. YPF's assertion that its breach of its contractual obligations under the Bylaws cannot give rise to a breach-of-contract claim under Argentine law is likewise as wrong as it sounds, for all of the reasons that Plaintiffs have already explained (and the district court adopted) with respect to Argentina's similar argument.

Even if Argentina and YPF could somehow avoid their contractual obligations under the Bylaws, they would still remain bound by their equally clear promises in the IPO prospectus and subsequent SEC filings, which deliberately induced massive and concrete reliance on the part of Plaintiffs and other investors. The district court erred by dismissing Plaintiffs' promissory estoppel claims as duplicative early in this litigation while Defendants continued to contest their contractual liability—an error that was only underscored by the court's subsequent summary judgment ruling for YPF, which left Plaintiffs with no way to hold YPF liable for defying its contractual or extra-contractual promises.

Finally, YPF's attempt to rely on more than a decade of Argentine inflation to reduce its potential damages liability by some *95%* squarely contravenes New York law. As the district court correctly explained in rejecting Argentina's identical gambit, New York sensibly does not subject plaintiffs to the risk that unpredictable

currency fluctuations might massively devalue their award unless the underlying obligation is itself specifically denominated in a foreign currency. YPF's obligations here were *performance* obligations, requiring it to carry out certain actions, not payment obligations denominated in any particular currency, let alone pesos. And even if those obligations could somehow be reframed as currency-denominated, the relevant currency would be U.S. dollars, which is the currency in which the required tender offer for Plaintiffs' American Depository Receipts ("ADRs") would have been made. YPF's extraordinary response—that Argentina was not required to tender for ADRs *at all*—would make a mockery of the tender-offer provisions and eviscerate the central protection that Defendants repeatedly touted to foreign investors. This Court should reverse the district court's summary judgment for YPF and dismissal of Plaintiffs' promissory estoppel claims, and otherwise affirm.

## ARGUMENT

## I.   The District Court Erred In Granting Summary Judgment For YPF.

The district court's sole basis for granting summary judgment for YPF was its remarkable conclusion that the Bylaws impose no obligation on YPF if an acquirer disregards the Bylaws' tender-offer requirements, despite clear language in the Bylaws imposing disabilities on shares acquired in derogation of those requirements. SA107-14. That conclusion is incorrect. It contradicts this Court's prior opinion in this case, the plain language of the Bylaws, and the promises that allowed YPF to

raise more than a billion dollars on the NYSE in its IPO despite concerns about Argentina's temptation to return to economic nationalism. Through the Bylaws, YPF guaranteed investors that in the all-too-plausible event that Argentina yielded to the temptation to renationalize YPF, they would not need to rely exclusively on Argentina honoring its contractual promises, but would have the double protection of YPF's contractual obligation to deny voting rights and dividends to shares acquired in contravention of the tender-offer requirements (consequences that only YPF itself could carry out). By declining to recognize and enforce YPF's contractual commitments—and treating them instead as nothing more than passive-voice aspirations—the district court retroactively converted clear promises on which NYSE investors had relied to the tune of more than a billion dollars into mere parchment pablum. This Court should reverse that error.

### A. The District Court Erred in Concluding That the Bylaws Impose No Obligation on YPF to Deny Improperly Acquired Shares Voting Rights and Dividends.

The promises that YPF made in the Bylaws were both unusual and unusually necessary. Faced with Argentina's recurring history of political and economic shifts, and its demonstrated penchant for nationalizing key industries, investors in the 1990s were understandably skeptical that Argentina's newfound commitment to free markets would last. *See, e.g.*, JA___[Dkt.364-26.¶19]; JA___[Dkt.372.¶¶15, 21, 27]. Convincing those investors to put money into a newly privatized YPF required

more than just promises from Argentina itself—as Argentina was the primary source of investors' concerns—and so Argentina and YPF gave them more, amending the Bylaws to impose not only a clear (and clearly mandatory) obligation on Argentina to make a tender offer to minority shareholders, but also an equally clear obligation on YPF to prevent evasion of the tender-offer requirements, including by denying any shares that Argentina obtained in violation of that requirement "any right to vote or collect dividends." JA___[Dkt.363-1.at.12] (Bylaws §7(h)).

By imposing that separate obligation on YPF, the Bylaws promised investors that if Argentina did someday decide to renationalize YPF, they would not be left relying solely on Argentina's own willingness to abide by the Bylaws (or the unattractive prospect of litigation against a foreign sovereign) to protect their investment. Instead, minority shareholders could rely on YPF to serve as their last line of defense by honoring its promise to deny non-complying shares voting rights and dividends as specified in the Bylaws. The district court's decision to negate those distinct obligations and leave investors with only half the protections they bargained for in the Bylaws was error.

### 1. This Court has already made clear that the Bylaws obligated YPF to enforce the tender-offer requirements and their consequences.

The first problem with the district court's holding that the Bylaws "do not impose an obligation on YPF to enforce" the tender offer provision is that it

contravenes this Court's prior decision in this case. Six years ago, YPF asked this Court to hold that the FSIA barred Plaintiffs from bringing suit against YPF at all, on the theory that its breach of the Bylaws was "not a commercial activity" and "had no direct effect in the United States." *Petersen Energía Inversora S.A.U. v. Argentine Republic*, 895 F.3d 194, 210 (2d Cir. 2018) ("*Petersen II*"). This Court rejected those arguments—and in doing so, recognized that YPF had a specific contractual "obligation to enforce the tender offer provision" and "to enforce the penalties imposed by section 7(h)" of the Bylaws. *Id.*

As this Court explained, "every corporation is obligated to abide by its bylaws," and so YPF's "failure to do so"—i.e., its failure to carry out its contractual "obligation to enforce the tender offer provision triggered by Argentina's expropriation" and to comply with the Bylaws in determining "what voting rights attach to which shares and which shares are entitled to collect dividends"— constituted commercial activity. *Id.* That holding continues to control and cannot be reconciled with the district court's view that the Bylaws imposed no obligations on YPF.

YPF seeks to evade this Court's decision on the ground that *Petersen II* resolved only the FSIA issue and "did not purport to decide the ultimate merits." YPF.Br.43. But this Court's decision to leave "the ultimate merits" for remand was not an invitation to ignore this Court's controlling reasoning. When this Court

"remands a matter to a district court, the lower court is bound not only by [its] resolution of the *claims* before [it], but also of the legal *issues* [it] decided in the course of resolving those claims." *Havlish v. 650 Fifth Ave. Co.*, 934 F.3d 174, 182 (2d Cir. 2019). This Court's conclusion that YPF had an "obligation to enforce the tender offer provision" and "to enforce the penalties imposed by section 7(h)" was no stray dictum: It was central to its ultimate holding that YPF could not claim FSIA immunity, since YPF's failure to carry out those contractual obligations was the "commercial activity" that "caused a direct effect in the United States." *Petersen II*, 895 F.3d at 210.

Nor can YPF escape *Petersen II* by asserting that when this Court recognized YPF's contractual obligations under the Bylaws, it was merely "recit[ing] … what the complaint alleges," YPF.Br.44 (quotation marks and brackets omitted). Neither the Court's general observation that "every corporation is obligated to abide by its bylaws" nor its specific recognition of "YPF's obligation to enforce the tender offer provision" and to carry out the consequences that the Bylaws specify, 895 F.3d at 210, was somehow limited to repeating "the facts alleged in the complaint," *contra* YPF.Br.44. Indeed, neither of those propositions was a factual matter on which allegations would have controlled at the motion-to-dismiss stage. On the contrary, the Court explicitly stated in *Petersen II* that it was reviewing *de novo* the relevant "legal determinations regarding … subject matter jurisdiction," 895 F.3d at 203, and

the scope of YPF's contractual obligations under the Bylaws is just such a legal determination.

Put differently, while the question of whether the defendant engaged in certain activity is a factual matter, whether that activity is commercial (and the reasoning necessary for that determination) is a legal conclusion that is binding on remand. Here, no one disputes the facts surrounding YPF's abject failure to undertake its obligations to make the tender-offer requirements stick: YPF counted votes from the improperly acquired shares and distributed them dividends after proudly proclaiming it would not respect the Bylaws. This Court's legal conclusion that YPF was engaged in commercial activity when it engaged in this conduct—because the Bylaws contractually obligated YPF to enforce the tender-offer provisions and carry out their specified consequences—is controlling, and the district court "lacked the authority to disagree with [those] holdings." *Havlish*, 934 F.3d at 182.

### 2. The text and context of the Bylaws confirm that YPF was obligated to enforce the tender-offer requirements and their consequences.

Even if this Court were addressing the issue anew, the district court's conclusion that the Bylaws imposed no obligations on YPF would remain incorrect. Under the plain text of the Bylaws, YPF was contractually obligated to ensure compliance with the tender-offer requirements and to carry out the explicit consequences provided for a non-compliant acquisition. YPF was not free to

disregard the Bylaws' instructions and engage in conduct that the Bylaws expressly prohibited by distributing dividends the Bylaws said "shall not" be paid and counting votes the Bylaws said "shall not" be counted. The district court erred by reading out YPF's clear contractual obligations based on the Bylaws' use of the passive voice to describe obligations that only YPF could undertake.

1. Sections 7 and 28 of the Bylaws impose specific and unambiguously mandatory requirements in connection with acquisitions of control. Acquisitions that trigger the Bylaws' tender-offer provisions but fail to comply with the tender-offer requirements "shall be forbidden." JA___[Dkt.363-1.at.6]. Those provisions, and any stricter requirements imposed by the exchanges where the shares are listed or jurisdictions where the tender offer takes place, "shall be complied with." JA___[Dkt.363-1.at.7]. Where Argentina itself is the acquirer, the same requirements "shall apply." JA___[Dkt.363-1.at.29].

