# 23-7370(L)

## 23-7463(XAP), 23-7614(XAP)

IN THE

# United States Court of Appeals

### FOR THE SECOND CIRCUIT

◆◆

PETERSEN ENERGIA INVERSORA S.A.U. and PETERSEN ENERGIA S.A.U.,

*Plaintiffs-Appellees-Cross-Appellants,*

—v.—

ARGENTINE REPUBLIC,

*Defendant-Appellant-Cross-Appellee,*

YPF S.A.,

*Defendant-Conditional Cross-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
(NO. 1:15-CV-02739) (HON. LORETTA A. PRESKA)

## FINAL FORM REPLY BRIEF
## FOR DEFENDANT-CONDITIONAL CROSS-APPELLANT YPF S.A.

MARK P. GOODMAN
SHANNON ROSE SELDEN
J. ROBERT ABRAHAM
WENDY B. REILLY
CARL RIEHL
SOL CZERWONKO
DEBEVOISE & PLIMPTON LLP
66 Hudson Boulevard
New York, New York 10001
(212) 909-6000

*Counsel to Defendant-Conditional
Cross-Appellant YPF S.A.*

## **TABLE OF CONTENTS**                                           **Page**

INTRODUCTION ............................................................................................1

ARGUMENT ..................................................................................................5

I.   The Facts Requiring Application of the Judgment-Day Rule Are
     Undisputed. ...........................................................................................5

II.  Plaintiffs' Causes of Action Against YPF Are Based Upon Purported
     Monetary Obligations Denominated in Pesos. ......................................6

     A.   Plaintiffs' Allegations Seek to Tie YPF to the Tender Offer. ..................7

     B.   Plaintiffs Allege Obligations Denominated in Pesos. ...........................10

III. The Republic Had No Obligation to Include ADRs Directly in a Tender
     Offer. ..................................................................................................13

     A.   The Bylaws Limit the Scope of Bylaws-Mandated Tender Offers
          from the Republic to "Class D Shares," as the Prospectus Disclosed. ...13

     B.   Plaintiffs' Attempt to Broaden the Required Scope of the Tender
          Offer to ADRs Misstates and Misquotes the Bylaws and the Record. ...15

          1.   The Bylaws Did Not Require Tender Offers on the NYSE. ..............15

          2.   The Bylaws Did Not Require the Republic to Include
               ADRs as "Securities Convertible into Shares." .................................17

               a.   The Bylaws Expressly Exclude "Securities Convertible into
                    Shares" from a Mandatory Tender Offer by the Republic. .........18

               b.   In Any Event, ADRs are Not "Securities Convertible into
                    Shares." ...........................................................................................21

IV.  Applying the Judgment-Day Rule Here is Fair. .................................21

CONCLUSION .............................................................................................27

## TABLE OF AUTHORITIES

**U.S. CASES**

*Competex, S.A. v. Labow*,
  783 F.2d 333 (2d Cir. 1986) ..........................................................3, 22

*Die Deutsche Bank Filiale Nurnberg v. Humphrey*,
  272 U.S. 517 (1926)........................................................................22

*Mendez-Aponte v. Bonilla*,
  645 F.3d 60 (1st Cir. 2011)..............................................................19

*Nature's Plus Nordic A/S v. Nat. Organics, Inc.,*
  78 F. Supp. 3d 556 (E.D.N.Y. 2015) ...............................................9

*Petersen Energía Inversora S.A.U. v. Argentine Republic*,
  895 F.3d 194 (2d Cir. 2018) ...........................................................17

*Ramgoolie v. Ramgoolie*,
  2021 WL 8013769 (S.D.N.Y. Nov. 24, 2021), *report and
  recommendation adopted*, 2022 WL 669868 (S.D.N.Y. Mar. 4,
  2022) ..............................................................................................10

**U.S. STATUTES**

N.Y. Jud. Law § 27(b)..................................................................*passim*

**ARGENTINE STATUTES**

Argentine Commercial Code, § 217 .....................................................20

**OTHER AUTHORITIES**

*Black's Law Dictionary* (12th ed. 2024)..............................................12

Tipos de Cambio, *Banco Central De La Republica Argentina*,
  https://www.bcra.gob.ar/MediosPago/Tipos_de_Cambio_SML.asp .................22

Totalidad, *Real Academia Española*, https://dle.rae.es/totalidad ...........................20

Totalidad, *Word Reference*,
    https://www.wordreference.com/es/en/translation.asp?spen=
    totalidad.......................................................................................19, 20

Yanina Aguirre, *Los Eskenazi Ponen el Ojo en el Banco Patagonia:
    Posible Compra en Puerta*, URGENTE 24, June 6, 2024,
    https://urgente24.com/zona-/los-eskenazi-ponen-el-ojo-el-banco-
    patagonia-posible-compra-puerta-n578580...................................................5, 25

## INTRODUCTION

This Court should affirm the district court's dismissal of Plaintiffs' meritless claims against YPF.  Plaintiffs have no viable cause of action against YPF and no basis to recover damages from it.  But, to be clear, the claims for damages that Plaintiffs ask this Court to reinstate against YPF are — on Plaintiffs' own theory — inextricably tied to the tender-offer obligation at issue in their case against the Republic, and subject to New York's judgment-day rule, as YPF demonstrated in its Opening Brief.  SA193, N.Y. Jud. Law § 27(b); *see* YPF Br. 57–69.