The Bylaws also explicitly recognize the possibility that an acquirer (whether a private party or Argentina) may breach its obligation to make the required tender offer, and impose specific obligations and consequences: Any shares acquired in violation of the tender-offer requirements "shall not grant any right to vote or collect dividends or other distributions that [YPF] may carry out, nor shall they be computed to determine the presence of the quorum at any of the shareholders' meetings of [YPF]." JA___[Dkt.363-1.at.12]. For avoidance of doubt, the Bylaws confirm that

these same consequences "shall be applied" when Argentina is the acquirer (or "shall be limited … to the loss of the right to vote" if the violation was unintentional), JA___[Dkt.363-1.at.29-30]. As the Bylaws' repeated use of the mandatory "shall" emphasizes, those obligations are anything but illusory or optional. *See, e.g.*, *Maine Cmty. Health Options v. United States*, 590 U.S. 296, 310 (2020) ("[T]he word 'shall' usually connotes a requirement."); *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998) (noting "the mandatory 'shall'").

By the plain terms of the Bylaws, YPF itself was the party contractually required to discharge these obligations and impose the contractually specified consequences on non-compliant shares. That obligation is especially unmistakable with respect to the Bylaws' command in §7(h) that improperly acquired shares "shall not grant any right to vote or collect dividends or other distributions that [YPF] may carry out, nor shall they be computed to determine the presence of the quorum at any of the shareholders' meetings of [YPF]." JA___[Dkt.363-1.at.12]—a provision that only YPF itself could carry out. As this Court has already recognized, it is YPF that determines which shares will "collect dividends or other distributions that [YPF] may carry out" or which shares will have the "right to vote" and will be "computed to determine the presence of the quorum" at shareholders' meetings. JA___[Dkt.363-1.at.12]; *see Petersen II*, 895 F.3d at 210. The Bylaws imposed clear

obligations on YPF to comply with the express terms of §7(h), whether those YPF-only obligations were phrased in the active or passive voice.

That is likewise true for YPF's broader obligation to carry out the Bylaws' commands that acquisitions in violation of the tender-offer provisions "shall be forbidden," JA___[Dkt.363-1.at.6], and that the procedures required by those provisions, including any "additional or stricter requirements" of the relevant jurisdictions and exchanges, "shall be complied with," JA___[Dkt.363-1.at.7]. Again, those commands are plainly directed at YPF, whose Board of Directors is explicitly afforded "wide powers" under the Bylaws to "organize, conduct and manage [YPF's] affairs" and "perform all the acts for the best fulfillment of the corporate purpose." JA___[Dkt.363-1.at.19-22].[1]   Indeed, Vice-Intervenor Axel Kicilloff, testifying on behalf of both YPF and Argentina the day after the expropriation, acknowledged YPF's and Argentina's obligations under the Bylaws while telling Congress they would not be "stupid" enough to respect them. JA___[Dkt.481-11.at.25].

---

[1] YPF is wrong to suggest that the Board's powers are somehow irrelevant. *Contra* YPF.Br.38.  The Board of Directors acts for YPF in carrying out "[t]he administration and management of the Corporation," JA___[Dkt.363-1.at.15], and its broad powers exist precisely to ensure that YPF can and will carry out its Bylaws obligations.

That is reinforced by background principles of Argentine law, under which it is "well accepted … that corporations are required to take affirmative actions to ensure that [their] shareholders abide by the [b]ylaws." JA___[Dkt.364-36.¶27]; *see* JA___[Dkt.364-37.¶¶76-77] (explaining that the "assertion that YPF had no obligation to enforce the Bylaws ignores the Bylaws' plain language and is contrary to contract construction principles of Argentine law," as "Sections 7 and 28 create precisely such obligations" and YPF is "responsible for enforcing the bylaws, including the tender-offer provision"); JA___[Dkt.364-32.¶57] ("[I]t is incumbent upon the company to abide by the terms of the bylaws in order to ensure that the tender-offer obligation is timely complied with before the acquirer takes control of the company."); JA___[Dkt.364-36.¶27]. YPF's obligations are further confirmed by its own contemporaneous assurances to investors, which repeatedly promised that investors would be protected by the tender-offer provisions in any future acquisition (and specifically with respect to Argentina)—assurances that bind YPF under the doctrine of *actos propios*. *See* JA___[Dkt.112-2.at.11, 80-82]; JA___[Dkt.364-38.¶79].

As Plaintiffs' opening brief emphasized, all of this would be unmistakable in the case of a private party that crossed one of the Bylaws' tender-offer thresholds—say, by acquiring 15% of YPF's stock. *See* Pltfs.Br.87. In that scenario, YPF would not be free to allow the non-compliant shares to vote, collect dividends, or count

toward quorums. It would be contractually bound to treat those shares as nullities for all those purposes. But there is no basis for reading the Bylaws differently when Argentina is the non-compliant acquirer. To the contrary, multiple provisions of the Bylaws ensure that all the relevant provision shall apply to government acquisitions, which is hardly surprising given investors' predominant concerns about renationalization.

2. The district court nevertheless declined to enforce these clear contractual promises, reasoning that the Bylaws' "use of passive voice" meant that they imposed no obligation on YPF (or anyone else) to implement the Bylaws provisions governing the rights of shares acquired in defiance of the Bylaws' tender-offer requirements. SA110. That gets matters exactly backwards.

The fact that the Bylaws use passive constructions to describe these obligations—providing (for instance) that shares acquired in violation of the tender-offer requirements "shall not grant any right to vote or collect dividends or other distributions that [YPF] may carry out, nor shall they be computed to determine the presence of the quorum at any of the shareholders' meetings of [YPF]," JA___[Dkt.363-1.at.12], rather than that "YPF shall not grant" voting rights or dividends and "YPF shall exclude such shares in determining the presence of the quorum"—does not somehow make those clear and mandatory obligations binding on no one at all. Instead, it simply reflects the reality that those obligations so

obviously fell on YPF—the only party that grants voting rights, issues dividends, or determines quorums—that there was no reason to favor the active over the passive voice. In fact, the Bylaws eliminate all doubt about the relevant actor for these provisions by recognizing that it is YPF that issues the "dividends or other distributions that [YPF] may carry out" and whose "shareholder meetings of [YPF]" demand a quorum. JA___[Dkt.363-1.at.12]. The Bylaws provisions here thus "leave little doubt" to whom they apply, even if they "speak[] only in the passive voice." *E.I. du Pont de Nemours & Co. v. Train*, 430 U.S. 112, 128 (1977).[2]

Apparently recognizing the weakness of the district court's reliance on "the Bylaws' use of passive voice," SA110, YPF rewrites the opinion below, claiming the court concluded only that "the plain and unambiguous text of the Bylaws" does not impose the relevant obligations on YPF. YPF.Br.33. But the district court could not have been clearer: "The kernel of the dispute here is how the Bylaws' use of passive voice … should be interpreted." SA110. While the court ultimately concluded that the Bylaws "are unambiguous and do not impose any duty on YPF," SA112, its *reason* for reaching that conclusion was simply that the Bylaws do not explicitly name YPF as the entity that must carry out "the consequences of a failure to comply

---

[2] YPF chides Plaintiffs for citing federal cases interpreting passive sentences, but does not contest that Argentine law likewise recognizes that a passive sentence can unambiguously specify the relevant actor. YPF.Br.35 n.5.

with the tender offer requirement," SA110—even though no other entity has the authority or practical ability to impose those voting and dividend consequences or determine a quorum, and even though that conclusion renders important contractual language meaningless.

YPF's own reasons for reading its contractual obligations out of the Bylaws are no more persuasive. YPF repeatedly insists that there is no "language in the Bylaws imposing the obligations that [Plaintiffs] claim YPF breached" to enforce the tender-offer provisions or apply the consequences that those provisions prescribe. YPF.Br.19; *see* YPF.Br.23-24, 26-32. But saying it does not make it so.

The Bylaws' enforcement provision in §7(h) states that shares acquired in breach of the tender-offer provisions "shall not grant any right to vote or collect dividends or other distributions that [YPF] may carry out, nor shall they be computed to determine the presence of the quorum at any of the shareholders' meetings of [YPF]." JA___[Dkt.363-1.at.12]. Remarkably, YPF asserts that "no action by YPF is specified or required" by §7(h), as if shares could simply receive dividends and have their votes counted of their own volition. YPF.Br.29. But shareholders do not receive dividends unless YPF pays them, and shareholders do not have their votes counted unless YPF counts them. A driver who exceeds a 55-mph speed limit cannot complain that the prohibition is phrased in the passive voice ("It shall be prohibited to exceed 55 mph") rather than the active voice ("Drivers shall not exceed 55 mph").

17

Either way, the speeding driver must bear the consequences. So too for YPF: YPF credited Argentina's votes and paid Argentina dividends in violation of the Bylaws' express prohibition, and is liable for those affirmative breaches of its clear obligations.

In sum, §7(h) imposes a clear obligation on *someone*—to refrain from counting votes cast by improperly acquired shares, paying them dividends or other distributions, or including them in determining the quorum—and that someone is plainly YPF. JA___[Dkt.363-1.at.12]; *contra* YPF.Br.29. That would be obvious in a non-compliant tender offer by a private party, and §28 makes clear that the same provisions "shall apply" and "shall be applied" to acquisitions by Argentina. JA___[Dkt.363-1.at.6-7, 29-30]; *contra* YPF.Br.26, 30, 31-32. The fact that the provisions do not explicitly name YPF as their subject does not make the obligations that they impose on YPF any less binding and mandatory, especially in light of context and background principles. *See Petersen II*, 895 F.3d at 210 ("[E]very corporation is obligated to abide by its bylaws[.]"); JA___[Dkt.364-36.¶27] ("[I]t is well accepted under Argentine law that corporations are required to take affirmative actions to ensure that [their] shareholders abide by the [b]ylaws[.]"); *accord New York v. United Parcel Serv., Inc.*, 942 F.3d 554, 579 (2d Cir. 2019) (enforcing passive-voice obligation because "context makes clear" the obligation ran to UPS);

*Huang v. INS*, 436 F.3d 89, 93 (2d Cir. 2006) (enforcing passive-voice obligation on Board of Immigration Appeals).