Plaintiffs offer no credible response.  They do not, and cannot, dispute that their causes of action against YPF assert that "YPF was obligated to enforce the [Republic's] tender-offer requirement," Pls. Resp. 46, and to "ensure" that Plaintiffs received the mandatory offer at the price specified by the Bylaws, Pls. Resp. 10; *see also* JA156–57, 160, ¶¶68–72, 82–85.  They do not, and cannot, dispute that YPF is an Argentine company, that YPF shares are issued, priced, and traded in Argentine pesos in Argentina, or — dispositive for this issue — that ***the formulae in YPF's Bylaws determine minimum tender-offer prices in pesos, not dollars***.  Plaintiffs' claims against YPF would be governed by the judgment-day rule because Plaintiffs allege that non-performance by YPF resulted in non-payment of a mandatory tender offer price set by the Bylaws in Argentine pesos.

In their Response, Plaintiffs urge a manufactured distinction between "payment" and "performance" obligations that does not exist in the statute.[1] New York's judgment-day statute looks to the currency of the obligation at issue in Plaintiffs' claims, and sets one simple and clear rule, for all parties, as to when damages based on a non-U.S. currency obligation will be converted to U.S. dollars: at judgment. SA193, N.Y. Jud. Law § 27(b). Far-fetched though Plaintiffs' claim is, it is unequivocally an attempt to tie non-performance of YPF's supposed obligations to non-payment by the Republic of a tender offer at the specified price — and as such, squarely within that statutory rule.

Plaintiffs' continued insistence that the judgment-day rule is inapplicable because they were allegedly entitled to receive a tender offer in dollars for their ADRs (rather than in pesos for the underlying shares) amounts to nothing more than wishful thinking. ***Both*** the Bylaws ***and*** the IPO Prospectus disclosed that the

---

[1] Under Plaintiffs' theory, damages against the Republic (the party alleged to have a "payment obligation") would be converted from pesos to dollars as of the judgment day, while any damages potentially awarded against YPF (the party alleged to have a "performance obligation" to enforce the Republic's payment) would be converted from pesos to dollars as of the breach date. Under Plaintiffs' false distinction, even though the claims against each defendant are based on non-payment of the identical tender offer — and tied to the identical underlying minimum price set by the Bylaws — the potential damages would be wildly different. YPF might face billions of dollars more in damages even though — and on Plaintiffs' theory ***because*** — it never had an obligation to make any payment itself. New York law quite sensibly rejects that ludicrous result.

Republic would be required to include **only Class D shares** — the Buenos-Aires-listed, peso-denominated common equity — in any mandatory tender offer. Neither indicated that any Republic tender offer would include cross-listed, dollar-denominated ADRs. Plaintiffs' arguments to the contrary have no support in the record. They rest on misleading and selective partial quotes that distort the plain text of the Bylaws and misrepresent the facts.

There is nothing unfair about applying the judgment-day rule to Plaintiffs' claims. Plaintiffs concede that when an obligation is "'denominated in a [non-U.S.] currency' . . . the risk that the obligation may be worth less in dollars by the time it is paid 'is merely the consequence of holding an obligation in [foreign currency].'" Pls. Resp. 48 (quoting N.Y. Jud. Law § 27(b) and *Competex, S.A. v. Labow*, 783 F.2d 333, 338 (2d Cir. 1986)). If Plaintiffs had brought suit in Argentina — which provides the governing law — any damages arising from the peso-denominated obligations they assert would have been assessed and awarded in pesos. Dollars are irrelevant to the merits, and are in play only because the judgment on these Argentine claims was entered in a U.S. court. Plaintiffs chose that forum, and that forum recognizes that currency risk remains with plaintiffs — who bear the burden of proof — until they have obtained judgment.

This clarity is important. New York's judgment-day rule is a bright-line rule that conveys to all market participants and litigants what to expect if (and when) they

3

litigate a money-damages claim in New York for an obligation denominated in non-U.S. currency. The statutory rule does not deviate based on the currency, the party, or how much currency appreciation or devaluation has occurred. Investors in non-U.S. issuers can and should take the rule into account when purchasing securities, and Plaintiffs could and should have taken it into account here. There is no unfairness in applying this long-standing, simple statute to Plaintiffs' claims.

By contrast, it would be manifestly unfair — and create unwarranted uncertainty and disruption for investors in other assets denominated in non-U.S. currencies — to manufacture an exception from the judgment-day rule simply because the currency at issue in this case happens to have depreciated. The value of the district court's damages award against the Republic in pesos is orders of magnitude higher than the amount the Republic would have been required to pay Plaintiffs in pesos under the obligation Plaintiffs claim YPF was required to enforce. Plaintiffs knowingly and willingly accepted currency risk when they purchased YPF ADRs. YPF had repeatedly disclosed currency risk to ADR-holders, and Petersen — in particular — was well aware of it, since Petersen was created specifically to acquire YPF shares by an Argentine conglomerate that has operated in Argentina since 1920, *see* JA3247, ¶¶23–24, and that continues to be "one of Argentina's most important economic groups" with an "empire that spans from construction to

energy" and includes four Argentine banks.[2]  This Court should reverse the damages determination because it is required to do so by law — but to the extent the equities are relevant, they favor YPF.