Moreover, even if YPF were right that the "shall not" command in §7(h) is not specifically addressed to YPF (although YPF identifies nobody else who could conceivably distribute dividends or implement shareholder votes), YPF would still be liable for its affirmative violation of §7(h)'s prohibition. YPF did not simply fail to take action. It actively breached clear passive-voice commands by affirmatively taking the precise actions that the Bylaws expressly prohibited. Instead of protecting the victims it had lured with its promises by enforcing the tender-offer requirement, YPF took affirmative steps, in direct violation of the Bylaws, to hand Argentina the spoils of its wrongdoing—the voting power and dividends that typically come with a control acquisition but which YPF's Bylaws denied a non-compliant acquirer. YPF portrays itself as an innocent bystander whose only sin was failing to help a victim, and it argues that the Bylaws do not require it to be a Good Samaritan. But YPF did not just fail to do the right thing; it affirmatively breached the Bylaws by doing precisely what they prohibited, shirking its obligations to investors who had parted with their dollars in reliance on YPF's promised protection.

3. Like the district court, YPF insists that because other Bylaws provisions impose obligations on named actors via the active voice, any passive provisions must be merely precatory or aspirational. YPF.Br.30-31; *see* SA111-12. But like the

19

district court, YPF cites no law—Argentine or otherwise—for that dubious reasoning. That is no accident. There is no *expressio unius* canon when it comes to the active versus passive voice. The Bill of Rights alternates between active-voice prohibitions—"Congress shall make no law…" U.S. Const. amend. I—and passive-voice protections—"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated," U.S. Const. amend. IV—but they are all enforceable against the federal government.

YPF's approach also contravenes the canon against superfluity, by effectively reducing the relevant Bylaws provisions to a nullity. In YPF's view, the Bylaws impose *no obligation on anyone* to enforce the tender offer provisions or to carry out the specified consequences under §7(h); instead, YPF says, §7(h) just sets forth consequences that should occur "without any action on the part of" YPF itself. YPF.Br.35. According to YPF, the company was completely free to ignore the "shall not" prohibitions in the Bylaws and grant voting rights and pay dividends to whomever it wanted without any consequence. That makes no sense. Where the Bylaws say something "shall not" be done and YPF does it anyway, YPF cannot deny that it has breached the Bylaws.

Indeed, the Bylaws' use of the passive voice, if anything, puts *even more emphasis on the consequences* of a non-compliant tender offer and less emphasis on

the actor (because it is obvious that YPF is the only party that can police voting rights, dividends and quorums). *Cf.* Passive Voice, *Fowler's Dictionary of Modern English Usage* (J. Butterfield ed., 4th ed. 2015) (including as a "legitimate and irreproachable use[] of the passive," its use to "highlight the person or thing affected by the action, rather than the doer of the action"). Reading the use of the passive voice as rendering those consequences illusory thus gets matters backwards—especially as §7(h) only applies when an acquirer has *already* refused to fulfill its own tender-offer obligation, making the view that §7(h) is just an honor code directed to the offending acquirer nonsensical.

YPF insists that reading the tender-offer provisions to impose no obligations on YPF creates no gap in enforcement, because shareholders could challenge any unlawful resolutions passed at a shareholder meeting in the Argentine courts. YPF.Br.36. But that argument backfires, as the suit YPF envisions would be a suit *against YPF,* which only underscores that the Bylaws' passive-voice obligations run to the corporation. *See* SA226 (General Companies Law ("GCL") §251) (suit shall be brought "against the company").

YPF next contends that this Court should not find any obligations on YPF in the Bylaws because the money raised in YPF's IPO on the NYSE went to Argentina and its provinces rather than to YPF itself, and because (YPF says) investors "placed no importance on the Bylaws' tender-offer provisions." YPF.Br.37 & n.7. That

contradicts both common sense and the record. It is the nature of privatizations that the capital raised is not deposited in the corporate treasury, but is distributed to the previous owners, i.e., the government. That is precisely why the investors need meaningful protections for their investment in general and specific protection against the government taking actions to run down the stock price and then renationalize the company on the cheap. And the record is replete with evidence confirming that (unsurprisingly) the tender-offer provisions were a critical protection for investors against those risks and that the IPO would not have succeeded without them. *See, e.g.*, JA___[Dkt.364-26.¶¶1, 11, 13-15, 38-39, 50-58; Dkt.364-27.¶¶3-5, 22-26, 29-34, 37-38; Dkt.364-29.¶¶18, 20-27; Dkt.364-108.at.809; Dkt.406-3.at.59-60].

YPF brushes aside its repeated assurances to investors in its IPO prospectus, dismissing them as "extrinsic evidence" and claiming (like the district court) that those promises add nothing to the terms of the Bylaws themselves. YPF.Br.39; *see* SA112-13. But as YPF's own expert explained, the Argentine doctrine of estoppel (or "*actos propios*") allows courts to look to a party's prior conduct "as a tool for interpreting and explaining the existence of contractual liability," applying "a principle that stops someone from going against their own prior acts." JA___[Dkt.36.¶¶46-47]; *see* JA___[Dkt.377-25.¶13 & n.11] (explaining that "Argentine courts and doctrine have long agreed" that courts may "resort[] to extrinsic evidence if necessary" to "ascertain what the parties meant"). That

principle is not limited to persons who are themselves "bringing a claim," *contra* YPF.Br.39; instead, as YPF's expert explained, it applies equally to "the conduct of the allegedly breaching party," JA___[Dkt.36.¶¶46-48].

Here, YPF's statements in its IPO prospectus unambiguously confirm its obligations under the Bylaws.  YPF promised investors that any person engaging in a control acquisition "must … make a public tender offer for all outstanding shares," that the acquirer "will be obliged to acquire all tendered shares," that Argentina in particular "would be required to make a cash tender offer to all holders of Class D Shares," and that "[a]ny Control Acquisition carried out by the Argentine Government other than in accordance with the procedure described … will result in the suspension of the voting, dividend and other distribution rights of the shares so acquired."  JA___[Dkt.112-2.at.11, 82].  If the plain text of the Bylaws leaves any doubt as to the scope of YPF's obligations, those promises resolve it.[3]

YPF eventually resorts to asserting that it would contravene "core principles of corporate law" to require YPF to comply with obligations that are "absent from the Bylaws' text."  YPF.Br.41-42.  That begs the question.  The obligations here are *present* in the Bylaws' text—which clearly articulated what "shall not" be done—

---

[3] As the district court recognized, Plaintiffs do not assert guarantor liability, making YPF's discussion of that doctrine irrelevant.  *See* SA114; *contra* YPF.Br.39-41.

and for all the reasons already explained, those obligations apply to YPF, which was not free to do what the Bylaws flatly prohibited. There is thus nothing "extraordinary" or "unpredictable" about holding YPF to those obligations. *Contra* YPF.Br.41. Nor are those obligations remotely "out of the corporation's control," YPF.Br.41, as YPF has full control over whether to comply with the Bylaws by enforcing the tender-offer requirements and respecting their consequences, including by not counting votes from or distributing dividends to improperly acquired shares. *See* JA___[Dkt.363-1.at.12]. There is also nothing "extraordinary" in the fact that holding YPF liable for breaching its obligations may affect YPF's "other shareholders" and other constituencies, *contra* YPF.Br.41-42; on the contrary, it is *always* true that holding a corporation liable for breach of contract may have some negative impact on shareholders and other its stakeholders. That is hardly a reason to allow corporations to escape their contractual obligations, especially when the vast majority of shareholders acquired their shares knowing of the wrongdoing.

### B. YPF's Causation Argument Is Wrong and Provides No Alternative Basis for Affirming the Judgment for YPF.

YPF next asks this Court to affirm on the alternative basis that (according to YPF) Plaintiffs put forward no evidence from which a reasonable factfinder could infer causation—an argument the district court never reached. YPF.Br.45. This Court should reject that argument out of hand, as YPF comes nowhere near showing that "no reasonable jury could find in [Plaintiffs'] favor" on causation. *Jingrong v.*

*Chinese Anti-Cult World All. Inc.*, 16 F.4th 47, 57 (2d Cir. 2021). In fact, the record shows the opposite: YPF was supposed to provide the last line of defense in the event an acquirer disregarded the Bylaws' tender-offer requirement, whether intentionally or inadvertently. By abandoning the ramparts instead—and affirmatively affording voting rights and dividends to Argentina despite the Bylaws' prohibition—YPF plainly caused Plaintiffs substantial harm.

1. YPF rests its causation argument on repeatedly asserting that Plaintiffs advanced "no evidence" that YPF's breach led to Plaintiffs' injury. YPF.Br.46; *see* YPF.Br.46-48. That is wishful thinking. The record provides copious evidence showing that if YPF had complied with its obligations under the Bylaws, then Plaintiffs would not have been injured.

That evidence begins with the February 2012 memorandum from Argentine Secretary of Energy Daniel Cameron to Argentina's appointed member of the YPF board, which "explore[d] the different forms of accessibility to the company" two months before Argentina seized control. JA___[Dkt.364-81.at.69040]. In that memorandum, after explaining why Argentina wanted to renationalize YPF, Cameron laid out two routes for acquiring control: first, "under the rules of [YPF's] own bylaws," which "implies moving forward with a stock tender offer," JA___[Dkt.364-81.at.69040], or second, through "expropriation," which would allow Argentina "to take control of the company without prior payment,"

JA___[Dkt.364-81.at.69041]. A tender offer would cost Argentina "between 11 billion and 14.5 billion dollars," so Cameron concluded "[t]he only way to go is expropriation." JA___[Dkt.364-81.at.69041]. But if YPF had complied with its Bylaws obligations, the only shares Argentina could have obtained without the required tender offer would have been shares carrying no voting or dividend rights. Faced with that choice, Argentina's only option—if "the severity of the situation" indeed made obtaining control of YPF "a matter of national public interest and a priority objective," JA___[Dkt.481-10.at.8] (intervention decree)—would have been to make the tender offer the Bylaws demanded. The Cameron memorandum accordingly provides strong evidence that YPF's failure to comply with its enforcement obligations led, "in the natural and ordinary course of things," JA___[Dkt.377-27.¶101], to Plaintiffs' injury.