## ARGUMENT

### I.     The Facts Requiring Application of the Judgment-Day Rule Are Undisputed.

As YPF demonstrated in its Opening Brief, when it came to damages, the district court made a critical error, with outsize consequences: it assumed, contrary to the Bylaws and to the parties' presentations in briefing and at trial, that "the Bylaws are silent as to denomination[.]"  SA147.  In fact, the Bylaws speak unambiguously to denomination by specifying minimum tender-offer prices calculated exclusively pursuant to formulae in which the inputs and outputs are entirely peso-denominated, *see* YPF Br. 59–62, which fall within New York's judgment-day rule mandating conversion of damages from pesos to dollars on judgment day rather than breach day.

---

[2] Yanina Aguirre, *Los Eskenazi Ponen el Ojo en el Banco Patagonia: Posible Compra en Puerta*, Urgente 24, June 6, 2024, https://urgente24.com/zona-/los-eskenazi-ponen-el-ojo-el-banco-patagonia-posible-compra-puerta-n578580 ("Grupo Petersen [es] uno de los grupos económicos más importantes de Argentina;" "la familia ha construido un imperio que abarca desde la construcción hasta la energia;" "Entre los bancos que posee el grupo se encuentran los de Santa Fe, Entre Ríos, Santa Cruz y San Juan").

Plaintiffs completely avoid addressing this fundamental error because they have no answer for it. Instead, they argue that, as to YPF, the obligations "are not 'denominated' in any currency at all," and damages would fall under the "general rule" requiring computation in U.S. dollars. Pls. Resp. 45. Plaintiffs do not and cannot, however, reckon with the fact that the Bylaws are not "silent as to denomination," but set the tender-offer price on which all of Plaintiffs' damages hinge — against both defendants and on any theory — in "a currency other than the currency of the United States." That falls squarely within New York's judgment-day rule for timing of currency conversion. SA193, N.Y. Jud. Law § 27(b).

## II. Plaintiffs' Causes of Action Against YPF Are Based Upon Purported Monetary Obligations Denominated in Pesos.

Plaintiffs' Opening Brief asked this Court to make two illogical leaps to avoid the conclusion that any purported damages against YPF are subject to the judgment-day rule: first, to assume that the tender offer obligation was a performance obligation and not a payment obligation and, second, to assume that it was not for a "sum certain." Pls. Br. 67–69. In their Response, Plaintiffs drop their second argument, presumably because it is so patently wrong, but continue to press the first: arguing that their claims that YPF is liable for breach of contract for failing to perform alleged "enforcement" obligations that would have caused them to receive the binding tender offer merely assert "performance" obligations untethered to payment and "not denominated in any currency." That argument utterly ignores

6

Plaintiffs' own claims and theory as to YPF — which are wrong and meritless, but which allege that YPF is liable for damages in the amount of the absent tender offer because YPF owed and breached "enforcement" obligations that, if performed, would have ensured that Plaintiffs received that offer and payment at the Bylaws-mandated price. If reinstated, these claims would be squarely within the scope of the judgment-day rule.

### A.    Plaintiffs' Allegations Seek to Tie YPF to the Tender Offer.

Plaintiffs' case against YPF is founded on their (false) assertion that YPF had obligations to "enforce" and "ensure" they received money in a tender offer from the Republic. Plaintiffs argue that YPF "promised" a "cash tender offer," that "YPF was obligated to *enforce* the [Republic's] tender-offer requirement in accordance with its terms," and that they "are entitled to judgment . . . *for the full amount they would have received if YPF had satisfied its obligations*." Pls. Resp. 22, 45–46 (emphasis added); *see also* Pls. Resp. 23 (YPF was obligated "to comply with the Bylaws by *enforcing* the tender-offer requirements" mandating an offer at a specified price (emphasis added)); Pls. Resp. 25 ("[I]f YPF had complied with its obligation under the Bylaws, then Plaintiffs would not have been injured" because they would have been offered this price); Pls. Resp. 27–28 ("Under the Bylaws, YPF promised Plaintiffs that a tender offer would be made and undertook obligations to ensure that it would be." (quotation marks omitted)). Their allegations — though

7

wrong — are unequivocal: they allege that YPF promised a tender-offer price "substantially in excess of the market price," and that "if YPF had carried out its obligations, Plaintiffs would have received (and accepted) a tender offer." Pls. Resp. 38–39, 45. Because the tender-offer price was determined in pesos, that is a cause of action squarely within the judgment-day rule.[3]

In their Response, however, Plaintiffs argue, for purposes of inflating damages, that YPF's purported obligations merely required "performance" by YPF, not "payment" in "any specified form of legal tender," Pls. Resp. 46–49; *see also* Pls. Resp. 50 n.10, and seek (for the first time and solely in order to defend their currency-based quantum) to distance YPF's alleged non-performance from their lack of a tender offer at the Bylaws-mandated price. That argument is as meritless as it is remarkable. Plaintiffs now attempt to disavow the allegations on liability they have made for many years for the narrow purpose of evading the application of the judgment-day rule to damages. Plaintiffs' related contention that the judgment-

---

[3] YPF — in addition to vigorously disputing that it had any of the asserted obligations — disputes that Plaintiffs would have received and executed on a tender offer even if YPF had performed the obligations Plaintiffs allege. *See* YPF Br. 45–49. That is among the issues that would need to be resolved before any potential final judgment awarding damages against YPF could be entered on remand in either pesos or dollars. But the issue for this conditional cross-cross appeal is whether Plaintiffs' causes of action — ***on Plaintiffs' theories of liability and damages*** — are based on obligations denominated in a non-U.S. currency. Under Plaintiffs' theories, their benefit of the bargain was being paid money in a tender offer.

day rule does not apply to YPF because New York has different currency conversion rules for direct obligations to pay money, on one hand, and obligations to enforce someone else's obligation to pay money, on the other, *see, e.g.*, Pls. Resp. 50–51, is a completely made-up distortion of the statute and a wholesale abandonment of the common-sense clarity it was intended to provide. Whether a party has an obligation to pay directly or to cause someone else to pay, the upshot of each obligation is the same: a payment to the recipient.