That inference of causation is confirmed by the April 17, 2012 speech to the Argentine Congress by Axel Kicillof, in his dual role as YPF's Vice-Intervenor and Argentina's Secretary of Economic Policy and Development Planning. JA___[Dkt.481-11]. In that speech—one day after the intervention—Kicillof unambiguously declared that YPF would do nothing at all to enforce the Bylaws, openly mocking as "fools … those who think that the State has to be stupid and buy everything according to the law of YPF itself, respecting its bylaws," and dismissing the tender-offer provisions as a "bear trap." JA___[Dkt.481-11.at.25]. As that

26

speech highlights, Argentina was able to disregard the Bylaws' tender-offer requirement only because YPF likewise disregarded its own obligation to enforce that requirement, and instead affirmatively supported Argentina's breach.

The causal chain from YPF's breach to Plaintiffs' injury is also clear from the nature of the obligations YPF breached. Through those obligations, investors concerned about a possible renationalization obtained a double security against that prospect. Rather than impose obligations on Argentina alone, the Bylaws impose reinforcing obligations on YPF precisely to ensure that even when faced with an acquirer intent on bypassing its tender-offer obligations, minority shareholders would be protected by YPF itself, which would (among other things) prevent any such acquirer from voting its improperly acquired shares or collecting dividends on those shares. *See* JA___[Dkt.363-1.at.12] (Bylaws §7(h)). Those obligations were designed to dissuade an acquirer from disregarding its tender-offer obligations in the first place and, as to Argentina in particular, to act as a firebreak in the event it went forward in either conscious or inadvertent disregard of the tender-offer requirements. JA___[Dkt.363-1.at.29] (Bylaws §28(C)) (imposing lesser consequences for an inadvertent violation). Needless to say, by failing to honor obligations designed to provide a second layer of protection against a renationalization that avowedly disregarded the Bylaws' tender-offer requirements, YPF's breach caused minority shareholders serious harm. Indeed, Plaintiffs' injury flows directly from YPF's

27

decision to violate the Bylaws by counting Argentina's votes and paying it dividends—thereby handing Argentina the full economic control that the Bylaws rendered off-limits and leaving Plaintiffs stranded as minority investors in a state-owned company without access to the Bylaws' promised compensated exit.

In short, as Plaintiffs' experts explained below, the "causation here is obvious." JA___[Dkt.364-38.¶45]; *see* JA___[Dkt.377-36.¶43]. Indeed, "[i]t is hard to imagine a case with a more direct causal link between Defendants' breaches and Plaintiffs' damages." JA___[Dkt.364-38.¶45]. YPF was supposed to supply the last line of defense against a non-compliant tender offer, but when the need for that last line of defense arose, YPF folded and collaborated. Under the Bylaws, YPF "promised Plaintiffs that a tender offer would be made and undertook obligations to ensure that it would be. But when circumstances requiring a tender arose, YPF did nothing, and no tender occurred." JA___[Dkt.377-36.¶49]. "It is of course a foreseeable (adequate) consequence of failing to take one's required contractual steps that the contractual outcome would not occur." JA___[Dkt.377-36.¶49]; *see* JA___[Dkt.364-38.¶50]. And "as a matter of basic fairness, YPF cannot do nothing at all—that is, ignore its contractual obligation—and then defend itself by speculating that nothing would have worked." JA___[Dkt.377-36.¶49].

2. None of YPF's contrary arguments is persuasive. YPF starts by trying to shift the standard, arguing it "had no means of forcing [Argentina]" to comply with

its contractual obligations and could not "compel the sovereign republic to tender to purchase shares." YPF.Br.47 (quoting JA___[Dkt.377-27.¶80]); *see* YPF.Br.46. But as YPF elsewhere admits (quoting its own expert), the question is not whether YPF could "force" or "compel" the sovereign nation of Argentina to do its bidding, *contra* YPF.Br.46-47, but simply whether the "natural and ordinary" result of YPF performing its obligations would have been to avoid Plaintiffs' damages, YPF.Br.46 (quoting JA___[Dkt.377-27.¶101]).  Under that correct standard, the "natural and ordinary" causal link between YPF's failure to perform and Plaintiffs' injury is straightforward.  If YPF had not breached—and instead had obeyed the Bylaws' "shall not" commands when counting votes and paying dividends—Plaintiffs' injury would have been avoided.

YPF next criticizes Plaintiffs for "resort[ing] to hypotheticals" to demonstrate causation.  YPF.Br.47.  That criticism is mystifying.  After all, "[b]ut-for causation is a hypothetical construct." *Price Waterhouse v. Hopkins*, 490 U.S. 228, 240 (1989) (plurality op.), *superseded by statute on other grounds*, Pub. L. No. 102-166, §107, 105 Stat. 1075.  Here, there is nothing hypothetical about Plaintiffs' injuries, and determining whether YPF's breach was a cause of those real-world injuries *requires* considering the hypothetical scenario in which the defendant complied with its obligations to ascertain whether "but for the defendant's unlawful conduct, [the plaintiff's] alleged injury would not have occurred." *Comcast Corp. v. Nat'l Ass'n*

29

*of Afr. Am.-Owned Media*, 589 U.S. 327, 331 (2020). Having failed to comply with its Bylaws obligations—and having instead chosen to take affirmative steps to hand Argentina the voting power and economic interest that Argentina sought, but the Bylaws prohibited—YPF can hardly complain when Plaintiffs are forced to rely on counterfactuals to show what would have occurred if those obligations had been honored.

YPF contends next that it was "up to the shareholders—not [YPF]—to enforce" the Bylaws' tender-offer provisions, and blames Plaintiffs for not objecting to the intervention or Argentina's improper voting of the expropriated shares at the June 2012 shareholders' meeting. YPF.Br.47-48. That is not a causation argument at all; it simply denies that YPF had any independent obligation under the Bylaws, which is wrong for all the reasons already explained. The Bylaws imposed obligations on YPF as part of the double-security against a non-complying tender offer. As long as YPF obeyed the Bylaws, an acquirer who violated the tender-offer provision could not achieve its goals and could impose only limited damage on other shareholders: the acquirer would be powerless to deprive other shareholders of the economic and political benefits they had enjoyed *ex ante* before the acquirer's control transaction. Having failed to provide that last line of defense, YPF is in no position to dispute causation.

30

Changing tack, YPF claims it "took no part" at all in the June 2012 shareholders' meeting, because under the terms of Law 26,741—the "YPF Expropriation Law," *Petersen II*, 895 F.3d at 202, which YPF euphemistically calls the "Public Interest Law"—that meeting "was called and presided over by the then-President of the CNV," or Comisión National de Valores, which is the Argentine agency responsible for regulating the national stock market. YPF.Br.48; *see* JA___[Dkt.364-118.at.109773]. But nothing in the YPF Expropriation Law suggests that just because the CNV was instructed to "call a Meeting of Shareholders" for YPF, JA___[Dkt.364-118.at.109773], the company was somehow excused from its obligations under the Bylaws at that meeting and all subsequent ones, and was free thereafter to count votes and pay dividends for shares that the Bylaws said "shall not" receive them. YPF's assertion that it "took no part" in the shareholders' meeting only underscores its failure to carry out its Bylaws obligations. *Contra* YPF.Br.48.[4]

---

[4] YPF asserts in a footnote that Plaintiffs "abandoned" their claim that YPF breached its duties by "failing to distribute dividends to YPF's shareholders," while citing nothing showing that purported abandonment. YPF.Br.48 n.12. In fact, YPF's failure to make its scheduled dividend payment after the intervention was the direct result of YPF's failure to carry out its obligations, *see Petersen II*, 895 F.3d at 203, and YPF's subsequent dividend payments to the improperly acquired shares continued to breach its obligations, *see* JA___[Dkt.363-1.at.12].

As a last resort, YPF asserts Plaintiffs have somehow conceded causation and admitted that "it would have been 'futile' for YPF" to comply with its obligations. YPF.Br.48 (quoting Pltfs.Br.60). That is flatly incorrect. As Plaintiffs' opening brief makes clear, it would have been "futile" for *Plaintiffs* to request specific performance from Argentina, because Argentina had already "explicitly announced" it "had no intention of fulfilling its tender-offer obligations." Pltfs.Br.60; *see* JA___[Dkt.481-11.at.25] (Kicillof speech). But the fact that Plaintiffs could not have remedied their injury by requesting specific performance hardly suggests—let alone "all but admit[s]," YPF.Br.48—that YPF could not have prevented or at least ameliorated that injury by carrying out its own obligations. To the contrary, the obligations to deny voting, dividends and quorums presuppose that the non-compliant acquisition has occurred. They do not obligate shareholders to go to court and seek specific performance, but instead obligate YPF to take certain actions in convening shareholder meetings and distributing dividends. Those provisions are designed to protect minority shareholders even after a non-complying tender offer has occurred. The failure to honor those obligations plainly injured the minority shareholders the provisions were designed to protect.

### C. YPF's Argentine Law Arguments Are Wrong and Provide No Alternative Basis for Affirming the Judgment for YPF.

YPF next presents yet another purported alternative basis for affirmance, asserting (on two grounds) that even if YPF breached its clear obligations under the

32

Bylaws and caused Plaintiffs' injuries, Plaintiffs' claims against YPF for that breach "are not cognizable under Argentine Law." YPF.Br.49. YPF is incorrect.

### 1. Plaintiffs have breach-of-contract claims against YPF.

YPF begins with the extraordinary assertion that under Argentine law, a shareholder can *never* sue a company for breaching its bylaws—an assertion for which YPF relies solely on the declarations of its experts, without citing any actual Argentine law whatsoever. YPF.Br.49-50. That is flat wrong. As this Court has already recognized, under Argentine law, the Bylaws are a contract—specifically, "the contract governing the relationship among YPF, Argentina (in its capacity as a shareholder), and other YPF shareholders." *Petersen II*, 895 F.3d at 199; *see* JA___[Dkt.364-36.¶21] ("[C]orporate bylaws are contracts."). Violating a contractual obligation imposed by the Bylaws accordingly gives rise to a breach-of-contract claim under the Argentine Civil Code, and makes the breaching party "responsible for damages and interest caused to the [non-breaching party] by their default in fulfilling the obligation." SA201 (Civil Code Article 508); *see* SA201 (Civil Code Articles 505, 506, 511); SA205 (Civil Code Article 889); *see also* JA___[Dkt.364-36.¶21] ("[B]reaches of corporate bylaws are contractual breaches that give rise to contractual civil liability under Articles 506, 508, 511, and 889 of the Civil Code[.]"); JA___[Dkt.364-31.¶¶11-12].