Plaintiffs continue to rely on just one case — *Nature's Plus Nordic A/S v. Nat. Organics, Inc.*, 78 F. Supp. 3d 556 (E.D.N.Y. 2015) — as the basis for the unwarranted distinction they press between "payment" and "performance" obligations. *See* Pls. Resp. 46–47, 49–50. But YPF demonstrated, and Plaintiffs do not dispute, that in *Nature's Plus Nordic* the obligation was to provide notice and an opportunity to cure before terminating a contract, not to offer, pay, or cause payment of money. *See* 78 F. Supp. 3d at 557–58. The court held that was a "***non-monetary*** obligation" that was "not denominated in any currency." *Id.* at 557 (emphasis added). Unlike the plaintiffs in *Nature's Plus Nordic*, Plaintiffs here allege their injury is that they were not paid money, indeed, a specific quantum of money, and that YPF is liable along with the Republic for the Republic not paying that money. Nothing in *Nature's Plus Nordic* exempts that from the judgment-day rule.

9

Nor does anything else. Plaintiffs do not identify a single court or case that has adopted their restrictive interpretation of the judgment-day statute. To the contrary, the Southern District of New York has acknowledged that the judgment-day statute applies not just to direct obligations to pay particular sums, but to other monetary obligations as well. *See Ramgoolie v. Ramgoolie*, 2021 WL 8013769, at *4, 7, (S.D.N.Y. Nov. 24, 2021), *report and recommendation adopted*, 2022 WL 669868 (S.D.N.Y. Mar. 4, 2022) (applying New York's judgment-day statute to assess damages in Trinidad and Tobago Dollars where the plaintiffs' entitlement was not to "payment," but to "50 percent of" the value of a joint venture's shares); *see also* Rep. Br. 77.

### B.    Plaintiffs Allege Obligations Denominated in Pesos.

Plaintiffs do not dispute that they calculated the mandatory tender-offer price pursuant to the Bylaws in pesos, so any claim against YPF that it was required to "enforce" and "ensure" an offer for payment of that price is also, necessarily, denominated in pesos. Nothing in Plaintiffs' Response rebuts that simple, dispositive point.

Plaintiffs' first argument — that their calculation of the required tender-offer price in pesos was merely a calculation of damages, not a reflection of the currency denominating the underlying obligation, Pls. Resp. 52 — is directly at odds with their own claims.

10

Plaintiffs allege that they were entitled to receive a tender offer for all of their ADRs at a price per Class D share specified in the Bylaws; to establish the price per Class D share Plaintiffs claim they were entitled to receive, Plaintiffs had to calculate and prove it in pesos. Pesos are not only "inputs" to the Bylaws pricing formulae, as Plaintiffs suggest, Pls. Resp. 52, but are the ***outputs*** of price per share. Not surprisingly, when the variables denominated in pesos were input into the formulae used to calculate the tender-offer price, the resulting price output was also in pesos. Pesos in, pesos out. Plaintiffs' own damages expert, Professor Fischel, testified that the Bylaws formulae generate a minimum required tender-offer price that is "***calculate[d] in pesos***." JA3404, 66:1–7 (Fischel) (emphasis added). Plaintiffs do not dispute either that ***383.88 pesos per share*** was their own "Calculation of Tender Offer Price," *see* YPF Br. 60–61, which the District Court adopted, SA187, or that the Bylaws determined the minimum price per Class D share the Republic allegedly would have been obligated to offer and pay in any mandatory tender offer ***only*** in pesos, *see* YPF Br. 59–62. Describing the calculation of the tender-offer price in pesos as merely a calculation of "damages," Pls. Resp. 52, utterly disregards these facts and Plaintiffs' own thesis. The price per share Plaintiffs seek to enforce as the underlying tender-offer obligation had a Bylaws-specified currency, and that currency was pesos.

11

Plaintiffs' next argument fares no better. Plaintiffs say their claims against YPF have no "denomination" because *Black's Law Dictionary* (12th ed. 2024) defines "denominate" to mean "officially set the value of (something) according to an established system or a type of money," and YPF was not itself required to pay money. Pls. Resp. 49. But that argument misses the point of Plaintiffs' own claims: Plaintiffs allege that YPF was obligated to ensure they received a tender offer. That is a claim tied to an offer that has a monetary value, and the Bylaws "set the value" of that offer and payment in pesos.

Plaintiffs next argue that the judgment-day rule does not apply because an acquirer could have satisfied the Bylaws by choosing to make a mandatory tender offer in a different currency. Pls. Resp. 52. But electing to price an offer in dollars sufficient to comply with a mandatory minimum price established by the Bylaws in pesos does not alter the currency in which the ***obligation*** is set. An obligation determined in one currency might be satisfied by paying the equivalent amount of a different currency using the then-current exchange rate, but that does not alter its terms.

In sum, for all its straining, Plaintiffs' Response cannot divorce their damages from their underlying claims, which — misguided though they are — attempt to establish YPF's liability for the peso-denominated tender offer that is at the heart of this litigation.