That conclusion is supported not only by the plain text of the Civil Code, but by prior decisions of the Argentine courts, which have recognized that actions arising from corporate bylaws can be brought against the corporation itself as well as against other shareholders. *See, e.g.*, JA___[Dkt.396-12.at.1013] (*Zullo v. Kehoe*, CN Com., Room A, July 22, 2008 (TR LA LEY AR/JUR/8909/2008)) ("[A]ctions that arise from the bylaws … may be exercised by the company against the shareholders or by the shareholders among themselves or against the company[.]"); JA___[Dkt.377-38.at.PDF41] (*Gutiérrez v. Neumáticos Gutiérrez SA*, October 16, 2012, CN Com., Room A (TR LA LEY AR/JUR/62470/2012)) (similar). That precedent confirms that the Civil Code means what it says, and that nothing in Argentine law prohibits Plaintiffs from suing YPF for breaching its obligations under the Bylaws.

YPF does not dispute—or even mention—that the Civil Code by its terms authorizes damages actions for any breach of contractual obligations. Instead, YPF simply asserts (again invoking solely its own experts) that the only "proper way for shareholders to contest alleged bylaws violations" is through an action under Article 251 of the GCL, YPF.Br.51, which allows shareholders who vote against a corporate resolution at a shareholders' meeting to challenge that resolution by bringing suit in Argentine court "within three (3) months from the adjournment of the meeting," SA226.

As the district court recognized in rejecting Argentina's identical argument, *see* SA126-28, that is entirely mistaken. Under black-letter Argentine law, the Civil Code "applies to all matters and business transactions" unless modified by the Argentine Commercial Code (which includes the GCL). SA126-27 (quoting Commercial Code Article 207); *see* SA210; JA___[Dkt.377-25.¶¶24-25]; JA___[Dkt.364-37.¶30]. Here, as the district court explained, "the existence of mechanisms in the GCL by which shareholders can propose and challenge shareholder resolutions" does not "require that every dispute related in any way to corporate bylaws proceed via these mechanisms," and does not "displac[e] the breach of contract claim Plaintiffs bring under the Argentine Civil Code." SA127; *see* JA___[Dkt.377-25.¶26]; JA___[Dkt.364-37.¶¶33-34]. Plaintiffs' claim under the Civil Code against YPF for its breach of its contractual obligations was not "somehow modified or displaced by ill-fitting and indirect intra-corporate procedures governing challenges to resolutions" just because the contractual obligations that YPF breached "w[ere] contained in the Bylaws." SA128.[5]

---

[5] Despite Professor Pargendler's unsupported musings, there is nothing "inimical to the economic logic of the corporate form" in recognizing shareholder claims for damages against corporations that breach their bylaws. *Contra* YPF.Br.50 (quoting JA___[Dkt.400-1.¶39]). *Any* damages claim against a corporation may in some sense "undermine" the interests of "other shareholders, creditors, workers and other constituencies," YPF.Br.50 (quoting JA___[Dkt.400-1.¶38]), but that is no reason to allow corporations to breach their contractual obligations with impunity.

That result accords not only with the plain terms of the Civil Code and Argentine law, but with common sense. The Bylaws promised investors not just that Argentina would be contractually obligated to make them a tender offer if Argentina sought to renationalize YPF, but that YPF itself would provide a second layer of protection by taking actions in the event of non-compliance with the tender-offer requirements. If YPF had told investors that its Bylaws obligations were really as unenforceable as YPF now claims, and that their only recourse if YPF chose to ignore those obligations would be to challenge its corporate resolutions at a shareholder meeting and then follow up within three months with a corporate-law suit in the Argentine courts—where they could not recover any damages from YPF even if they prevailed, *see* SA226-27—no reasonable investor would have relied on YPF's promises, and the IPO would have failed out of the gate. YPF cannot now turn around and write its promises out of the Bylaws by denying Plaintiffs their straightforward breach-of-contract remedy for YPF's straightforward contractual breach.

###     2.     The YPF Expropriation Law does not bar Plaintiffs' claims against YPF.

In a single cursory paragraph, YPF argues in the alternative that the YPF Expropriation Law somehow "superseded the Bylaws" and "excused" YPF's failure to enforce the tender-offer requirement. YPF.Br.51-52. There is a reason YPF spends only one paragraph on this argument: It is meritless. Nothing in the YPF

Expropriation Law purports to excuse YPF from its contractual obligations under the Bylaws to enforce the tender-offer provisions, or from liability for failing to carry out those contractual obligations. As this Court has already recognized, there is "no reason why Argentina could not have complied with both the bylaws' tender offer requirements and the YPF Expropriation Law." *Petersen II*, 895 F.3d at 208. There is likewise no reason why YPF could not have complied with its own obligations to enforce those tender offer requirements.

The only purported conflict that YPF identifies between its Bylaws obligations and the YPF Expropriation Law is that the latter provides that Argentina "shall … exercise all rights carried by the stock to be expropriated." JA___[Dkt.364-118.at.109773]; *see* YPF.Br.51-52. But the "rights carried by the stock to be expropriated" are themselves defined by the Bylaws—including §7(h), which (as even YPF recognizes) deprives any shares acquired in violation of the tender-offer provisions of their voting and dividend rights. JA___[Dkt.363-1.at.12]; *see* YPF.Br.35-36. Because Argentina failed to make the required tender offer, the "rights carried by the stock to be expropriated" did not include any voting or dividend rights, and nothing in the YPF Expropriation Law required YPF to breach the Bylaws by affording Argentina rights that the expropriated shares lacked. JA___[Dkt.364-118.at.109773]; *see* JA___[Dkt.396-9.¶¶46-48].

Even if there were any conflict between the YPF Expropriation Law and YPF's obligations under the Bylaws, that conflict would not excuse YPF from liability. YPF's claim that it could not carry out its Bylaws obligations in light of the YPF Expropriation Law is in effect an attempt to invoke the defense of *force majeure*, by asserting an "impossibility to perform" caused by "a legal regulation." JA___[Dkt.364-38.¶48]. That defense, however, is only available under Argentine law when the impediment to performance "was unforeseen, or could not have been taken reasonably into account at the time the contract was concluded." JA___[Dkt.377-36.¶36] (citing Civil Code Articles 513 and 514); *see* JA___[Dkt.364-38.¶48] (*force majeure* must be "unforeseeable"). That is the opposite of this case, as Argentina and YPF amended the Bylaws to include the tender-offer provisions and YPF's enforcement obligations *precisely* because it was foreseeable that Argentina might seek to re-take control of the company and evade the tender-offer requirement. *See* JA___[Dkt.364-38.¶50]; JA___[Dkt.377-36.¶37]. YPF therefore cannot rely on the YPF Expropriation Law to avoid liability for breaching its enforcement obligations.

## II. The District Court Erred In Dismissing Plaintiffs' Promissory Estoppel Claims.

The district court erred not only in granting summary judgment for YPF on Plaintiffs' breach-of-contract claims, but also in dismissing Petersen's promissory estoppel claims against both Defendants. Argentina and YPF made clear promises

in the IPO prospectus and subsequent SEC filings about the conditions that Argentina would be required to meet if it ever sought to re-acquire control of YPF, committing to provide investors with a compensated exit in the event of any future renationalization. *See* JA___[Dkt.1.¶¶2, 24-25, 65, 83]. And investors (including Plaintiffs) placed massive and concrete reliance on those promises, putting billions of dollars into YPF based on those assurances that they would not later find themselves trapped as minority shareholders in a state-controlled enterprise with no opportunity for that compensated exit. JA___[Dkt.1.¶¶29, 66-67, 84-85]. As such, if this Court were to conclude that either Argentina or YPF were not contractually bound to comply with its obligations under the Bylaws, promissory estoppel would provide an alternative basis for that party's liability.

Argentina's and YPF's promises were unambiguous. They assured understandably wary investors that any acquisition of shares above specified aggregate thresholds would "be preceded by a cash tender offer for all outstanding shares"; that any such acquisition "must be carried out in accordance with the procedure described"; that the required tender offer would be "a public tender offer for all outstanding shares," and "must be carried out in accordance with [the] procedure specified in the By-laws and in accordance with any additional or stricter requirements of jurisdictions, exchanges or markets in which the offer is made or in which [YPF's] securities are traded"; that the tender-offer price under the Bylaws

formulae could be "substantially in excess of the market price"; and that "[t]he voting, dividend and other distribution rights of any shares acquired … other than in accordance with [these] provisions will be suspended, and such shares will not be counted for purposes of determining the existence of a quorum at shareholders' meetings." JA___[Dkt.112-2.at.10-11, 80-82].

As to Argentina in particular, the promises underscored that "[s]pecial rules apply to acquisitions of shares by the Argentine Government," that "in order to acquire a majority of [YPF's] capital stock … the Argentine Government first would be required to make a cash tender offer to all holders of Class D Shares," and that "[a]ny Control Acquisition carried out by the Argentine Government other than in accordance with the procedure described … will result in the suspension of the voting, dividend and other distribution rights of the shares so acquired." JA___[Dkt.112-2.at.10-11, 82]. Those promises were not only included in the IPO prospectus, but regularly repeated in YPF's later SEC filings as well. *See, e.g.*, JA___[Dkt.364-109.at.180-81]; JA___[Dkt.1.¶¶25, 65, 83]. Having made those clear commitments to investors, and induced their reliance on them, Argentina and YPF cannot now evade liability for failing to carry out their unequivocal promises.