12

### III.  The Republic Had No Obligation to Include ADRs Directly in a Tender Offer.

YPF demonstrated — and Plaintiffs cannot rebut — that the Republic had no obligation to make a tender offer directly for ADRs or in dollars.  YPF Br. 62–66.  The Bylaws expressly provide that Republic tender offers "shall be limited to the aggregate amount of class D shares of stock."  JA674, §28(B).  Plaintiffs' attempts to evade the clear implications of that language in order to argue that they were entitled to an offer for ADRs, and thus in dollars, ignore the unambiguous contemporaneous disclosure of that limitation in the IPO Prospectus, misrepresent other Bylaws provisions, and stretch the meaning of "aggregate amount" beyond the breaking point.

#### A.  The Bylaws Limit the Scope of Bylaws-Mandated Tender Offers from the Republic to "Class D Shares," as the Prospectus Disclosed.

Plaintiffs rely on the IPO Prospectus to support their erroneous claim that their ADRs would have been included in a tender offer, *see* Pls. Resp. 55–56 n.11, but the Prospectus plainly warned investors of just the opposite — that the Republic *would not* have to include ADRs if it made a mandatory tender offer.  The Prospectus made no reference at all to the inclusion of ADRs, and instead expressly cautioned investors that "[w]ith respect to acquisitions by the Argentine Government [pursuant to Section 28(A) of the Bylaws], the required tender offer *need only be conducted for all outstanding Class D Shares*."  JA513 (emphasis added).

13

Plaintiffs ignore this blunt disclosure. Instead, they offer unsupported and irrelevant speculation that "investors on the NYSE would hardly have been willing to buy more than a billion dollars in ADRs if the tender-offer protection did not cover them," Pls. Resp. 54, and that "the IPO would have been DOA" if investors had known they might only be able to participate in mandatory Republic tender offers by surrendering their ADRs to withdraw and tendering the underlying Class D shares, Pls. Resp. 57. But Plaintiffs' assumptions are belied by — and cannot trump — the plain text of the Bylaws and the Prospectus's unambiguous disclosure that mandatory tender offers by the Republic would encompass only Class D shares. Plaintiffs' argument that because the Prospectus was addressed to ADR buyers, the fact that it described the Republic's tender-offer obligation shows it must "extend to ADRs," Pls. Resp. 55–56 n.11, is nonsensical. ADR buyers would have just as much interest in knowing — as the Prospectus disclosed — that the Republic's tender-offer obligation did *not* extend to ADRs, as that it *did* extend to ADRs.

Plaintiffs' backstop argument that the Republic was required to "make a public tender offer for all outstanding shares and convertible securities," (and that ADRs are included as "convertible securit[ies]"), Pls. Resp. 56, is also at odds with that plain text and is meritless. The Bylaws' reference to "convertible" securities in a tender offer applies, on its face, only to offers by acquirers *other than* the sovereign Republic. *See* YPF Br. 63. And, as YPF has demonstrated, even those acquirers

were not required to tender for ADRs because ADRs are neither shares nor "convertible" securities. *See* YPF Br. 63–64. The Bylaws, as accurately described in the Prospectus, limit the required scope of Republic tender offers to "all outstanding Class D shares," and that limit is dispositive.

## B.   Plaintiffs' Attempt to Broaden the Required Scope of the Tender Offer to ADRs Misstates and Misquotes the Bylaws and the Record.

Plaintiffs mischaracterize what the Bylaws say in order to avoid the Bylaws' explicit limitation on the scope of tender offers by the Republic and its obvious consequences. These misleading "quotes" and misstatements provide no basis to evade the judgment-day rule.

### 1.   The Bylaws Did Not Require Tender Offers on the NYSE.

Plaintiffs' first false assertion is that "the text of the Bylaws . . . expressly contemplates that the tender offer . . . will extend to all . . . 'jurisdictions' and 'stock exchanges where [YPF's] shares and securities are listed,' including 'in the City of New York, U.S.A.'" Pls. Resp. 54. That statement purports to quote a handful of words from Bylaws Sections 7(f) and 7(f)(iv), but takes those words out of context and ***rearranges*** them to create a statement that appears nowhere in the Bylaws text. Sections 7(f) and 7(f)(iv) say no such thing.

Section 7(f) does not mandate making a tender offer in the U.S. for dollars. Nor does it refer to "jurisdictions . . . where [YPF's] shares and securities are listed,"

as Plaintiffs falsely assert.  Pls. Resp. 54.  On its face, when quoted accurately and in full, Section 7(f) — which addresses the ***procedures*** for making a takeover bid and tender offer — refers to "jurisdictions where the takeover bid takes place," JA652, §7(f), recognizing the possibility of offers in multiple jurisdictions (as an acquirer may elect), but not mandating that the Republic offer outside its own territory.  Nothing in Section 7(f) specifies that the tender offer must "take place" in the United States, where ADRs are listed.

Nor does Section 7(f) say that a tender offer must "extend to . . . stock exchanges where [YPF's] shares and securities are listed," as Plaintiffs falsely assert. Pls. Resp. 54.  That, again, is not in the text.  Section 7(f) says only that tender offers must "compl[y] with" "the provisions of the stock exchanges where [YPF's] shares and securities are listed" "***to the extent that***" they "impose additional or stricter requirements than the ones provided hereunder[.]"  JA652, §7(f) (emphasis added). Plaintiffs' own expert, Nancy Lissemore, confirmed that there are ***no*** provisions of the New York Stock Exchange that obligate the Republic to include ADRs in mandatory tender offers, as YPF established in its Opening Brief.  *See* YPF Br. 65; JA3421, 3423, 228:12–14, 231:6–11 (Lissemore).