Defendants begin by asserting (like the district court) that promissory estoppel "is not an autonomous source of obligations" under Argentine law. Arg.Resp.56; *see* SA46; YPF.Br.52-53. But YPF's own expert, Dr. Kemelmajer, explained that is true

only "[i]n the case of a *contractual* relationship." JA___[Dkt.36.¶48]. Where there is a contract between the parties, estoppel is only "used as a tool for interpreting and explaining the existence of contractual liability." JA___[Dkt.36.¶47]; *see supra* pp.22-23. By contrast, in "the absence of a contractual relationship between the parties," Argentine law *does* recognize estoppel as an "autonomous source[] of obligations." JA___[Dkt.36.¶48] (emphasis omitted). So too here: If (as Plaintiffs contend) the Bylaws establish binding contractual obligations, then Argentina's and YPF's accompanying promises simply confirm "the existence of [their] contractual liability." JA___[Dkt.36.¶47]. But if (as Defendants contend) the Bylaws do not create an enforceable contractual relationship, Argentine law makes their relied-upon promises enforceable instead. *See* JA___[Dkt.36.¶45 n.18] (recognizing the Argentine legal principle that "if someone's actions generate well-founded legal expectations, it is contrary to good faith to contradict them harmfully").[6]

Defendants next contend (again, like the district court) that Petersen's promissory estoppel claim "impermissibly duplicates its breach-of-contract claim."

---

[6] Argentina's contrary assertion—that estoppel is only "an interpretive tool to help determine whether a party has breached a promise," Arg.Resp.57—cannot be squared with Dr. Kemelmajer's recognition that estoppel can arise in "the absence of a contractual relationship," JA___[Dkt.36.¶47]. YPF, by contrast, appears to concede that the Bylaws create a contractual relationship; it just suggests that they "do not impose the broad obligations" that their plain terms require, YPF.Br.52-53, which is wrong for all the reasons already explained.

Arg.Resp.57; *see* SA46; YPF.Br.53-54. But that is true only if (as Plaintiffs contend) there are binding contracts. Under both Argentine law and New York law, where (as here) there is "a dispute over the existence, scope, or enforceability of the putative contract," a plaintiff "may plead … promissory estoppel claims in the alternative" alongside its breach-of-contract claims. *Goldberg v. Pace Univ.*, 88 F.4th 204, 214-15 (2d Cir. 2023); *see* JA___[Dkt.36.¶¶47-49]. Neither Argentina nor YPF disputes that dispositive rule. *See* Arg.Resp.57-58; YPF.Br.53. Instead, Defendants contend there is no material difference between their promises in their prospectus and SEC filings and their contractual promises in the Bylaws. *See* Arg.Resp.57-58; YPF.Br.54. That misses the point: Even if both sets of promises were identical, the district court would have erred in dismissing the promissory estoppel claim while Defendants continued to dispute the "existence, scope, or enforceability" of their contractual obligations in the Bylaws. *Goldberg*, 88 F.4th at 215.

YPF (but not Argentina) next asserts two purported alternative grounds for affirmance: (1) language in the prospectus stating that "any action relating to enforcement of the By-laws or a shareholder's rights thereunder is required to be brought in an Argentine court," JA___[Dkt.112-2.at.88], and (2) language in the district court's summary judgment decision inviting Plaintiffs to seek reconsideration regarding the promissory estoppel claims, *see* SA113 n.6. Neither argument is remotely persuasive. As to the former, the district court correctly held

that the non-contractual language YPF cites did not and could not create a unilateral-but-mandatory forum-selection clause that would bar Plaintiffs from filing their breach-of-contract claims in federal court. *See* SA60-62. Nor could that language bar Plaintiffs from bringing promissory estoppel claims in federal court, not least because those estoppel claims do not seek enforcement of "the By-laws or a shareholder's rights thereunder," but rest on Defendants' promises in the prospectus and later SEC filings. JA___[Dkt.112-2.at.88]. It is not at all "inconsistent," let alone a basis for judicial estoppel, for Plaintiffs to insist that all their claims should be heard in the same federal court. *Contra* YPF.Br.55.

As to the latter, Plaintiffs plainly did not forfeit their challenge to the district court's erroneous dismissal of the promissory estoppel claims by declining to seek reconsideration of that ruling after the district court's summary judgment decision. *See, e.g.*, *Sargeant v. Barfield*, 87 F.4th 358, 362 (7th Cir. 2023) ("no authority" requires a party to "ask[] the court to reconsider … to preserve [its] argument for appeal"); *United States v. Burris*, 29 F.4th 1232, 1234 n.1 (10th Cir. 2022) (rejecting the argument that "a motion for reconsideration must be filed to preserve an argument for appellate review"); *Young v. Hawaii*, 992 F.3d 765, 779 n.5 (9th Cir. 2021) ("Young was not required to seek reconsideration to preserve his claims for appeal."), *vacated on other grounds*, 142 S.Ct. 2895 (2022); *contra* YPF.Br.55-56. Plaintiffs are not somehow raising a new "alternative argument" by pointing out that

if this Court were to conclude that YPF (or Argentina) is not contractually bound by the tender-offer provisions, promissory estoppel should provide an alternative basis for liability, *contra* YPF.Br.56; that has been Plaintiffs' consistent position ever since Petersen pleaded both breach-of-contract and promissory estoppel claims in its complaint. *See* JA___[Dkt.1.¶¶51-85]; JA___[Dkt.49.at.2]. After properly opposing dismissal of the promissory estoppel claims at the motion-to-dismiss stage, *see* JA___[Dkt.49.at.2, 5, 20-22], Plaintiffs were not required to re-raise and relitigate that issue when the district court's summary judgment decision further undermined the premise of its prior ruling. *Contra* YPF.Br.56.[7]

## III.    The District Court Correctly Calculated Plaintiffs' Damages.

YPF's conditional cross-cross-appeal raises only a single issue, asserting that the district court erred by calculating Plaintiffs' damages in dollars. According to YPF, the district court should instead have first calculated the damages that Plaintiffs were owed in 2012 in Argentine pesos, and then converted those 2012 Argentine pesos into current U.S. dollars using the conversion rate in effect *when the court entered judgment in 2023*—rewarding YPF with a massive discount for its prolonged

---

[7] Argentina and YPF also cursorily assert that Eton Park should not be permitted to assert promissory estoppel because its complaint did not explicitly raise that theory. Arg.Resp.56; YPF.Br.57 n.17. But Eton Park's complaint alleged all the facts needed to support promissory estoppel, *see* JA___[Eton.Park.Dkt.1.¶¶4-8, 27-28, 31]; and in any event, as YPF apparently recognizes, the issue is best resolved on remand if necessary, *see* YPF.Br.57 n.17.

delay in meeting its obligations by retroactively applying more than a decade of skyrocketing Argentine inflation to wipe out a staggering *95%* of Plaintiffs' damages award.  YPF.Br.57-58; *see* JA___[Dkt.407-16.¶22].  That remarkable attempt to rely on *post hoc* currency fluctuations to deny Plaintiffs practically all the damages that they are owed cannot be squared with governing New York law or basic fairness, and the district court correctly rejected it.

As the district court recognized, and YPF concedes, the governing law here is New York Judiciary Law §27, which provides:

(a)  Except as provided in subdivision (b) of this section, judgments and accounts must be computed in dollars and cents. …

(b)  In any case in which the cause of action is based upon an obligation denominated in a currency other than currency of the United States, a court shall render or enter a judgment or decree in the foreign currency of the underlying obligation. Such judgment or decree shall be converted into currency of the United States at the rate of exchange prevailing on the date of entry of the judgment or decree.

N.Y. Jud. Law §27; *see* SA146-47; YPF.Br.58-59 & n.19.  Under the plain terms of that statute, all judgments "must be computed in dollars and cents" except for a single narrow class of cases: those "based upon an obligation denominated in a currency other than currency of the United States," for which the court "shall render or enter a judgment or decree in the foreign currency" and then convert it into dollars at the judgment-day rate.  N.Y. Jud. Law §27.

As the district court correctly recognized, this case falls under the general rule, not the narrow exception. SA146-47. Under the Bylaws and their accompanying promises, the obligations YPF breached here are not "obligation[s] denominated in a currency other than currency of the United States." N.Y. Jud. Law §27(b). Indeed, like the vast majority of all contractual obligations, they are not "denominated" in any currency at all; the relevant obligations simply require YPF to perform certain actions, not to pay any specific amount in any specific currency. That should end the matter. But as icing on the cake, if YPF had carried out its obligations, Plaintiffs would have received (and accepted) a tender offer in dollars, not Argentine pesos—and certainly would not have held Argentine pesos for more than a decade as they rapidly lost some 95% of their value. New York law thus accords with economic reality: Plaintiffs are entitled to judgment in dollars for the full amount they would have received if YPF had satisfied its obligations, not the dramatically reduced peso-denominated amount that YPF proposes.

### A. YPF's Obligations Under the Bylaws Were Not Denominated in Any Foreign Currency.

1. YPF's attempt to invoke the judgment-day rule of Judiciary Law §27(b) fails for a simple reason: This action is not "based upon an obligation denominated in a currency other than currency of the United States." SA146 (quoting N.Y. Jud. Law §27(b)). Under the Bylaws and the promises made to investors, YPF was obligated to enforce the tender-offer requirement in accordance with its terms, and

to carry out the specified consequences for any shares acquired in violation of that requirement. *See supra* pp.10-24. Those are *performance* obligations, not *payment* obligations denominated in a particular currency; they require YPF to take certain actions for Plaintiffs' benefit, not to pay Plaintiffs any particular amount in any specified form of legal tender. Because Plaintiffs are suing YPF based on "the breach of [its] obligation to perform … under the Bylaws" and its accompanying promises, rather than based on any obligation to pay "a sum certain denominated in pesos" or any other foreign currency, "the judgment-day rule does not apply." SA147; *see Nature's Plus Nordic A/S v. Nat. Organics, Inc.*, 78 F.Supp.3d 556, 557-58 (E.D.N.Y. 2015) (where an obligation "is not denominated in any currency, but is rather a performance obligation …. Judiciary Law 27(b) is inapplicable").