The Bylaws' reference to "the City of New York, U.S.A." is in a separate subsection — 7(f)(iv) — that specifies ***notice and publication procedures***, and not the required tender offer scope.  Section 7(f)(iv) requires publication of notice in

16

newspapers in New York City, but it does not — contrary to Plaintiffs' mischaracterization — "contemplate[] that the tender offer . . . will extend" to New York or include ADRs directly.  *See* JA653–54, §7(f)(iv).

Plaintiffs next misstate the record, claiming that "this Court has already concluded . . . the tender-offer provisions 'required Argentina to tender for ADRs listed on the NYSE.'" Pls. Resp. 54–55 (quoting *Petersen Energía Inversora S.A.U. v. Argentine Republic*, 895 F.3d 194, 205 (2d Cir. 2018) (*Petersen II*)).  In *Petersen II*, its FSIA ruling, this Court affirmed the district court's conclusion that a breach of the Republic's tender-offer obligation would cause a direct effect in the United States based on Petersen's ***allegations*** that the Bylaws required the Republic to "tender for ADRs listed on the NYSE[.]"  895 F.3d at 205; *see also* JA135, 142–43, 151, ¶¶5, 22–23, 44.  But the Court did not and could not rule on the factual and merits question of whether those allegations were correct, as YPF explained in its Opening Brief, *see* YPF Br. 42–45, and the plain text of the Bylaws shows they were not.

### 2. The Bylaws Did Not Require the Republic to Include ADRs as "Securities Convertible into Shares."

Plaintiffs' additional contention that ADRs are "securities convertible into shares" that must be included in Republic tender offers ignores Petersen's own contrary prior admission, as well as the Bylaws provision that expressly excludes

convertible securities from the required scope of Republic tender offers.  *See* YPF

Br. 63–64.

### a.    The Bylaws Expressly Exclude "Securities Convertible into Shares" from a Mandatory Tender Offer by the Republic.

At the threshold, the question of whether ADRs are "securities convertible

into shares" is irrelevant because the Bylaws ***exclude*** "securities convertible into

shares" from the required scope of mandatory tender offers by the Republic.  While

other Takeover acquirers are required to make a "takeover bid" for "all the shares of

all classes of the Corporation and all securities convertible into shares" ("*todas las*

*acciones de todas las clases de la Sociedad y de todos los títulos convertibles en*

*acciones*," in the original Spanish), JA652, 682, §7(e)(ii), the Bylaws limit Republic

tender offers to "the aggregate amount of class D shares of stock" ("*la totalidad de*

*las acciones de la clase D*," in the original Spanish), JA674, 705, §28(B).

Plaintiffs' assertion that the Bylaws' specification of the "aggregate amount

of class D shares of stock" encompasses "both actual Class D shares and securities

convertible into Class D shares," Pls. Resp. 55, stretches "aggregate amount" beyond

any reasonable meaning and is belied by both the Prospectus and the Bylaws' text.

The "aggregate amount" of Class D shares, under the plain meaning of that

phrase, includes all Class D shares, but does not include anything — such as a

security convertible into a Class D share — that is not a Class D share.  That is how

the Prospectus contemporaneously interpreted the Republic's tender-offer obligation, advising investors that tender offers by the Republic "need only be conducted for all outstanding Class D Shares." JA513.

That is also what the governing original Spanish text of the Bylaws says. Section 28(B) of the Bylaws limits the required scope of Republic tender offers to "*la totalidad de*" — *i.e.*, "all of"[4] — the Class D shares. JA705, §28(B). And comparing the original Spanish versions of Bylaws Sections 7(e)(ii) and 28(B) leaves no doubt that "securities convertible into shares" are not encompassed within the scope of the Republic's obligation set out in Section 28(B). Section 7(e)(ii) specifies that other acquirers are obligated to include in their tender offers both "**todas** las acciones de todas las clases de la Sociedad" ("all the shares of all classes of the Corporation") **and** ("*y*") "**todos** los títulos convertibles en acciones" ("all securities convertible into shares"). JA652, 682, §7(e)(ii) (emphasis added). Section 28(B), however, omits "*todos los títulos convertibles en acciones*" and provides that the Republic's obligation "shall be limited to" "**la totalidad de** las acciones de la clase D." JA705, §28(B) (emphasis added). Especially because "*todo*" and "*la*

---

[4] *See, e.g.*, Totalidad, *Word Reference*, https://www.wordreference.com/es/en/trans lation.asp?spen=totalidad. Courts have taken judicial notice of WordReference.com and other Spanish-English and Spanish dictionaries. *See, e.g.*, *Mendez-Aponte v. Bonilla*, 645 F.3d 60, 66–67 n.10 (1st Cir. 2011) (taking judicial notice of WordReference.com).

*totalidad*" are synonyms,[5] "*la totalidad de las acciones de la clase D*" ("the aggregate amount of class D shares of stock") in Section 28(B) cannot be read to include the "securities convertible into shares" ("*títulos convertibles en acciones*") that are specified separately from "shares of all classes of the Corporation" ("*acciones de todas las clases de la Sociedad*") in Section 7(e)(ii) and therefore are not encompassed within "*todas las acciones de todas las clases de la Sociedad*" in Section 7(e)(ii) or "*la totalidad de las acciones de la clase D*" in Section 28(B).