Even if a *performance* obligation—as opposed to a *payment* obligation— could conceivably be "denominated" in a particular currency, the Bylaws and YPF's promises here "are silent as to denomination." SA147. None of those obligations— such as ensuring that acquisitions in violation of the tender-offer requirement "shall be forbidden," that the applicable tender-offer procedures "shall be complied with," that shares acquired in violation of the tender-offer requirements "shall not grant any right to vote or collect dividends," and that these same consequences "shall be applied" when Argentina is the acquirer, JA___[Dkt.363-1.at.6-7, 12, 29-30]—is in any way denominated in pesos, and in context they plainly contemplate tender offers

47

to ADR holders in U.S. dollars instead, *see infra* pp.54-59. The limited exception of Judiciary Law §27(b) accordingly does not apply, and Plaintiffs' damages must instead be "computed in dollars and cents" as of the date of breach under Judiciary Law §27(a). N.Y. Jud. Law §27; *see* SA146-47; *Nature's Plus*, 78 F.Supp.3d at 557-58.

That result conforms with settled principles of statutory construction, under which it is well established—and YPF does not dispute—that a statute "enacted in derogation of the common law" must be "strictly construed" to carry "the narrowest sense that its words and underlying purposes permit." *Malmberg v. United States*, 816 F.3d 185, 193 (2d Cir. 2016) (quoting *Oden v. Chemung Cnty. Indus. Dev. Agency*, 661 N.E.2d 142 (N.Y. 1995)); *see* Pltfs.Br.69-70. That rule squarely applies here, as the statutory exception in Judiciary Law §27(b) is a conscious (and consciously limited) departure from the New York common-law rule that obligations involving foreign currency should be converted using the rate "on the date the breach of contract occurred." *Newmont Mines Ltd. v. Hanover Ins. Co.*, 784 F.2d 127, 138 (2d Cir. 1986); *see* Arg.Br.73. The scope of that statutory exception—and in particular, the phrase "obligation denominated in a [foreign] currency," N.Y. Jud. Law §27(b)—must accordingly be "strictly construed" in its "narrowest sense,"

*Malmberg*, 816 F.3d at 193, which excludes performance obligations that are not denominated in any currency at all.[8]

The limited scope of §27(b) accords with common sense. Under the background common-law rule, embodied in §27(a), a plaintiff is entitled to a judgment that reflects the injury "computed in dollars and cents" that it suffered on the date of breach, regardless of any subsequent currency fluctuations. N.Y. Jud. Law §27(a). Deviation from that general rule is only warranted when the underlying obligation *itself* imposes the risk of those currency fluctuations on the plaintiff—i.e., when the obligation is specifically "denominated in a currency other than currency of the United States." N.Y. Jud. Law §27(b). In those limited circumstances, the risk that the obligation may be worth less in dollars by the time it is paid "is merely the consequence of holding an obligation in [foreign currency]." *Competex, S.A. v. Labow*, 783 F.2d 333, 338 (2d Cir. 1986). But outside that narrow category of cases, forcing a plaintiff to bear the risk that its damages will be radically reduced by unpredictable currency fluctuation between the date of breach and the date of judgment comports neither with New York law nor with basic fairness.[9]

---

[8] That canon is not affected by the fact that the background common-law rule is now embodied in Judiciary Law §27(a). *See, e.g.*, *Baldwin v. Express Oil Change, LLC*, 87 F.4th 1292, 1305 (11th Cir. 2023) (applying canon to state statute carrying forward common-law regime).

[9] Indeed, this case underscores the point, as imposing the risk of peso deflation on Plaintiffs would be especially unfair given that they paid dollars to purchase

2. YPF has no meaningful response.  In a strained effort to bring its obligations within the scope of §27(b), YPF contends that the statute "does not distinguish" between performance obligations and payment obligations, and applies equally to both.  But YPF does not cite a single decision applying §27(b) to a performance obligation, and cannot contest that the only decision squarely addressing the question holds §27(b) "inapplicable" to such obligations.  *Nature's Plus*, 78 F.Supp.3d at 557-58; *see* YPF.Br.67-68.  That is for good reason:  While §27(b) does not explicitly use the words "performance" and "payment," it *does* explicitly limit its narrow exception to obligations "denominated in a [foreign] currency," N.Y. Jud. Law §27(b)—which necessarily distinguishes between performance and payment obligations, since only the latter can be "denominated" in currency to begin with.  Denominate, *Black's Law Dictionary* (12th ed. 2024) ("officially set the value of (something) according to an established system or a type of money").  And while YPF's obligations here are different from the notice and opportunity to cure obligation in *Nature's Plus*, they are identical in the only way that matters under §27(b): they are "performance

---

dollar-denominated, NYSE-traded ADRs, received all dividends and distributions in dollars, and shared in corporate profits derived from a dollar-denominated global commodity.  *See* JA___[Dkt.364-33.¶¶21-22; Dkt.407-16.¶¶18, 23].

obligation[s]" that are "not denominated in any currency." *Nature's Plus*, 78 F.Supp.3d at 558; *contra* YPF.Br.68.[10]

That effort to transform performance obligations into payment obligations is especially odd coming from YPF, as no one has ever asserted that YPF's obligations here—as opposed to Argentina's—involved making any kind of payment at all. As already explained, YPF's obligations here were simply to comply with the Bylaws, police the tender-offer requirements, and take specified non-monetary actions in the event of a non-compliant tender offer. *See supra* pp.10-24. Nothing about those obligations required YPF to make any kind of payment to Plaintiffs or to anyone else, let alone a payment "denominated in a [foreign] currency." N.Y. Jud. Law §27(b).

Apparently recognizing the problem, YPF tries to move the goalposts, claiming that the "obligation" here is the "mandatory tender offer" that the Bylaws require. YPF.Br.67; *see* YPF.Br.61 (asserting that "the 'obligation' Plaintiffs seek to enforce" is the "[o]ffer and payment" of the required tender offer). But no one contends that *YPF* was required to make any tender offer, or make any payment if that offer was accepted; its obligations were just to enforce the tender-offer

---

[10] Neither the district court nor Plaintiffs have taken the view that §27(b) is limited to obligations to pay a "sum certain *fixed in advance*." *Contra* YPF.Br.68-69 (emphasis added). The statute is limited to obligations to pay sums "denominated in a [foreign] currency," which the obligations here are not. N.Y. Jud. Law §27(b); *see* SA147; Pltfs.Br.69.

requirements and impose consequences in the face of a control acquisition that failed to comply. Those obligations—the ones that Plaintiffs' claims against YPF are "based upon"—are neither payment obligations nor "denominated in a [foreign] currency," and so fall outside the narrow scope of Judiciary Law §27(b).

Even if Plaintiffs' claims against YPF (like their claims against Argentina) were based upon the tender-offer obligation itself, that obligation is likewise a performance obligation and not denominated in any foreign currency. The Bylaws tender-offer provisions impose an obligation on potential acquirers (and Argentina in particular) to *make a tender offer* in compliance with the Bylaws—by, for instance, providing notice to YPF at least 15 business days in advance, complying with the requirements of the exchanges where YPF's securities are listed (including the NYSE), keeping the tender offer open for the specified time, and acquiring all the shares tendered. JA___[Dkt.363-1.at.6-10]. As the district court explained, that is an "obligation to perform" by making the required tender offer, and nothing about that obligation is "denominated in pesos." SA147.

To be sure, if Argentina had complied with its tender-offer obligation and Plaintiffs had tendered their ADRs, Argentina would then have been required to pay for those ADRs. *See* YPF.Br.67 (recognizing that a "mandatory tender offer entails … actual payment … *upon acceptance of the offer*" (emphasis altered)). But even then, the Bylaws do not "denominate" that payment obligation in any specific

currency—and in context, they clearly contemplate dollar-denominated payment, *infra* pp.54-59.

YPF insists otherwise, asserting that the Bylaws "require a tender offer to be made in an amount of pesos determined by the Bylaws." YPF.Br.59. Not so. Nothing in the Bylaws requires the tender offer to be made in pesos; in fact, the word "pesos" does not appear anywhere at all in the tender-offer provisions (unlike other Bylaws provisions, *see, e.g.*, JA___[Dkt.363-1.at.3, 17]). Whatever inputs the Bylaws formulae consider, *see* JA___[Dkt.363-1.at.9], the Bylaws nowhere denominate the required tender offer price in pesos—which is why Petersen and Repsol could comply with their own tender offer obligations under the Bylaws by making tender offers for ADRs in dollars. *See* JA___[Dkt.396-22.at.1; Dkt.407-14.at.952].

YPF devotes over two pages (and a large picture) to emphasizing that Plaintiffs' expert applied the Bylaws formulae by using inputs in pesos to calculate Plaintiffs' damages figure in dollars. YPF.Br.60-62. That argument ignores the text of Judiciary Law §27(b), which asks how the underlying "obligation [is] denominated," not how damages are calculated. Litigation over cross-border transactions will often involve damages calculations with at least some inputs priced in foreign currencies, since one party or the other will almost always face some costs or expect some profits that are not in U.S. dollars. That does not mean that every

obligation in a cross-border contract is automatically denominated in a foreign currency and subject to the judgment-day rule under §27(b)—an approach that would dramatically expand the boundaries of §27(b)'s exception and that finds no support in the statutory text.

### B. Plaintiffs Were Entitled to a Tender Offer in Dollars.

Even if the tender-offer obligation here could be described as "denominated" in any particular currency, that currency would be dollars, not pesos. Under the Bylaws, Argentina was required to make a tender offer for all the Class D shares of YPF "and all securities convertible into shares," including dollar-denominated ADRs traded on the NYSE; to comply with the requirements of all "exchanges where [YPF's] shares and securities are listed," including the NYSE; and to publish notice of the tender offer "in the business section of the major newspapers of … the City of New York, U.S.A., and any other city where the shares shall be listed." JA___[Dkt.363-1.at.7-9]; *see* JA___[Dkt.363-1.at.29] (Bylaws §28(A)) (applying those provisions "to all acquisitions made by [Argentina]"). Those provisions make clear beyond any doubt that the Bylaws required Argentina to tender for ADRs, which are the only form of YPF "shares and securities" that can be "listed" on "exchanges" in "the City of New York, U.S.A." JA___[Dkt.363-1.at.7-9]. And any tender offer for those ADRs would have been made in U.S. dollars, as it is impossible to pay Argentine pesos for ADRs in the United States (a fact YPF does not dispute).