Plaintiffs also continue to misrepresent custom and practice in cross-border tender offers at the relevant time. Plaintiffs have not rebutted YPF's showing that the custom and practice when the tender offer obligation was added to the Bylaws ***at the time of YPF's IPO in 1993*** was to exclude U.S. security holders. *See* YPF Br. 65–66. In their Response, Plaintiffs offer incorrect criticisms of a separate study Defendants' expert, Professor Solomon, conducted of tender offers involving ADRs ***since 2001***. *See* Pls. Resp. 58; JA1078, ¶20 (Lissemore). That study of ***later*** IPOs formed no part of the basis for Professor Solomon's opinions concerning the custom

---

[5] *See, e.g.*, Totalidad, *Real Academia Española*, https://dle.rae.es/totalidad; Totalidad, *Word Reference*, https://www.wordreference.com/es/en/translation.asp?s pen=totalidad; *see also* SA210, Argentine Commercial Code, § 217 ("[t]he words of contracts and agreements must be understood in the sense given to them by general usage, even if the obligated party claims to have understood them differently").

and practice in 1993, *see* JA3063–67, ¶¶173–185 (Solomon), which remain unchallenged by Plaintiffs.

> ### b.    In Any Event, ADRs are Not "Securities Convertible into Shares."

Even if the Republic *were* required to include "convertible" securities in mandatory tender offers, ADRs are not "securities convertible into shares." YPF demonstrated in its Opening Brief, YPF Br. 63–64, that Plaintiffs' contrary argument, Pls. Resp. 53, 56, has no support in the Bylaws and is contradicted by Petersen's own 2008 representation to the SEC that YPF had "[n]o securities convertible into Shares[.]" JA1400, n.3. Plaintiffs' argument in their Response that Petersen also told the SEC that it was "obliged to conduct" its tender offers "to comply with the requirement of the By-laws," JA1400; *see* Pls. Resp. 56 n.12, is not relevant to the question of whether ADRs are "securities convertible into shares."

*   *   *   *   *

In short, nothing obligated the Republic to include ADRs in a tender offer, and Plaintiffs thus had no right to receive payment in dollars.

## IV.    Applying the Judgment-Day Rule Here is Fair.

Plaintiffs' assertions that applying New York's judgment-day rule would be "remarkably inequitable," Pls. Br. 67, and "cannot be squared with . . . basic fairness," Pls. Resp. 44, have the equities exactly backward. Plaintiffs chose to purchase interests in a non-U.S. company, subject to the terms of its Bylaws and

21

Argentine law.  They brought suit in federal court in New York three and four years, respectively, after the alleged breach — after the peso had already lost 50% and 71%, respectively, of its value relative to the dollar.[6]  They undertook currency risk when they invested, and again when they chose when to sue.  It is not for this Court to relieve them of that risk.

As the Supreme Court observed almost a century ago, "[a]n obligation in terms of the currency of a country takes the risk of currency fluctuations and whether creditor or debtor profits by the change[,] the law takes no account of it."  *Die Deutsche Bank Filiale Nurnberg v. Humphrey*, 272 U.S. 517, 519 (1926).  Plaintiffs acknowledge as much, admitting that when an obligation is "'denominated in a currency other than currency of the United States' . . . , the risk that the obligation may be worth less in dollars by the time it is paid 'is merely the consequence of holding an obligation in [foreign currency].'"  Pls. Resp. 48 (quoting N.Y. Jud. Law § 27(b) and *Competex,* 783 F.2d at 338).

---

[6] The official exchange rates from the data series Plaintiffs' expert used to compute the damages the district court adopted were 4.39530 AR$/US$ on the April 16, 2012 breach date, 8.83880 AR$/US$ on April 8, 2015, when Petersen filed its complaint, *see* JA162, and 15.12500 AR$/US$ on November 3, 2016, when Eton Park filed its complaint, *see* JA446; Tipos de Cambio, *Banco Central De La Republica Argentina*, https://www.bcra.gob.ar/MediosPago/
Tipos_de_Cambio_SML.asp; JA3910, n.[D]; SA188.  One peso was thus worth 1/4.39530 = US$ 0.2275 on the breach date, US$ 0.1131 (50.27% less) when Petersen filed its complaint, and US$ 0.0661 (70.94% less) when Eton Park filed its complaint.

Plaintiffs complain that reversing the decision below to assess damages in pesos would result in "a massive discount" and "wipe out a staggering 95% of Plaintiffs' damages," Pls. Resp. 44, but that is only because the ruling below was erroneous. It is not the result of any unfairness in the judgment-day rule. It just comes from a dollars-centered perspective that tautologically assumes Plaintiffs' desired conclusion: that they are entitled to damages assessed in dollars — rather than pesos — as of the breach date. But because Plaintiffs are not entitled to damages assessed in dollars — and would not have damages assessed in dollars if they had brought suit in the Argentine courts whose law governs the merits of their claims — their damages against the Republic have been radically overstated and they are actually sitting on a windfall.