JA___[Dkt.364-33.¶20]; *see* Pltfs.Br.73-74. As such, if the obligation to tender for Plaintiffs' ADRs were "denominated" in any currency at all, that currency would have to be dollars.

1. YPF's lead challenge to that conclusion is truly extraordinary: It asserts that the Bylaws imposed no obligation on Argentina to tender for ADRs in New York *at all*, instead requiring Argentina only to tender for the Class D shares themselves in Buenos Aires. YPF.Br.62-65. That cannot be squared with the text of the Bylaws, which expressly contemplates that the tender offer will not be limited to Class D shares held in Buenos Aires, but will extend to all other "jurisdictions" and "stock exchanges where [YPF's] shares and securities are listed," including "in the City of New York, U.S.A." JA___[Dkt.363-1.at.7, 9]. Nor can it be squared with the basic purpose of the tender-offer provision: to assure hesitant foreign investors that they would have a compensated exit from their investment if Argentina chose to renationalize YPF, and would not be trapped as minority shareholders in a state-controlled enterprise. YPF's post hoc attempt to limit Argentina's tender-offer obligation accordingly fails not only text but also history, as investors on the NYSE would hardly have been willing to buy more than a billion dollars in ADRs if the tender-offer protection did not cover them. That is why, as this Court has already concluded, the tender-offer provisions "required Argentina to tender for ADRs listed

on the NYSE." *Petersen II*, 895 F.3d at 205; *see id.* at 210 (noting "the required tender for ADRs listed on the NYSE").

Ignoring that reality entirely, YPF contends that Bylaws §28(B) "expressly limits" the tender-offer requirement for Argentina "to Class D shares only," and so Argentina was not required to tender for securities like ADRs that are "convertible into shares." YPF.Br.63. YPF is wrong. The provision YPF cites says nothing to exempt Argentina from its obligation to tender for "securities convertible into shares," JA___[Dkt.363-1.at.7]; instead, it merely limits the tender-offer requirement for Argentina to "the *aggregate amount* of class D shares of stock," including both actual Class D shares and securities convertible into Class D shares. JA___[Dkt.363-1.at.29] (emphasis added). That provision just makes clear that Argentina, unlike other acquirers, is not required to tender for shares or securities in Class A, B, or C, which are the classes held by Argentina itself, its provinces, and YPF's employees. *See* JA___[Dkt.363-1.at.3-4] (defining classes); *see also* JA___[Dkt.363-1.at.7] (requiring other acquirers to tender for shares "of all classes"). Nothing about that provision strips all foreign investors holding ADRs of the very protection against a possible Argentine renationalization of YPF that the tender-offer provision was adopted to guarantee.[11]

---

[11] YPF's reliance on imprecise language in the prospectus, *see* YPF.Br.63-64, is even less persuasive. That language cannot vary Argentina's clear contractual

2. YPF alternatively contends that ADRs do not qualify as "securities convertible into shares," and so again are not covered by the Bylaws' tender-offer requirement—either as to Argentina or as to any other acquirer. That alternative argument is equally incompatible with the Bylaws' text and purpose. YPF disputes whether ADRs are "convertible into shares," on the theory that exchanging an ADR for a foreign share does not "require issuance of *new* equity." YPF.Br.64-65. But the Bylaws do not limit the tender-offer requirement to securities convertible into "new" equity, *contra* YPF.Br.64-65, and YPF gives no good reason to insert that missing word into the provision. On the contrary, the plain meaning of a "convertible security" is simply one "that may be exchanged by the owner for another security," whether or not that exchange requires issuing new equity. *Black's Law Dictionary* (12th ed. 2024). And as YPF admits, ADRs unquestionably "may be exchanged by the owner" for the underlying shares, *id.*, however arduous that process may be. *See* YPF.Br.64-65.[12]

---

obligations under the Bylaws, *see* SA61; and in any event, the fact that the prospectus described Argentina's tender-offer obligation only underscores that the obligation *was* intended to extend to ADRs, as potential ADR buyers are the very audience to whom the prospectus was addressed.

[12] YPF cites a single footnote in Petersen's 2008 no-action letter to claim Petersen has acknowledged the tender-offer obligation does not extend to ADRs—while ignoring that the body of the letter says exactly the opposite. *Compare* YPF.Br.65 (citing JA___[Dkt.364-83.at.3 n.3], *with* JA___[Dkt.364-83.at.3] (tender offer for ADRs was necessary "to comply with the requirement of the By-laws").

Indeed, YPF itself *relies* on the fact that ADRs could be exchanged for Class D shares, claiming Plaintiffs could only have participated in a tender offer by "surrendering their ADRs to withdraw the underlying Class D shares and tendering those shares." YPF.Br.62-63 n.21. That is, in YPF's view, ADR holders could only take advantage of the tender-offer provisions' clear protections by (1) finding a broker in Argentina and opening an account to hold their Class D shares; (2) if necessary, registering as a foreign holder of Argentine securities, *see* JA___[Dkt.407-27]; (3) instructing the Bank of New York Mellon as depositary to break apart their ADRs and deliver the underlying Class D shares to their new Argentine brokerage account; (4) opening a bank account in Argentina to hold the proceeds of their tender; and finally (5) instructing their new Argentine broker to tender the Class D shares and deposit the proceeds into their new Argentine bank account, all within the forty business days or so between notice of the tender offer and its closing, *see* SA142-43. If YPF had articulated that daisy chain of cumbersome required steps when it unveiled its IPO, the IPO would have been DOA. Instead, the Bylaws promised a clear and straightforward compensated exit by requiring a tender offer in accordance with all the "provisions of the stock exchanges where [YPF's] shares and securities are listed." JA___[Dkt.363-1.at.7]. The tender offer had to be made in New York, where the compensation would be dollars, not just in Buenos Aires.

3. Finally, YPF asserts that the "custom and practice in cross-border tender offers was to exclude U.S. security holders," and that the Bylaws "are consistent with that standard practice." YPF.Br.65-66. Again, YPF has no answer to the actual text of the Bylaws, which explicitly contemplate tender offers for securities listed on the NYSE, JA___[Dkt.363-1.at.7-9], and no explanation for how a tender-offer protection limited to Argentine shares would have "entice[d] investors to participate in the IPO" of ADRs on the NYSE, *Petersen II*, 895 F.3d at 199. In any event, YPF's description of "standard practice" is exactly backwards. Defendants' expert Dr. Solomon initially claimed that 20 out of the 25 international tender offers he identified provided for consideration "solely in local currency," and that 12 out of those 25 required ADR holders "to withdraw the ADR in order to tender the underlying shares." JA___[Dkt.364-34.¶¶20, 26]. In reality, however, in *all but three* of those tender offers, "the ADR holders could tender ADRs (not local shares) and received cash consideration in U.S. dollars," and the three outliers "involved exceptional circumstances." JA___[Dkt.364-34.¶¶20-25]. Standard practice comports with the Bylaws' plain text: The tender offer the Bylaws required Argentina to make to Plaintiffs was an offer denominated in dollars for Plaintiffs' NYSE-listed ADRs, and the district court did not err in refusing to allow Defendants to use more than a decade of rampant Argentine inflation to wipe out 95% of Plaintiffs' damages.

\* \* \*

The judgment against Argentina should not obscure the importance of this cross-appeal. Given their legitimate—and ultimately prophetic—concerns about renationalization, and the difficulties of executing judgments against foreign sovereigns, investors were not content with contractual promises from Argentina. The Bylaws thus gave investors a double-security against acquisitions that failed to comply with the acquirer's obligations under the Bylaws. In the event of such a non-compliant tender offer—whether inadvertent or intentional—YPF contractually agreed and extra-contractually promised to provide the last line of defense by, *inter alia*, denying voting rights and dividends. YPF plainly violated those obligations, which just as plainly harmed plaintiffs. YPF should not be able to escape its independent obligations just because the district court held Argentina to its contractual promises.

## CONCLUSION

This Court should reverse the judgment for YPF and dismissal of the promissory estoppel claims, and otherwise affirm.

Respectfully submitted,

MARK C. HANSEN                          s/Paul D. Clement
DEREK T. HO                             PAUL D. CLEMENT
ANDREW E. GOLDSMITH                      *Counsel of Record*
KELLOGG, HANSEN, TODD, FIGEL,            C. HARKER RHODES IV
& FREDERICK, P.L.L.C.                   NICHOLAS M. GALLAGHER*
1615 M Street, N.W., Suite 400          CLEMENT & MURPHY, PLLC
Washington, DC 20036                    706 Duke Street
                                        Alexandria, VA 22314
RANDY M. MASTRO                         (202) 742-8900
KING & SPALDING LLP                     paul.clement@clementmurphy.com
1185 Avenue of the Americas,
34th Floor                              *Supervised by principals of the firm who are
New York, NY 10036                      members of the Virginia bar

*Counsel for Plaintiffs-Appellees-Cross-Appellants*

July 24, 2024

61

## CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMITATION

I hereby certify that:

1. This brief complies with the type-volume limitation of Local Rule 28.1.1(a) because it contains 13,998 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), as determined by the word counting feature of Microsoft Word 2016.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point font.

July 24, 2024

s/Paul D. Clement
Paul D. Clement

## CERTIFICATE OF SERVICE

I hereby certify that, on July 24, 2024, an electronic copy of the foregoing brief was filed with the Clerk of Court using the ECF system and thereby served upon all counsel appearing in this case.



<u>s/Paul D. Clement</u>
Paul D. Clement