If Plaintiffs had received and accepted a tender offer at the price the district court used to assess damages against the Republic, the Republic would have paid them 43 billion pesos in exchange for their interests in YPF.[7] But because the district court assessed damages as of the breach date in dollars, rather than pesos, it effectively shifted the effects of currency risk — that is, the potential for the devaluation of the foreign-currency-denominated amount against the U.S. dollar —

---

[7] The district court assessed damages on the assumption that the Republic was required to make a tender offer for 100,145,077 Petersen shares and 11,950,000 Eton Park shares, JA3906, at a price of 383.88 pesos per share, JA3903. AR\$383.88 x (100,145,077 + 11,950,000) = AR\$43,031,058,158.76.

from the ADR-holders to the Republic. That shift of risk is contrary to the Bylaws, the Prospectus, and New York law, all of which require Plaintiffs to bear the currency risk through judgment. As a result of that shift, the district court's judgment requires the Republic to pay many times what the district court ruled it would have paid Plaintiffs in a 2012 tender offer.

Subjecting YPF to the potential imposition of similarly disproportionate damages would work a substantial injustice. The Republic had no obligation to offer or pay dollars in a tender offer, and Plaintiffs had no entitlement to receive dollars. While Plaintiffs knowingly and willingly assumed currency risk when they invested in YPF, YPF did not take on any such risk. Plaintiffs complain that assessing damages based on the amount of pesos they would have been offered in a tender offer, and correctly applying the judgment-day rule, would be unfair because it would expose them to currency risk. But that is precisely the risk they accepted. The peso devaluation is a historical fact. In litigation, under Section 27(b), the consequences of that devaluation fall either on plaintiffs or defendants, and whichever side bears the brunt of that devaluation effectively has currency risk imposed on them.

As Plaintiffs' expert acknowledged, YPF made multiple disclosures to ADR holders that they were exposed to currency risk, and Plaintiffs no doubt understood and accepted that risk. Petersen's CEO, Sebastián Eskenazi, himself "***thought that***

24

*owners of YPF [ADRs] were exposed to currency risk*," JA3411–14, 231:2–234:10 (Fischel) (emphasis added), and had ample reason to know that in Argentina, that risk could be significant, *see, e.g.*, JA3411, 231:10–24 (Fischel) (YPF disclosed that "[t]he peso has historically fluctuated significantly against many major world currencies, including the U.S. dollar."). Indeed, in the press release announcing its initial purchase of YPF ADRs, Petersen described the Petersen Group as "one of Argentina's largest corporate groups" and touted its "knowledge of the Argentine market over the course of its more than 85 years of existence." JA821. Plaintiffs' assertion that they "certainly would not have held Argentine pesos for more than a decade" if they had received pesos in a tender offer, Pls. Resp. 45 — while irrelevant in any event — is also belied by the fact that the Petersen Group continues to this day to hold substantial investments in Argentina, including four banks.[8]

New York's judgment-day rule is a statutory bright-line rule that properly focuses the court on the currency of the purported obligation upon which the cause of action is based, not the performance of the currency over time. It does not permit or require an attempt to determine the equities of currency fluctuation. It applies to all non-U.S. currency of all sovereigns, not only those that manage to minimize

---

[8] *See, e.g.*, Yanina Aguirre, *Los Eskenazi Ponen el Ojo en el Banco Patagonia: Posible Compra en Puerta*, URGENTE 24, June 6, 2024, https://urgente24.com/zona-/los-eskenazi-ponen-el-ojo-el-banco-patagonia-posible-compra-puerta-n578580.

inflation.   Plaintiffs knowingly assumed the currency risk, as governed by the Bylaws and the New York statute, and it is only fair to hold them to it.

(*continues on next page*)

## CONCLUSION

This Court should affirm the district court's judgments dismissing all claims against YPF and need never reach YPF's conditional cross-cross appeal. If it reverses or vacates, however, it should also reverse the district court's holding that the Bylaws tender-offer obligation is not denominated in pesos and thus that the judgment-day rule does not apply.

Dated: August 23, 2024

Respectfully submitted,

/s/ *Mark P. Goodman*

Mark P. Goodman
Shannon Rose Selden
J. Robert Abraham
Wendy B. Reilly
Carl Riehl
Sol Czerwonko
DEBEVOISE & PLIMPTON LLP
66 Hudson Boulevard
New York, New York 10001
(212) 909-6000
mpgoodman@debevoise.com
srselden@debevoise.com
jrabraham@debevoise.com
wbreilly@debevoise.com
criehl@debevoise.com
sczerwonko@debevoise.com

*Counsel to Defendant-Conditional
Cross-Appellant YPF S.A.*

**Certificate of Compliance with**
**Federal Rule of Appellate Procedure 32(a)**

This brief complies with the type-volume limitations of Fed. R. App. Proc. 32(a)(7)(B) and Local Rule 32.1(a)(4)(B) because it contains 6,260 words, exclusive of the parts of the brief exempted by Fed. R. App. Proc. 32(f).

This brief complies with the typeface requirements of Fed. R. App. Proc. 32(a)(5) and the type style requirements of Fed. R. App. Proc. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman font.

I certify under penalty of perjury that the foregoing statements are true.

Dated: September 6, 2024

/s/ *Mark P. Goodman*

Mark P. Goodman

**Certificate of Service**

I hereby certify that on September 6, 2024, I filed the foregoing Final Form Brief with the Clerk of Court of the United States Court of Appeals for the Second Circuit through the ACMS system. I certify that all participants in these cases are registered ACMS users and that service will be accomplished by the ACMS system.

Dated: September 6, 2024

/s/ *Mark P. Goodman*

Mark P. Goodman