# 23-7370(L)

## 23-7463(XAP), 23-7614(XAP)

# In the United States Court of Appeals for the Second Circuit

PETERSEN ENERGIA INVERSORA S.A.U. and PETERSEN ENERGIA S.A.U.,
*Plaintiffs-Appellees-Cross-Appellants*,

v.

ARGENTINE REPUBLIC,
*Defendant-Appellant-Cross-Appellee*,

YPF, S.A.,
*Defendant-Conditional Cross-Appellant*.

On Appeal from the United States District Court
for the Southern District of New York
(No. 1:15-cv-02739) (Hon. Loretta A. Preska)

### FINAL FORM OPENING BRIEF FOR
### DEFENDANT-APPELLANT THE ARGENTINE REPUBLIC

Amanda F. Davidoff
Thomas C. White
Morgan L. Ratner
SULLIVAN & CROMWELL LLP
1700 New York Avenue NW
Washington, DC 20006
(202) 956-7500
davidoffa@sullcrom.com

Robert J. Giuffra, Jr.
Sergio Galvis
Adam R. Brebner
Pedro José Izquierdo
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
(212) 558-4000
giuffrar@sullcrom.com

*Attorneys for the Argentine Republic*

## CORPORATE DISCLOSURE STATEMENT

The Argentine Republic is a governmental party not required to file a corporate disclosure statement under Federal Rule of Appellate Procedure 26.1.

# TABLE OF CONTENTS

*Page*

**CORPORATE DISCLOSURE STATEMENT**.......................................................i

**INTRODUCTION**...................................................................................1

**JURISDICTIONAL STATEMENT**...........................................................8

**STATEMENT OF THE ISSUES**...............................................................9

**STATEMENT OF THE CASE**................................................................10

    A.    Factual Background.................................................................10

           1.    The Republic privatizes state-owned energy company YPF ............................................................................10

           2.    Plaintiffs acquire a minority stake in YPF.............................12

           3.    The Republic begins the expropriation process.......................14

           4.    Repsol and other YPF shareholders (but not plaintiffs) pursue Argentine remedies .........................................15

    B.    Procedural Background .........................................................18

**SUMMARY OF ARGUMENT** ...............................................................22

**STANDARD OF REVIEW** ....................................................................28

**ARGUMENT** ......................................................................................29

**I.**    **PLAINTIFFS' CLAIMS DO NOT BELONG IN A U.S. COURT** .........29

    A.    The District Court Should Have Dismissed This Suit Under the Doctrine of *Forum Non Conveniens* ...................................30

    B.    The District Court Should Have Dismissed This Suit Under Principles of International Comity .........................................37

**II.**    **PLAINTIFFS' CLAIMS ARE NOT COGNIZABLE UNDER GOVERNING ARGENTINE LAW** .................................................42

A.     Argentine Corporate Law Does Not Recognize a Shareholder Breach-of-Contract Claim for Damages .............................................. 42

B.     Even If a Breach-of-Contract Suit Were Permissible, Argentine Courts Would Not Award Damages ..................................................... 49

     1.     The Bylaws' express penalty clause bars plaintiffs' claims for damages........................................................................ 49

     2.     Plaintiffs' failure to show that specific performance was impossible bars their claims for damages .................................. 53

C.     Under Argentine Law, Plaintiffs Were No Longer Shareholders When the Supposed Breach Occurred.................................................. 58

D.     Argentina's General Expropriation Law Separately Forecloses Plaintiffs' Claims............................................................................. 61

     1.     Argentina's General Expropriation Law required plaintiffs to seek compensation through the expropriation process............................................................................................ 62

     2.     The district court misconstrued Argentina's General Expropriation Law ................................................................... 68

III.     AT A MINIMUM, PLAINTIFFS' DAMAGES MUST BE RECALCULATED............................................................................ 71

A.     The District Court Misapplied New York's Judgment-Day Rule for Currency Conversion...................................................................... 72

B.     The District Court Used the Wrong Breach Date and Prejudgment Interest Rate Under Argentine Law .............................. 78

CONCLUSION........................................................................................ 81

# TABLE OF AUTHORITIES

*Page(s)*

**U.S. Cases**

*Abad* v. *Bayer Corp.*,
563 F.3d 663 (7th Cir. 2009) ........................................................32, 37

*Acosta* v. *JPMorgan Chase & Co.*,
219 Fed. Appx. 83 (2d Cir. 2007)...................................................33

*Aenergy, S.A.* v. *Republic of Angola*,
31 F.4th 119 (2d Cir. 2022) ........................................................29, 32

*Animal Sci. Prods., Inc.* v. *Hebei Welcome Pharm. Co.*,
585 U.S. 33 (2018)...............................................................5, 28, 29

*In re Arbitration Between Monegasque De Reassurances S.A.M.* v.
*Nak Naftogaz of Ukraine*,
311 F.3d 488 (2d Cir. 2002) ........................................................28

*In re Assicurazioni Generali S.p.A. Holocaust Ins. Litig.*,
228 F. Supp. 2d 348 (S.D.N.Y. 2002) ............................................31

*Bi* v. *Union Carbide Chemicals & Plastics Co.*,
984 F.2d 582 (2d Cir. 1993) ........................................................40, 41

*Bigio* v. *Coca-Cola Co.*,
448 F.3d 176 (2d Cir. 2006) ........................................................37

*Branch of Citibank, N.A.* v. *De Nevares*,
74 F.4th 8 (2d Cir. 2023) ...........................................................28

*Cattan* v. *Rohner*,
No. 652468/2020, slip op. (N.Y. Sup. Ct. Apr. 10, 2023)...................36

*Comm'ns Imp. Exp. S.A.* v. *Republic of Congo*,
2020 WL 4040753 (S.D.N.Y. July 17, 2020)....................................77

*Cooper* v. *Tokyo Elec. Power Co. Holdings, Inc.*,
960 F.3d 549 (9th Cir. 2020) .......................................................41

iv

*DiRienzo* v. *Philip Servs. Corp.*,
   294 F.3d 21 (2d Cir. 2002) ...................................................35

*Figueiredo Ferraz E Engenharia de Projeto Ltda.* v. *Republic of Peru*,
   665 F.3d 384 (2d Cir. 2011) ...............................28, 30, 32

*Gonzalez* v. *Naviera Neptuno A.A.*,
   832 F.2d 876 (5th Cir. 1987) ..............................................36

*Hilton* v. *Guyot*,
   159 U.S. 113 (1895).............................................................38, 40

*Indasu Int'l, C.A.* v. *Citibank, N.A.*,
   861 F.2d 375 (2d Cir. 1988) ..............................................36

*Iragorri* v. *United Techs. Corp.*,
   274 F.3d 65 (2d Cir. 2001) (en banc) ..............................30

*Lauder* v. *First Unum Life Ins. Co.*,
   284 F.3d 375 (2d Cir. 2002) ..............................................29

*Lucente* v. *Int'l Bus. Machines Corp.*,
   310 F.3d 243 (2d Cir. 2002) ..............................................54

*In re Maxwell Comm'cn Corp.*,
   93 F.3d 1036 (2d Cir. 1996) ..............................................38, 40

*Mestecky* v. *City of New York*,
   88 N.E.3d 365 (N.Y. 2017)..................................................76

*Mujica* v. *AirScan, Inc.*,
   771 F.3d 580 (9th Cir. 2014) ..........................................38, 39, 40

*Nature's Plus Nordic A/S* v. *Natural Organics, Inc.*,
   78 F. Supp. 3d 556 (E.D.N.Y. 2015) .........................75, 76, 77

*Ole Media Mgmt., L.P.* v. *EMI Apr. Music, Inc.*,
   2013 WL 2531277 (S.D.N.Y. June 10, 2013) ............38, 39

*Oscar Gruss & Son, Inc.* v. *Hollander*,
   337 F.3d 186 (2d Cir. 2003) ..............................................29

*Otto Candies, LLC* v. *Citigroup, Inc.*,
  963 F.3d 1331 (11th Cir. 2020) ......................................................31

*Petersen Energía Inversora S.A.U.* v. *Argentine Republic*,
  895 F.3d 194 (2d Cir. 2018) ....................................................*passim*

*Piper Aircraft Co.* v. *Reyno*,
  454 U.S. 235 (1981).......................................................................32

*Quantum Tech. Partners II, L.P.* v. *Altman Browning & Co.*,
  2009 WL 4826474 (D. Or. Dec. 8, 2009), *aff'd*, 436 Fed. Appx.
  792 (9th Cir. 2011)........................................................................46

*Ramgoolie* v. *Ramgoolie*,
  Report & Recommendation, 2021 WL 8013769 (S.D.N.Y. Nov.
  24, 2021), *adopted*, 2022 WL 669868 (S.D.N.Y. Mar. 4, 2022) ......77

*Rosenfeld* v. *Achleitner*,
  No. 651578/2020, slip op. (N.Y. Sup. Ct. Mar. 22, 2023) ..................36

*Royal & Sun Alliance Ins. Co.* v. *Century Int'l Arms, Inc.*,
  466 F.3d 88 (2d Cir. 2006) ....................................................38, 39, 40

*Terra Firma Invs. (GP) 2 Ltd.* v. *Citigroup Inc.*,
  716 F.3d 296 (2d Cir. 2013) .........................................................28, 29

*Ungaro-Benages* v. *Dresdner Bank AG*,
  379 F.3d 1227 (11th Cir. 2004) ...............................................38, 39, 41

*United States* v. *Winstar Corp.*,
  518 U.S. 839 (1996).......................................................................54

*In re Vitamin C Antitrust Litig.*,
  8 F.4th 136 (2d Cir. 2021) .............................................................39

*Weissman* v. *Birn*,
  56 N.Y.S.2d 269 (Sup. Ct. 1945), *aff'd*, 270 A.D. 757, 59
  N.Y.S.2d 917 (App. Div. 1946).......................................................46

**Argentine Cases and Court Filings**

National Supreme Court of Justice, 2014/08/20, "De San Martín, José
  et al. v. EN – PEN," S.C. Comp. 731. L. XLIX .....................16, 33, 65

National Supreme Court of Justice, 1957/08/05, "Esquivillón de Igón et al. v. Nación Argentina," Fallos: 238:335 .................................................62, 64

National Supreme Court of Justice, 1911/11/21, "Ferrocarril Central Argentino v. L. de Fusse," Fallos: 115:59 .........................................................67

National Supreme Court of Justice, 1991/11/05, "Hidronor, S.A. v. Provincia de Río Negro," Fallos: 314:1422.............................................67, 69, 70

National Supreme Court of Justice, 1975/03/31, "Provincia de La Rioja v. Azzalini Luis," Fallos: 291:232 .................................................62

National Supreme Court of Justice, 1911/02/16, "Puerto de San Nicolás v. Provincia de Buenos Aires," Fallos: 114:124 ...........................64, 65

National Supreme Court of Justice, 1975/04/14, "Sociedad de Electricidad de Rosario," Fallos: 291:290 .............................................67, 69, 70

National Court of Appeals in Civil Matters, Chamber E, 2014/05/06, "L., G.L. v. D., O.R.," L.L. Online, AR/JUR/19485/2014..............................56

National Court of Appeals in Commercial Matters, Chamber A, 1999/10/22, "Gatti, Ernesto Ignacio and other v. Bulad, Alfredo Ragueb s/ summary," E.D., Vol. 188 ................................................44

National Court of Appeals in Commercial Matters, Chamber A, 1999/08/31, "Lezcano, Juan C. v. Arismendi S.C.S.," L.L., Vol. 2000-D .........................................................................................56

National Court of Appeals in Commercial Matters, Chamber A 2010/06/10, "Lipnik, Alberto Teodoro v. Constructora San José Argentina S.A.," L.L. Online, AR/JUR/32215/2010........................................56

Complaint, *Repsol S.A. and others* v. *YPF S.A. s/ordinario*, First Instance Court on Commercial Matters No. 3, Court Secretary No. 6, Docket No. 103.144/2012 ................................................45

**U.S. Statutes**

28 U.S.C. § 1291 ........................................................................................8

28 U.S.C. § 1330(a) ...................................................................................8

28 U.S.C. § 1605(a)(2) ........................................................8, 18

Fla. Stat. § 607.0750 ...............................................................46

N.Y. Jud. Law § 27 ...............................................27, 72, 73, 76

**Argentine Constitutional Provisions and Statutes**

Argentine Constitution, Art. 17 ..............................................62

Civil Code,
    Art. 21 ..............................................................................68
    Art. 505 ......................................................................56, 57
    Arts. 652-655 .....................................................50, 51, 52
    Art. 889 ......................................................................55, 57
    Art. 1083 ...........................................................................55
    Art. 1138 ....................................................................43, 47
    Art. 1204 ....................................................................54, 55
    Art. 2611 ...........................................................................62

Commercial Code, Art. 216 .............................................54, 55

National Code of Civil and Commercial Procedure,
    Art. 1 ................................................................................34
    Art. 5 ...............................................................20, 34, 41

Capital Markets Law (Law No. 26,831) .........................45, 48

General Companies Law (Law No. 19,550) ............33, 44, 58

General Expropriation Law (Law No. 21,499)................*passim*

YPF Expropriation Law (Law No. 26,741) .........................15

YPF Intervention Decree (Decree No. 530/2012) .................14

**Other Authorities**

14 N.Y. Jur. 2d Bus. Rels. § 129.............................................46

Am. Jur. Corps. § 270 .............................................................46

*Black's Law Dictionary* (11th ed. 2019)................................75

Brief for the United States, *Republic of Hungary* v. *Simon*
(U.S. Sept. 11, 2020), No. 18-1447 ................................................................40

Pedro Cazeaux & Felix Trigo Represas, *Derecho de las Obligaciones*
*[The Law of Obligations]* (2d ed. 1975).............................................52

Jennifer Freeman, *Judgments in Foreign Currency—A Little Known*
*Change in New York Law*, 23 International Lawyer 737(1989)........................73

4 Miguel S. Marienhoff, *Tratado de Derecho Administrativo [Treatise*
*on Administrative Law]* (5th updated ed. 1992) .................................................64

Andrés Sánchez Herrero, *La cláusula penal [The penalty clause]*
(2016).........................................................................................................51, 52

Bob Van Voris & Emily Siegel, *Burford Eyes 37,000% Return in $16*
*Billion Argentina Award*, Bloomberg (Sept. 11, 2023),
https://news.bloomberglaw.com/business-and-practice/burford-
eyes-37-000-return-in-16-billion-win-over-argentina ........................................3

# INTRODUCTION

These appeals arise from a combined judgment in two cases totaling $16.1 billion—the largest in the history of the Southern District of New York—based on the Argentine Republic's alleged violation of the corporate bylaws of YPF S.A., an Argentine energy company.  On summary judgment, the district court found the Republic liable under Argentine law for "breaching" YPF's Bylaws by expropriating a majority stake in YPF without making a tender offer to minority shareholders like plaintiffs.  As the district court belatedly acknowledged, its record-setting judgments rested on "issues of first impression and questions of Argentine law."  J.A. 3934.[1] Because the court misapplied Argentine public and private law in sustaining plaintiffs' U.S.-style "breach of contract" claims, this Court should reverse.

YPF, Argentina's largest energy company, was founded in 1922 as a state-owned enterprise and privatized in 1993 through an IPO of shares listed on the Buenos Aires Stock Exchange and American Depository Shares (ADSs) trading on the New York Stock Exchange.  Beginning in 2012, after YPF's decline in oil and gas production threatened the broader Argentine economy, the Republic took the first steps toward expropriating 51% of YPF's shares from YPF's then-controlling

---

[1] District court materials cited in the joint appendix are from the docket in *Petersen Energia Inversora S.A.U.* v. *Argentine Republic*, No. 1:15-cv-02739 (S.D.N.Y.).

shareholder, the Spanish company Repsol, as authorized by Argentina's Constitution and expropriation laws.

During the expropriation process, Repsol and several YPF minority shareholders (but not plaintiffs) objected that the Republic could not limit itself to expropriating Repsol's 51% stake in YPF. They contended that a provision in YPF's corporate bylaws—which are governed by Argentine law—required the Republic to make a tender offer to acquire *all* of YPF's outstanding shares at a specified price if it acquired a majority stake through the expropriation. After the Republic did not commence a tender offer, several YPF shareholders brought claims in Argentina against the Republic under a variety of Argentine-law theories, but none of those shareholders brought a breach-of-contract claim for damages. The expropriation process moved ahead, and, in 2014, the Republic paid $5 billion to compensate Repsol and to resolve claims arising from the expropriation filed in Argentina by minority shareholders.

As these events unfolded, plaintiffs chose not to pursue any Argentine corporate remedies or to seek compensation in Argentina. Instead, several years later, after they no longer held YPF shares, plaintiffs sold the right to pursue any claims to Burford Capital, the litigation-finance firm, for a relative pittance—in Petersen's case, roughly €15 million. Then, in 2015, the Petersen plaintiffs and Burford headed to the Southern District of New York, where they filed a suit

2

purporting to raise solely Argentine claims. But they cast those Argentine claims in decidedly U.S. terms: as a "breach of contract" to be remedied by damages. By late 2016, Eton Park, also funded by Burford, filed a separate copycat complaint under the same theories.

Plaintiffs' forum shopping worked, with Burford reportedly obtaining, subject to this appeal, a 37,000% return on its original investment.[2] Over the Republic's *forum non conveniens* and international-comity objections, the district court accepted plaintiffs' assurance that the court would not have to decide "complicated questions of Argentine law." S.A. 86. Plaintiffs also emphasized repeatedly that U.S. courts had a "substantial" interest in hosting this dispute to protect U.S. securities markets. *See, e.g.*, J.A. 583; *see also* J.A. 316. That all turned out to be mistaken. The court granted summary judgment to plaintiffs in both cases, interpreting complex questions of Argentine law—and often making new Argentine law—in plaintiffs' favor almost across the board. And the court had no need to decide any issues of U.S. securities law, because plaintiffs, who had acquired their shares long after the 1993 U.S. IPO of YPF, did not bring any U.S. securities claims.

---

[2] *See* Bob Van Voris & Emily Siegel, *Burford Eyes 37,000% Return in $16 Billion Argentina Award*, Bloomberg (Sept. 11, 2023), https://news.bloomberglaw.com/business-and-practice/burford-eyes-37-000-return-in-16-billion-win-over-argentina.

3

After a three-day bench trial on damages, the court awarded Petersen $14.4 billion and Eton Park $1.7 billion in damages and prejudgment interest. S.A. 190-191.  Taken together, those extraordinary judgments represent the equivalent of approximately 45% of the Republic's fiscal budget extended for 2024. After the dust settled, the court acknowledged that instead of the "straightforward" questions of Argentine law promised by plaintiffs, *see* J.A. 584, those $16.1 billion judgments rested on the court's resolution of "issues of first impression and questions of Argentine law," J.A. 3934.

This Court should reverse.  To begin with, plaintiffs' claims never should have seen the inside of a New York courtroom.  The district court mistakenly took on the task of adjudicating complex claims that are Argentine in every way.  The Petersen plaintiffs, who sued first and account for 89% percent of the combined judgments, were Spanish shell companies controlled by Argentine nationals.  The follow-on Eton Park plaintiffs had offices in New York, but that connection was not sufficient to overcome the other factors supporting dismissal.  And, in any event, the district court erred by relying on their complaint as the hook to hear the earlier-filed and separate Petersen case.

The defendant is the Argentine Republic, the events at issue all took place within Argentina, and all agree that plaintiffs' claims must be analyzed solely through the prism of Argentine law.  Thus, even if the district court had jurisdiction

4

under the Foreign Sovereign Immunities Act to decide these cases (as this Court previously held), it never should have taken on the new role of an Argentine court. And no U.S. interests required it to decide these claims, because, again, these cases do not involve U.S. securities laws or any other regulation of the U.S. capital markets. Although plaintiffs have emphasized that YPF listed its ADSs on the New York Stock Exchange in 1993, U.S. courts have repeatedly held that such a generic connection to our markets does not support deciding here foreign disputes over shareholder rights and corporate bylaws. Principles of *forum non conveniens* and international comity, standing alone, thus require reversal.

The Supreme Court has directed that a foreign "government's expressed view of its own law" is generally entitled to "substantial . . . weight" in understanding the requirements of foreign law. *Animal Sci. Prods., Inc.* v. *Hebei Welcome Pharm. Co.*, 585 U.S. 33, 46 (2018). Yet the district court repeatedly rejected the Republic's explanation of its own laws and decided plaintiffs' claims arising from an expropriation exclusively under a private-law framework—disregarding Argentine public law—which Argentine courts never would have done. This Court is now left with the unenviable task of serving as an Argentine appellate court in its *de novo* review of the district court's rulings under unfamiliar and complex Argentine public and private law.

5

The district court committed four fundamental errors of Argentine law in effectively treating plaintiffs' claims as a U.S.-style "breach-of-contract" action.

*First*, Argentina's civil-law system does not recognize a breach-of-contract claim for damages by one shareholder against another for violation of corporate bylaws. Tellingly, the district court and plaintiffs did not identify a *single* case in Argentine history recognizing such a claim.

*Second*, Argentina's civil-law system strictly limits the award of money damages. The YPF Bylaws provide for specific penalties on an acquiring shareholder that fails to conduct a tender offer, including stripping that shareholder of the right to vote the shares, to count them toward a quorum, and to receive dividends. Argentine law makes these penalties exclusive and requires a plaintiff seeking damages in a contract case to show that specific performance would have been impossible or to terminate the contract, and plaintiffs did neither here.

*Third*, plaintiffs have no right to bring any Argentine-law contract claims because they were not YPF shareholders when the alleged bylaw "breach" occurred. YPF's Bylaws provide that only the "acquisition" of a threshold percentage of YPF shares triggers the tender-offer obligation. Under Argentine law, "acquisition" has a settled meaning—obtaining legal title to property—and plaintiffs disposed of their YPF shares before the Republic acquired title to YPF's shares from Repsol in May 2014.

*Fourth*, the district court ignored that under Argentina's legal system, courts would not treat plaintiffs' claims solely as private-law contract claims in the first place. Instead, if plaintiffs had brought their claims in Argentina, courts would have resolved them under Argentina's public-law framework—as the Argentine Supreme Court did for other claims brought in Argentina by other YPF minority shareholders. That is because Argentina's General Expropriation Law requires third parties with expropriation-related claims against the government, including those involving contractual obligations allegedly triggered by an expropriation, to obtain compensation solely through Argentina's statutorily prescribed process.

Beyond its errors on the merits, the district court grossly inflated plaintiffs' damages. The court should have converted damages from Argentine pesos to U.S. dollars using the exchange rate in effect *on the date of its judgment* (September 15, 2023) under Section 27(b) of the New York Judiciary Law, which requires damages that must be calculated in a foreign currency, as plaintiffs' expert calculated them, to be converted using the judgment-day exchange rate. The court instead used the exchange rate effective *on the date of the Republic's supposed breach* (April 16, 2012), relying on a currency-conversion rule that New York abrogated decades ago. The district court then gave plaintiffs additional windfalls by using the wrong breach date and prejudgment interest rate under governing Argentine law.

This Court should not affirm these unprecedented judgments totaling $16.1 billion, against a foreign sovereign, under claims entirely governed by that sovereign's law, arising from conduct that occurred entirely in that sovereign's territory.  If the proverbial shoe were on the other foot—that is, if a foreign court allowed plaintiffs to sue the U.S. Government under U.S. law over conduct that occurred in the United States, created a cause of action not previously recognized by U.S. courts, and then entered a judgment of over $2 trillion (the equivalent proportion of U.S. federal spending last year)—the U.S. Government, the U.S. legal system, and the international community would be rightly shocked.  So too here. This Court should leave these claims to Argentine courts where they belong, or, in the exercise of its *de novo* review, should correct the district court's dispositive errors of Argentine law.  Either way, it should reverse.

## JURISDICTIONAL STATEMENT

The district court asserted subject-matter jurisdiction over these cases under 28 U.S.C. § 1330(a), after concluding that the FSIA's commercial-activity exception applied.  S.A. 19; *see* 28 U.S.C. § 1605(a)(2).  This Court affirmed that holding in a prior interlocutory appeal.  *Petersen Energía Inversora S.A.U.* v. *Argentine Republic*, 895 F.3d 194, 209 (2d Cir. 2018).  This Court has jurisdiction under 28 U.S.C. § 1291 to review the district court's September 15, 2023 final judgments. The Republic timely filed its notices of appeal on October 10, 2023.  J.A. 3915.

8

## STATEMENT OF THE ISSUES

1.  Whether the district court erred in exercising jurisdiction over these cases—involving the claims of shareholders of an Argentine company under Argentine law against the Argentine Republic—as a matter of *forum non conveniens* or international comity.

2.  Whether the district court erred in applying governing Argentine law, by:

    a.  Recognizing an unprecedented breach-of-contract action for damages under Argentine law by one shareholder against another shareholder for an alleged violation of corporate bylaws;

    b.  Permitting plaintiffs to seek damages, even though the Argentine civil-law system limits relief for the breach of a contract to the remedies specified in that contract, and does not authorize damages unless specific performance is impossible or the contract has been terminated;

    c.  Allowing plaintiffs to bring claims, even though the Republic "acqui[red]" title to Repsol's YPF shares in 2014 after plaintiffs no longer held their YPF shares; and

    d.  Permitting plaintiffs' breach-of-contract claims to proceed, notwithstanding that Argentina's General Expropriation Law requires that all

third-party claims against the Republic related to an expropriation be resolved through Argentina's comprehensive expropriation process.

3.     Whether, at a minimum, the district court erred in calculating plaintiffs' damages, by:

      a.     Failing to apply the judgment-day rule for currency conversion that applies to "obligations denominated in" a foreign currency under New York Judiciary Law Section 27(b); and

      b.     Applying the wrong breach date and prejudgment interest rate under Argentine law.

## STATEMENT OF THE CASE

### A.     Factual Background

#### 1.     The Republic privatizes state-owned energy company YPF.

In 1922, the Argentine Republic established YPF as a state-owned energy company to ensure an adequate domestic energy supply.  J.A. 3286, ¶ 2.  The Republic privatized YPF in 1993 through an IPO of Class D shares, issued and offered on the Buenos Aires Stock Exchange.  The Republic also made an offering of ADSs representing YPF shares; these ADSs are listed on the NYSE and evidenced by American Depositary Receipts (ADRs).  J.A. 3287, ¶¶ 3-4.

Plaintiffs' claims rest on YPF's Bylaws, which are governed by Argentine law and which the company adopted under the Republic's ownership shortly before the

10

1993 privatization.  J.A. 3288-3290, ¶¶ 11, 13-14.  Section 7 of the Bylaws (as later amended) provides that anyone "wishing" to "acquire, . . . whether directly or indirectly," a certain percentage of Class D shares shall "[a]rrange a takeover bid for the acquisition of" all the remaining shares.  J.A. 651-652 § 7(d), (e).  Bylaw Section 28 extends that tender-offer obligation to the Republic, but with a higher 49% threshold to trigger it.  J.A. 674 § 28(A).  In relevant part, Section 28 provides that the takeover provisions of Section 7:

> shall apply to all acquisitions made by the National Government, whether directly or indirectly, by any means or instrument, of shares or securities of the Corporation, [] if, as a consequence of such acquisition, the National Government becomes the owner, or exercises the control of, the shares of the Corporation, which, in addition to the prior holdings thereof of any class of shares, represent, in the aggregate, at least 49% of the capital stock.

J.A. 674 § 28(A).

The Bylaws specify the procedures by which tender offers under either Section 7 or Section 28 must take place, including formulas for calculating the tender-offer price in Argentine pesos.  J.A. 652-656 § 7(f).  They also prescribe specific "penalties" against an acquiring shareholder, including the Republic, that does not follow the tender-offer requirements.  Specifically, "[s]hares of stock and securities acquired in breach of the" tender-offer provisions (i) lose their "right to vote," (ii) are ineligible to "collect dividends or other distributions that the

11

Corporation may carry out," and (iii) may not be "computed to determine the presence of the quorum at any of the shareholders' meetings." J.A. 657 § 7(h). These penalties remain in force until the acquirer sells its wrongfully acquired shares (or, for an indirect acquisition, until the acquirer loses control of the directly acquiring company). *Id.* The Bylaws do not authorize any other remedies for failure to comply with the tender-offer obligation.

YPF's 1993 U.S. IPO Prospectus reinforced that Argentine law governed the company's Bylaws. It informed U.S. investors that "[t]he By-laws are *governed by Argentine law* and any action relating to enforcement of the By-laws or a shareholder's rights thereunder *is required to be brought in an Argentine court*." J.A. 519 (emphases added).

The Republic did not waive its sovereign immunity or consent to the jurisdiction of U.S. courts for disputes arising under the Bylaws. Nor do the Bylaws or the U.S. IPO Prospectus authorize, recognize, or even mention breach-of-contract suits for damages by shareholders if any other shareholder, including the Republic, violates any obligation under those Bylaws.

### 2. Plaintiffs acquire a minority stake in YPF.

By the end of 2001, eight years after the IPO, Spanish oil company Repsol S.A. had acquired over 99% of YPF's capital stock. J.A. 3292, ¶¶ 20-21. Over the next few years, YPF's average oil production, which accounted for 56% of

Argentina's total crude oil production in 2001, declined sharply.  J.A. 3299, ¶ 50; *see* YPF 20-F Filing at 10 (2001).  After Argentine officials expressed concern, Repsol sought an Argentine partner to take a stake in YPF.  J.A. 3292-3293, 3299, ¶¶ 22-23, 51-52.  Repsol turned to the Petersen Group, a privately held Argentine conglomerate owned and controlled by an Argentine family, the Eskenazis.  J.A. 3292-3293, ¶¶ 20-23.

In transactions during 2008 and 2011—over a decade after the 1993 YPF IPO—the Petersen Group acquired a 25% stake in YPF.  J.A. 3294, 3296-3297, ¶¶ 27, 39, 41.  The Petersen plaintiffs, two Spanish special-purpose vehicles created for the sole purpose of holding the Petersen Group's interest in YPF, J.A. 3293, ¶ 24, purchased nearly all of their shares as ADRs directly from Repsol, in transactions that took place in Madrid and Buenos Aires under agreements governed by Spanish law.  J.A. 3294, 3296-3297, ¶¶ 27, 39, 41; J.A. 188, ¶ 13.1.  Petersen financed almost all of its purchases of YPF shares through loans secured with a pledge of the purchased shares.  J.A. 3294, ¶¶ 28-30.

Between late 2010 and March 2012—again, long after the 1993 YPF IPO—the Eton Park plaintiffs acquired approximately 3% of YPF, also mostly from Repsol.  J.A. 3297-3298, ¶¶ 44-46.  Now defunct, Eton Park Capital Management, once headquartered in New York, was the manager of a multibillion-dollar hedge fund.  J.A. 3297, ¶ 43.  Eton Park acquired its YPF stake through Cayman Islands

and Delaware investment vehicles that are also plaintiffs in this action.  J.A. 3297-3298, ¶¶ 43-46.

### 3.    The Republic begins the expropriation process.

Controlled by Repsol and the Petersen Group, YPF went into serious decline: its oil and gas reserves were depleted, production dropped sharply, and the company took on enormous debt.  J.A. 3299-3301, ¶¶ 50, 56-58.  On April 16, 2012, the Argentine president submitted a bill to Congress that, if enacted, would authorize the expropriation of YPF shares owned by Repsol representing 51% of YPF's total capital stock.  J.A. 3301, ¶ 59.  In Argentina, as in the United States, the government can expropriate property in the public interest.  Under Argentina's Constitution and General Expropriation Law, Law No. 21,499 of 1977, the Argentine Congress has the constitutional power to authorize the expropriation of an asset in the public interest upon the payment of compensation.  S.A. 195, 229.

In addition to proposing the YPF expropriation bill, the Argentine president issued a decree appointing a temporary YPF "intervenor"—a role similar to a receiver under U.S. law.  The Intervention Decree authorized the temporary intervenor to exercise the powers of the YPF board of directors and company president for 30 days.  J.A. 3302, ¶¶ 61-62; YPF Intervention Decree (Decree No. 530/2012) (S.A. 249).

14

On May 3, 2012, after debating various options, the Argentine Congress passed the YPF Expropriation Law, Law No. 26,741, which went into effect on May 7, 2012.  J.A. 3303, ¶ 66.  The law declared "fifty-one percent (51%) of the equity of YPF Sociedad Anónima, represented by an identical stake of Class D shares held by Repsol" to be of "public interest and subject to expropriation." S.A. 241.  This law started a two-year clock for the Republic to resolve the expropriation by agreement.  Law 21,499, Art. 33 (S.A. 233).  The YPF Expropriation Law also provided that the Republic would exercise Repsol's rights over the shares "subject to expropriation"—through a mechanism referred to as "temporary occupation"—while the expropriation was pending.  S.A. 241-242; J.A. 3304, ¶ 71.

### 4. Repsol and other YPF shareholders (but not plaintiffs) pursue Argentine remedies.

At YPF's June 4, 2012 shareholders' meeting—the first after the expropriation process began—several shareholders asserted that the Republic had violated the Bylaws by assuming control over Repsol's YPF shares without making a tender offer.  Those shareholders claimed that, as a result of its violation, the Republic could not exercise voting rights, participate in YPF's corporate governance, or have the shares counted toward the meeting quorum.  J.A. 3305, ¶ 75.  The meeting chair (the head of Argentina's securities regulator) rejected those

arguments, explaining that they did not apply in the context of an expropriation.  *See* J.A. 528-531 (shareholders' meeting minutes).

After that meeting, some YPF shareholders brought claims in Argentine courts.  J.A. 3305-3306, ¶¶ 76-78.  In one case, *De San Martín*, YPF shareholders sued the Republic for specific performance in Argentina's federal civil and commercial courts, seeking a court order to compel the Republic to make a tender offer for Class D YPF S.A. shares at the price specified in the bylaws of the company.  National Supreme Court of Justice, 2014/08/20, "De San Martín, José et al. v. EN – PEN," Jurisdiction No. 731 XLIX (S.A. 252).  On a jurisdictional appeal, the Argentine Supreme Court transferred the case from a federal civil and commercial court to a federal court with jurisdiction over administrative matters because it turned on Argentine public law.  *Id.*

Repsol, for its part, brought suits in Argentina, Spain, and New York, as well as arbitral claims.  Eventually, the Republic and Repsol reached a global settlement agreement under which the Republic agreed to pay Repsol $5 billion for its claims and to secure the discontinuance of all minority shareholders' timely-filed claims related to the expropriation.  J.A. 3308-3309, ¶¶ 92-95; J.A. 1568-1569, ¶¶ 89-90; J.A. 1516, ¶ 22; J.A. 778-781, 788-792.  The settlement thus included the claims of the *De San Martín* plaintiffs and other minority shareholders, as well as Repsol's claims over its shares that had not been expropriated.  J.A. 788-792.  On April 23,

2014, the Argentine Congress ratified the settlement agreement. J.A. 3310, ¶ 97. On May 8, 2014, the Republic paid the agreed-upon compensation, and Repsol transferred title to the expropriated shares to the Republic, completing the expropriation within the two-year period mentioned above. J.A. 3310, ¶¶ 97-98.

Unlike Repsol and other YPF minority shareholders, neither Petersen nor Eton Park brought claims in Argentina or elsewhere while the expropriation was pending. Nor did they attend the June 2012 shareholders' meeting, object to the Republic's exercise of voting rights, or otherwise demand that the Republic make a tender offer. J.A. 3306, ¶ 79. Instead, Petersen, on the advice of "sophisticated Argentine counsel on matters of Argentine corporate law," elected not to pursue any action against the Republic in any forum. J.A. 3306, ¶¶ 80-81. Eton Park did the same. J.A. 3306, ¶ 82.

In May 2012, shortly after the YPF Expropriation Law passed, Petersen defaulted on the loans financing its acquisition of the YPF shares, and the lenders foreclosed. J.A. 3307-3308, ¶¶ 84-88. In March 2015, in the Petersen bankruptcy proceedings in Spain, Burford paid about €15 million for the exclusive right to prosecute Petersen's claims "related to . . . the expropriation" and to receive 70% of any recovery. J.A. 3308, 3310-3311, ¶¶ 89-90, 100-101; J.A. 3212-3213.

The Eton Park plaintiffs sold their YPF shares in 2012 and 2013. J.A. 3308, ¶ 91. In 2016, three years after Eton Park had ceased to hold any YPF shares,

17

Burford acquired the right to prosecute Eton Park's putative expropriation-related claims, and to receive 75% of any recovery.  J.A. 3311, ¶¶ 102-103.

**B.    Procedural Background**

In April 2015, Petersen, funded by Burford, sued the Republic and YPF in the Southern District of New York.  J.A. 133.  Petersen brought what it styled as a claim for "breach of contract," alleging that the Republic had breached YPF's Bylaws by "acqui[ring] a controlling stake in YPF" without making a tender offer to other shareholders.  J.A. 153, ¶¶ 50-54.  Petersen also asserted claims for breach of the duty of good faith and fair dealing and for promissory estoppel.  J.A. 155-156, ¶¶ 60-67.

1.    The Republic moved to dismiss Petersen's complaint.  It argued, among other things, that the district court lacked subject-matter jurisdiction under the FSIA, and that *forum non conveniens* required dismissal.  *See* J.A. 193.  The district court held that Petersen's breach-of-contract claim fell within the FSIA's "commercial activity" exception to sovereign immunity, 28 U.S.C. § 1605(a)(2).  S.A. 19.  Despite recognizing that "deference to Plaintiffs' choice of forum is not at its greatest height" for foreign plaintiffs such as Petersen, the court declined to dismiss for *forum non conveniens*, finding that Argentine courts were not then an adequate forum because of an unrelated pending criminal investigation in Argentina into Burford and one of Petersen's law firms.  S.A. 31, 34.  In November 2016, after the district

18

court's ruling, Eton Park, also funded by Burford, filed a copycat complaint against the Republic and YPF. The court agreed to treat these two separate lawsuits as related.

The Republic appealed the FSIA ruling under the collateral-order doctrine. In affirming, this Court agreed that "[e]xpropriation is a decidedly sovereign—rather than commercial—activity." *Petersen Energía Inversora S.A.U.* v. *Argentine Republic*, 895 F.3d 194, 206-07 (2d Cir. 2018) (citation omitted). But it found that the Republic was not immune from suit because plaintiffs' claims were premised on the Republic's "subsequent failure to make a tender offer," *not* the "expropriation itself." *Id.* at 206. As the district court recognized, this Court's prior decision "considered whether this Court's denial of [defendants'] motion to dismiss on sovereign immunity grounds was proper, not whether the claims themselves were meritorious." S.A. 108. Accordingly, this Court has not ruled on any of the questions of Argentine law presented on this appeal.

2.    On remand, the Republic renewed its motion to dismiss on grounds of *forum non conveniens* and international comity. The district court denied the motion. S.A. 50. This time, the court held that Argentina was an adequate forum, as the criminal investigations that the court had previously found concerning had been dismissed with prejudice. S.A. 69-75. But the court then gave "substantial deference" to the Eton Park plaintiffs' choice of forum, observing that Eton Park

was run out of New York, and that YPF's ADRs were "sold . . . on the New York Stock Exchange." S.A. 65-66, 86-87; J.A. 164. The court allowed *Eton Park*'s New York connection to buttress *Petersen*'s litigation in New York, even though Petersen had filed its separate case a year and a half earlier. Moreover, the court was not concerned by having to apply Argentine public and private law, because, accepting plaintiffs' representations, it predicted that no "complicated questions of Argentine law will actually arise." S.A. 86. In a footnote, the court declined to abstain on international-comity grounds, concluding that no "exceptional circumstances" justified dismissal. S.A. 87 n.15.

Finally, the court dismissed the relevance of Article 5, paragraph 11 of Argentina's National Code of Civil and Commercial Procedure. That Argentine statute requires actions "derived from corporate relations" involving Argentine companies to be heard by Argentine courts. S.A. 81-83. The court agreed that plaintiffs' claims fell within the statute, but read it to determine only which court within Argentina has jurisdiction to hear corporate claims, thus "allow[ing] for concurrent . . . international jurisdiction" in courts around the globe. S.A. 82-83.

3.     After discovery, both sides moved for summary judgment and submitted extensive compendiums of Argentine-law authorities—thousands of pages of cases and statutes—for the district court to wade through. In March 2023, without holding oral argument, the district court denied the Republic's motion for

summary judgment and granted summary judgment to plaintiffs, rejecting the Republic's explanation of how Argentina's law works on nearly every question. S.A. 92-93.

The court disposed of the Republic's argument that plaintiffs were no longer YPF shareholders when the Republic allegedly violated the Bylaws by rewriting the text of the relevant provision. S.A. 115-116. The court then made new Argentine law by recognizing a shareholder-versus-shareholder damages action for breach of corporate bylaws that no Argentine court has ever recognized. S.A. 125-126. The court next concluded, without support in Argentine caselaw or commentary, that plaintiffs were entitled to damages notwithstanding clear Argentine law precluding that remedy under these circumstances. S.A. 129.

The court also ruled, without analyzing or referencing any Argentine caselaw or commentary, that Argentina's exclusive process for compensating third parties with claims arising from an expropriation did not bar plaintiffs' U.S. lawsuits. Even though the claims of De San Martín and other minority shareholders were resolved through the expropriation process, the court held that Argentina's General Expropriation Law did not apply because plaintiffs were not "enforcing rights against the expropriated property." S.A. 136-141.

On damages, the district court failed to follow New York's conversion rule for foreign-currency obligations, which requires a conversion to dollars based on the

exchange rate in effect on the date of judgment. Instead, the court held that damages would be converted to dollars based on the exchange rate in effect at the time of the alleged breach in 2012. S.A. 146-148.

4.     The district court held a short bench trial on damages to resolve whether April 16, 2012, when the Argentine president issued the Intervention Decree and submitted the YPF expropriation bill to Congress, or May 7, 2012, when the YPF Expropriation Law became effective, was the precise date on which the Republic's putative obligation to conduct a tender offer was triggered. It also decided the proper method for calculating damages under the Bylaws and the appropriate rate of prejudgment interest. The court rejected the Republic's arguments under Argentine law on each of those issues and granted plaintiffs the maximum damages and interest they sought. S.A. 171-186.

On September 15, 2023, the district court entered final judgment for plaintiffs. S.A 188-191. The court awarded the Petersen plaintiffs approximately $14.4 billion in damages and prejudgment interest. The court also awarded the Eton Park plaintiffs approximately $1.7 billion. *Id.*

## SUMMARY OF ARGUMENT

I.     At the threshold, these cases never should have been litigated in a U.S. court. They involve an Argentine company and its shareholders, who seek redress under Argentine law for claims under Argentine corporate bylaws relating to an

22

expropriation in Argentina by the Argentine government.  These cases should be dismissed under either *forum non conveniens* or international comity, both of which keep U.S. courts from having to resolve fundamentally foreign disputes like this one.

A.    In declining to dismiss under *forum non conveniens*, the district court committed legal errors that constitute an abuse of discretion.  The court correctly acknowledged that most relevant considerations favored dismissal:  Argentina provides an adequate forum, and the interests in litigating there are strong.  But the court wrongly deferred to Eton Park's interest in litigating in New York, even though Eton Park was a tag-along plaintiff in a later-filed suit and its claimed damages were a fraction of Petersen's.  At the very least, even if Eton Park's supposed interest in litigating in New York could justify *its own* forum choice, that interest did not support litigating *Petersen*'s substantially larger claims here.

Then, in analyzing the balance of interests between litigating in Argentina and in New York, the district court committed legal errors on both sides of the equation. On the Argentine side, the court wrongly predicted that these cases would not involve complex questions of Argentine law and gave little weight to Argentina's statutorily expressed interest in hosting intra-corporate disputes of Argentine corporations in Argentina.  On the New York side, the court drew an inapt analogy to U.S. securities cases, even though these cases do not involve U.S. securities law

or the acquisition of shares in YPF's 1993 U.S. IPO. Together, those errors substantially prejudiced the Republic.

B.     The district court's failure to dismiss under principles of international comity independently mandates reversal. Under the adjudicatory-comity doctrine, U.S. courts decline to exercise jurisdiction when a foreign nation's courts also have jurisdiction and a greater claim to hosting the dispute. Here, in a footnote, the district court concluded that no "exceptional circumstances" required such abstention, even though this test applies only when the basis for dismissal is a parallel proceeding pending in a foreign country. Regardless, these cases easily satisfy any exceptional-circumstances test, given the massive stakes for the Republic and its statutorily expressed interests (i) in handling Argentine intra-corporate disputes in its own courts, and (ii) in resolving expropriation-related claims through a single domestic claims process.

II.     On the merits, the district court's errors of Argentine law, which this Court reviews *de novo*, confirm why the district court should not have decided these unquestionably complex Argentine-law disputes. The district court committed at least three independent errors in interpreting Argentine private law, permitting (1) claims that do not exist under Argentine law, (2) to be brought for damages in circumstances in which Argentine law does not award damages, (3) by plaintiffs that Argentine law would not recognize. The district court also committed a final and

24

overarching error of Argentine law by failing to address these private-law questions under Argentina's public-law expropriation framework, as an Argentine court would have done.

A.    *First*, as the district court acknowledged, no Argentine court has ever permitted one shareholder to sue another for damages based on a violation of corporate bylaws.  Indeed, the U.S. legal system generally does not permit such suits, either.  Yet, without analyzing or citing any Argentine caselaw, the court authorized plaintiffs' unprecedented breach-of-bylaws action for damages, concluding that YPF's Bylaws contained bilateral "contract" promises from the Republic to all other shareholders.  That summary conclusion was as unwarranted as it is unprecedented.  The Bylaws do not contain the type of promises required for a bilateral contract under Argentine law and did not authorize or even mention any claim for money damages.

B.    *Second*, Argentine private law precludes plaintiffs' damages claims.  Argentine law requires courts to give exclusive effect to remedies that the parties have specified in their agreements—here, the Bylaws' specific command that a breaching party would lose the right to vote its shares, count them toward a quorum, and collect dividends if it violated the tender-offer provisions.  Argentine law also requires plaintiffs to seek specific performance, show that such performance is impossible, or terminate the agreement, before seeking damages.  The district court

25

ignored those requirements, instead reading into Argentine law—without citing any Argentine cases—a U.S.-style damages remedy for the unprecedented U.S.-style "breach of contract" it had recognized.

C.    *Third*, specific YPF Bylaws provisions with well-defined meanings under Argentine law prevent these particular plaintiffs from pursuing a damages claim for violation of the Bylaws, because they were no longer YPF shareholders when that alleged violation occurred.  The Bylaws explicitly provide that the Republic's tender-offer obligation is triggered only by the "acquisition" of a threshold percentage of YPF shares.  Under Argentine law, "acquisition" means obtaining legal title.  All agree that the Republic did not acquire legal title to the relevant shares until May 8, 2014, by which point plaintiffs were no longer YPF shareholders.

D.    *Fourth*, Argentina's General Expropriation Law channels all claims against the Republic based on agreements related to expropriated property into its comprehensive expropriation process.  To ensure that the Argentine government obtains clean title, Article 28 of the General Expropriation Law extinguishes any third-party "encumbrance" on expropriated property and bars any third-party claims that might "impede" the expropriation or "its effects" not resolved through the expropriation process.  S.A. 233.  Under Article 28, that extinguishment includes contractual agreements or commercial obligations triggered by an expropriation,

26

such as, as plaintiffs allege, the tender-offer provision in YPF's Bylaws. Thus, plaintiffs could have sought compensation from the Republic for the alleged loss of their tender-offer rights only within the Argentine expropriation framework, as other similarly situated YPF minority shareholders did. Once the expropriation process concluded with Argentina's $5 billion payment, plaintiffs forfeited any right to compensation from the Republic relating to the expropriation, including based on the Republic's not undertaking a tender offer for their shares.

III. *Finally*, the district court's judgments, at a minimum, should be vacated because the court awarded plaintiffs a massive windfall by grossly miscalculating their damages in several ways.

A. The court erred first in its conversion of damages to U.S. dollars. New York law—which all parties agree governs this damages question—imposes an exclusive "judgment-day rule" for converting damages denominated in a foreign currency into dollars. The YPF Bylaws specify an obligation calculable only in Argentine pesos, as plaintiffs' expert did. As a result, the district court should have calculated any damages in pesos and then converted that figure into dollars "at the rate of exchange prevailing on the date of entry of the judgment"—September 15, 2023. N.Y. Jud. Law § 27(b). Instead, the court applied the exchange rate in effect on the date of the supposed *breach*—April 16, 2012—even though New York abandoned the breach-day rule in 1987.

27

B.    The district court also committed errors of Argentine law in calculating damages.    Even under its erroneous theory that the Republic "breached" its obligation on the day it began exercising control over the shares, the court misapprehended that date to be April 16, 2012, even though the Republic did not exercise any control *over the shares* (as opposed to control over YPF's management) until May 7, 2012, at the earliest.    Moreover, the court failed to apply the right prejudgment interest rate used by Argentine federal administrative-law courts, which would have heard plaintiffs' claims over the Republic's failure to commence a tender offer following its expropriation of YPF's 51% stake.

## STANDARD OF REVIEW

This Court reviews *forum non conveniens* and international-comity decisions for abuse of discretion.    *Figueiredo Ferraz E Engenharia de Projeto Ltda.* v. *Republic of Peru*, 665 F.3d 384, 389 (2d Cir. 2011).    A court abuses its discretion when its decision rests on an "error of law," which is assessed *de novo*.    *In re Arbitration Between Monegasque De Reassurances S.A.M.* v. *Nak Naftogaz of Ukraine*, 311 F.3d 488, 498 (2d Cir. 2002); *see Figueiredo*, 665 F.3d at 386, 389 (reversing denial of motion to dismiss on *forum non conveniens* grounds).

This Court reviews a district court's determination of foreign law *de novo*.    *Animal Sci. Prods.*, 585 U.S. at 42; *see Branch of Citibank, N.A.* v. *De Nevares*, 74 F.4th 8, 20 (2d Cir. 2023) (reversing for errors of Argentine law); *Terra Firma*

28

*Invs. (GP) 2 Ltd.* v. *Citigroup Inc.*, 716 F.3d 296, 301 (2d Cir. 2013) (vacating for error of English law).   In determining the content of foreign law, a foreign "government's expressed view of its own law is ordinarily entitled to substantial . . . weight." *Animal Sci. Prods.*, 585 U.S. at 46.

This Court reviews whether the district court correctly calculated damages *de novo*.  *Oscar Gruss & Son, Inc.* v. *Hollander*, 337 F.3d 186, 196 (2d Cir. 2003); *see Lauder* v. *First Unum Life Ins. Co.*, 284 F.3d 375, 379, 384 (2d Cir. 2002) (vacating calculation of damages).

## ARGUMENT

## I.  PLAINTIFFS' CLAIMS DO NOT BELONG IN A U.S. COURT.

At the threshold, the district court was wrong to exercise jurisdiction over this thoroughly Argentine dispute instead of dismissing under the doctrines of *forum non conveniens* or international comity.  In previously concluding that the FSIA afforded the district court subject-matter jurisdiction, this Court held only that the district court *could* hear the dispute—not that it *should* do so.  *Petersen*, 895 F.3d at 212. As this Court has recognized, "the traditional doctrine of *forum non conveniens* is still applicable in cases arising under the FSIA."   *Aenergy, S.A.* v. *Republic of Angola*, 31 F.4th 119, 126 (2d Cir. 2022) (citation omitted).  In fact, the "principles underlying the *forum non conveniens* doctrine apply with equal weight—indeed, in

some cases perhaps with greater weight—to lawsuits against foreign states" permitted under the FSIA. *Id.* at 127.

> **A.    The District Court Should Have Dismissed This Suit Under the Doctrine of *Forum Non Conveniens*.**

This Court has prescribed a three-step framework for assessing *forum non conveniens*. A district court must: (1) determine "the degree of deference to be given to a plaintiff's choice of forum"; (2) "consider whether an adequate alternative forum exists"; and (3) "balance" the "private interest factors" and "public interest factors" to "ascertain whether the case should be adjudicated in the plaintiff's chosen forum or in the alternative forum proposed by the defendant." *Iragorri* v. *United Techs. Corp.*, 274 F.3d 65, 71, 73-74 (2d Cir. 2001) (en banc). When a district court's decision to deny a *forum non conveniens* motion rests on legal errors, this Court has not hesitated to reverse. *See Figueiredo*, 665 F.3d at 392-93. Here, while correctly recognizing at the second step that Argentina provides an adequate forum, the district court abused its discretion in hearing plaintiffs' Argentine-law claims by committing dispositive legal errors at the first and third steps.

1.    At step one, the court wrongly deferred to plaintiffs' choice of forum by invoking Eton Park's New York connection. But that connection is irrelevant for two reasons. *First*, the Petersen plaintiffs, which were shell companies domiciled in Spain and controlled by Argentine nationals, chose the New York forum, and did so a year and a half *before* Eton Park sued. With only Petersen involved, the district

court recognized that deference to its choice of forum was "not at its greatest height." S.A. 31. In fact, courts have ruled that "where a domestic plaintiff is added at the eleventh hour to strengthen the other plaintiffs' connection to the United States, . . . reduced deference may be appropriate for all the plaintiffs." *Otto Candies, LLC* v. *Citigroup, Inc.*, 963 F.3d 1331, 1345 (11th Cir. 2020) (citing *Vivendi SA* v. *T-Mobile USA Inc.*, 586 F.3d 689, 694-696 (9th Cir. 2009)). That is why Eton Park's connection could not support keeping both cases in New York.

*Second*, to the extent it gave Eton Park's interest in New York any weight, the district court should have analyzed the cases separately and dismissed Petersen's far more substantial claims. The Eleventh Circuit has recognized that "[a] bifurcated analysis may be appropriate" in circumstances "where foreign and domestic plaintiffs filed separate lawsuits that were consolidated for administrative purposes." *Otto Candies*, 963 F.3d at 1345. Courts in this circuit have followed that approach. *See In re Assicurazioni Generali S.p.A. Holocaust Ins. Litig.*, 228 F. Supp. 2d 348, 352-353, 369-370 (S.D.N.Y. 2002) (conducting separate *forum non conveniens* analyses for domestic and foreign plaintiffs). Here, although Petersen's and Eton Park's lawsuits were treated as related for administrative purposes, they were separate lawsuits filed over a year apart and were never formally consolidated. At the very least, then, only Eton Park's forum selection deserved any deference;

Petersen's case should have been analyzed as a wholly foreign plaintiff selecting U.S. courts to host wholly foreign claims.

2.      At step three, the district court got the balancing wrong on both sides of the scale:  it discounted Argentina's statutorily expressed interest and superior competence to host these Argentine-law disputes and inflated New York's competing interest.

a.      On the Argentine side of the balance, the district court discounted two factors that clearly favor litigation in Argentina.  *First*, the court erroneously predicted that the cases would not involve complex questions of Argentine law.  As the Supreme Court has now emphasized, the "public interest factors point towards dismissal where the [U.S.] court would be required to 'untangle problems . . . in law foreign to itself.'"  *Piper Aircraft Co.* v. *Reyno*, 454 U.S. 235, 251 (1981) (citation omitted); *see Aenergy*, 31 F.4th at 135 ("[T]he contracts at issue are subject to Angolan law. . . . [T]his suggests that Angola is a superior forum.").  After all, a foreign country's courts are "'the only tribunals empowered to speak authoritatively' on the meaning and operation of [its] statute[s]."  *Figueiredo*, 665 F.3d at 392 (citation omitted).

Argentina's civil-law system is especially "foreign to" U.S. courts, meriting special caution.  *See Abad* v. *Bayer Corp.*, 563 F.3d 663, 671 (7th Cir. 2009) ("[T]he uncertainty of Argentine law is a compelling reason why [a] case should be litigated

in Argentina rather than in the United States.").  This Court has previously affirmed a dismissal under *forum non conveniens* because the case would "require extensive applications of . . . Argentine law."  *Acosta* v. *JPMorgan Chase & Co.*, 219 Fed. Appx. 83, 87 (2d Cir. 2007).  The same result was required here, where the district court had to untangle complex issues of Argentine private and public law involving unprecedented claims against a foreign sovereign.  Indeed, in *De San Martín*, the Argentine Supreme Court held that only a federal court focused on administrative matters—not even Argentine federal civil and commercial courts—should hear YPF minority shareholder claims seeking relief pursuant to the tender-offer provisions of the Bylaws.  National Supreme Court of Justice, 2014/08/20, "De San Martín, José et al. v. EN – PEN," S.C. Comp. 731 XLIX (S.A. 252).

Following remand from this Court, the district court doubted, at plaintiffs' urging, that "any complicated questions of Argentine law [would] actually arise." S.A. 86.  That prediction was wrong at the time and proved even more wrong in hindsight.  As shown in Part II, *infra*, the district court had to decide multiple questions under the Republic's Constitution, its Civil Code, its General Companies Law, and its expropriation laws.  In ruling on post-judgment motions, the district court tellingly "acknowledge[d] that, in reaching judgment for Plaintiffs," it had "decided issues of first impression and questions of Argentine law."  J.A. 3934.

*Second*, the district court misinterpreted Argentina's statutorily expressed interest in having Buenos Aires serve as the exclusive forum for corporate disputes involving YPF. Article 5, paragraph 11 of Argentina's National Code of Civil and Commercial Procedure provides that "actions derived from corporate relations" must be brought in the Argentine court where a corporation is registered or headquartered. S.A. 213. For YPF, that is Buenos Aires, as YPF's Prospectus made clear in stating that Bylaws disputes were "required to be brought in an Argentine court." J.A. 519. The court found that plaintiffs' claims are "derived from corporate relations" within the meaning of Article 5. *See* S.A. 82; *see also* J.A. 549-550, ¶¶ 23-24; J.A. 565-566, ¶ 5. But the court deemed Article 5 inapplicable, concluding that this statute merely "look[s] inward" to Argentina and determines which Argentine court has jurisdiction to hear corporate claims, while still "allow[ing] for concurrent . . . international jurisdiction" in courts anywhere around the world. S.A. 82. Article 5 draws no such distinction. It governs *all* disputes "derived from corporate relations." S.A. 213. And Article 1 underscores the point, explaining that where, as with corporate disputes, Argentina asserts "exclusive jurisdiction," that jurisdiction cannot be extended to courts outside of Argentina—not even by agreement of the parties. S.A. 212. Even though an Argentine statute cannot formally control the exercise of jurisdiction elsewhere, this statute makes clear that,

34

for *forum non conveniens* purposes, the Republic has a strongly expressed interest in resolving Argentine corporate disputes at home.

b.    On the New York side of the balance, the district court substantially overstated New York's interest in this litigation.  It treated these cases as analogous to a U.S. securities action, even though plaintiffs brought no claim under U.S. securities law or any other U.S. law.  Specifically, the court relied on *DiRienzo* v. *Philip Services Corp.*, 294 F.3d 21, 33 (2d Cir. 2002), which emphasized New York's interest in hosting U.S. securities-law claims against a Canadian defendant brought by Americans who purchased shares on American stock exchanges.  The court thought that "[t]his case is no different," because "YPF ADRs listed on the NYSE" were "market[ed]" *in 1993* to U.S. investors (although not to plaintiffs, who, along with Burford, did not even exist at the time).  S.A. 84.  But *DiRienzo* actually involved a dispute under U.S. securities laws, for securities purchased on American stock exchanges.  As this Court described, the *DiRienzo* "plaintiffs offered a quite valid reason for litigating in federal court:  this country's interest in having United States courts enforce United States securities laws."  294 F.3d at 28.

By contrast, plaintiffs have brought Argentine-law claims about an Argentine company's bylaws; their claims have nothing to do with U.S. securities law or the 1993 U.S. IPO.  Indeed, plaintiffs did not acquire any ADRs until over a decade after

the IPO, and they did so knowing full well that their rights were governed by Argentine law.

The U.S. listing of YPF's ADSs has no bearing on these cases. New York courts routinely dismiss corporate claims under foreign law involving foreign corporations on *forum non conveniens* grounds, regardless of whether the corporation's stock trades on a U.S. exchange. *See, e.g.*, *Rosenfeld* v. *Achleitner*, No. 651578/2020, slip op. at *33, 53-55 (N.Y. Sup. Ct. Mar. 22, 2023) (dismissing shareholder derivative action by N.Y.-domiciled plaintiff against German executives under *forum non conveniens*, even though defendant's "stock is listed on the New York Stock Exchange," because of Germany's "compelling interest in interpreting its own statute"); *Cattan* v. *Rohner*, No. 652468/2020, slip op. at *17 (N.Y. Sup. Ct. Apr. 10, 2023) (dismissing shareholder derivative action against Swiss executives under *forum non conveniens*).

3.    The district court's failure to dismiss on *forum non conveniens* grounds substantially prejudiced the Republic. *See Indasu Int'l, C.A.* v. *Citibank, N.A.*, 861 F.2d 375, 380 (2d Cir. 1988) (after adjudication on the merits, the Court may reverse a *forum non conveniens* decision upon a showing of "substantial prejudice"); *see also Gonzalez* v. *Naviera Neptuno A.A.*, 832 F.2d 876, 881 (5th Cir. 1987) (reversing post-trial judgment on *forum non conveniens* grounds in light of prejudice to defendant). As shown below, the district court, unfamiliar with Argentina's civil-

36

law system, and having to rely on translations of Argentine law, decided multiple questions of Argentine law against the Republic by rejecting its experts' reports and deposition testimony across the board. It should have left those legal questions, some of which it now recognizes involved "issues of first impression," J.A. 3934, to Argentine courts, which are "the more competent maker[s] of Argentine law—more competent in the sense of more legitimate, but also more competent in the sense of being better able to decide the case correctly." *Abad*, 563 F.3d at 671.

### B. The District Court Should Have Dismissed This Suit Under Principles of International Comity.

The district court independently erred in not dismissing under principles of international comity. The court brushed aside concerns about Argentina's sovereign prerogatives by applying an inapposite "exceptional circumstances" standard. *See Bigio* v. *Coca-Cola Co.*, 448 F.3d 176, 178 (2d Cir. 2006) (declining to defer to comity ruling "because the district court applied the wrong legal standard"). And even if that standard applied, these cases *do* present exceptional circumstances: another sovereign with an adequate legal system has expressed its strong interest in serving as the exclusive forum for homegrown corporate disputes and in consolidating all claims arising from a national expropriation. Indeed, in deciding post-judgment motions, the district court acknowledged that significant "international comity" concerns are present here, "[p]articularly in light of the questions of Argentine law decided." J.A. 3934.

37

1.    International comity reflects "the recognition which one nation allows . . . to the legislative, executive or judicial acts of another nation" as a means of showing "due regard . . . to international duty and convenience." *Hilton* v. *Guyot*, 159 U.S. 113, 164 (1895).  Under the strand of comity called "adjudicative comity," U.S. courts "decline to exercise jurisdiction in a case properly adjudicated in a foreign state." *In re Maxwell Comm'cn Corp.*, 93 F.3d 1036, 1047 (2d Cir. 1996).  They do so not because U.S. courts lack jurisdiction, but because they "conclude[] that a second sovereign also has a legitimate claim to jurisdiction" and has a greater interest in the dispute.  *Mujica* v. *AirScan, Inc.*, 771 F.3d 580, 598-599 (9th Cir. 2014) (citation omitted).  In other words, international comity functions as "an abstention doctrine:  A federal court has jurisdiction but defers to the judgment of an alternative forum." *Ungaro-Benages* v. *Dresdner Bank AG*, 379 F.3d 1227, 1237 (11th Cir. 2004).

In a single footnote, the district court summarily rejected the Republic's comity argument.  S.A. 87 n.15.  The court erroneously believed that "exceptional circumstances" were required to dismiss for international-comity reasons.  *Id.* (citing *Ole Media Mgmt., L.P.* v. *EMI Apr. Music, Inc.*, 2013 WL 2531277, at \*3 (S.D.N.Y. June 10, 2013)).  But the "exceptional circumstances" standard applies only when a party asks a U.S. court to stay its hand based on the existence of a parallel, prior-filed foreign proceeding.  *See Royal & Sun Alliance Ins. Co.* v. *Century Int'l Arms,*

*Inc.*, 466 F.3d 88, 93-94 (2d Cir. 2006) (drawing "exceptional circumstances" language from cases involving parallel federal and state litigation); *see also Ole Media Mgmt.*, 2013 WL 2531277 at *2 (applying exceptional-circumstances test in context of "prior action pending" doctrine).

When international comity is not premised on a previously filed proceeding, courts apply a different test.  In such cases, dismissal is appropriate when, as here, (1) a foreign sovereign has a strong interest in exercising jurisdiction and the issues are governed by foreign law; (2) the foreign forum is adequate; and (3) the United States has a weak interest in the case.  *See Mujica*, 771 F.3d at 603-608, 615; *Ungaro-Benages*, 379 F.3d at 1238-1240; *see also In re Vitamin C Antitrust Litig.*, 8 F.4th 136, 144 (2d Cir. 2021) ("As a general matter, international comity 'takes into account the interests of the United States, the interests of the foreign state, and those mutual interests the family of nations have in just and efficiently functioning rules of international law.'") (citation omitted); J.A. 486.  That test required dismissal here.

On the first prong, and as shown above, Argentina has a statutorily expressed interest in Argentine courts serving as the exclusive forum for Argentine corporate-law disputes.  *See* pp. 34-35, *supra*.  Moreover, these cases involve balancing Argentina's sovereign prerogative to expropriate property to safeguard the national fuel supply against claims of private parties, and applying Argentina's established

and exclusive process for resolving such expropriation-related claims. Critically, "[t]he closer the connection between the conduct and core prerogatives of the sovereign, the stronger that sovereign's interest." *Mujica*, 771 F.3d at 606.

On the second prong, as the district court found, Argentina would provide an adequate forum. S.A. 75.

On the third prong, no property of U.S. citizens was expropriated nor was there any other U.S. interest in resolving these thoroughly Argentine disputes in U.S. courts. *See* pp. 35-36, *supra*. In doing so, the United States risks "frustrat[ing] the substantive policies of foreign sovereigns," which may "have significant implications for [our] foreign relations." Br. for the U.S. at 15-16, *Republic of Hungary* v. *Simon* (U.S. Sept. 11, 2020), No. 18-1447. As this Court has recognized, "a friendly intercourse between the sovereignties" is fundamentally in "America['s] self-interest." *In re Maxwell*, 93 F.3d at 1053 (quoting *Hilton*, 159 U.S. at 165).

2.     Even if the "exceptional circumstances" standard applied, this Court has ruled that a foreign nation's statutorily expressed interest in adjudicating specific disputes in its own courts constitutes an exceptional circumstance. *See Royal & Sun Alliance*, 466 F.3d at 95 (citing "a foreign nation's interest in uniform bankruptcy proceedings" as an exceptional circumstance justifying abstention). Courts have thus deferred to, for example, an Indian statute creating an exclusive mechanism for compensating victims of a disaster "that occurred within that country," *Bi* v. *Union*

40

*Carbide Chemicals & Plastics Co.*, 984 F.2d 582, 586 (2d Cir. 1993); Germany's "comprehensive compensatory scheme for all remaining victims of the Nazi era," *Ungaro-Benages*, 379 F.3d at 1239; and "the integrity of the compensation system" Japan had established for victims of a power-plant leak, *Cooper* v. *Tokyo Elec. Power Co. Holdings, Inc.*, 960 F.3d 549, 568-569 (9th Cir. 2020).

Here, Argentina has expressed a powerful interest in (i) deciding Argentine intra-corporate disputes in its own courts, and (ii) resolving expropriation-related claims through a single Argentine claims process. As explained above, Article 5, paragraph 11 of the Argentine National Code of Civil and Commercial Procedure requires that all "actions derived from corporate relations," like this one, be brought where a company is registered. S.A. 213; *see* pp. 34-35, *supra*. As the district court recognized, paragraph 11 is designed to "reduce[] duplicative litigation and ensure[] consistency in the interpretation and application" of an Argentine corporation's bylaws. S.A. 83 (citations omitted).

Likewise, as detailed below, *see infra*, pp. 62-68, Argentina's General Expropriation Law provides a comprehensive system for resolving claims against the Republic relating to an Argentine expropriation, including those of third parties. This process allows stakeholders to obtain fair compensation and the Argentine government to determine the total cost of an expropriation before completing it.

Both statutes reflect Argentina's strong interest in adjudicating this homegrown dispute—exactly the sort of interest to which U.S. courts should defer.

## II. PLAINTIFFS' CLAIMS ARE NOT COGNIZABLE UNDER GOVERNING ARGENTINE LAW.

When plaintiffs purchased YPF ADRs, they did so with the full knowledge that Argentine law would govern all disputes over YPF's Bylaws. Plaintiffs' theories effectively treat the Bylaws as superior law that superseded Argentine public and private law. But the opposite is true: plaintiffs bought their shares *subject* to Argentine law and must abide by its requirements.

It is now even clearer why these Argentine-law cases belonged in Argentina. The district court, unfamiliar with Argentina's civil-law system, misapplied Argentine law at nearly every turn. Without analyzing or citing Argentine caselaw, the court endorsed plaintiffs' novel breach-of-contract action for damages, misconstrued Argentine statutes in awarding damages, and identified the wrong date of the supposed breach under Argentine law. The court also misunderstood Argentina's General Expropriation Law, which establishes the exclusive process for resolving claims against the Republic relating to an expropriation.

### A. Argentine Corporate Law Does Not Recognize a Shareholder Breach-of-Contract Claim for Damages.

The district court fundamentally erred in concluding that plaintiffs could pursue a "breach of contract" claim for damages against the Republic for violation

of YPF's Bylaws. From the outset, plaintiffs have portrayed this lawsuit as a straightforward U.S.-style breach-of-contract case—that the Republic broke a contractual agreement with plaintiffs and must pay damages. The district court even suggested that the Republic had not meaningfully challenged "the merits or substantive elements of Plaintiffs' breach of contract claim." S.A. 104. That was mistaken. As the Republic has consistently argued, Argentine law does not recognize a breach-of-contract claim for damages by one shareholder against another for violation of corporate bylaws.[3]

1. As in other civil-law jurisdictions, Argentine contract law is specified in written codes. The Civil Code defines ordinary bilateral contracts as ones in which the "parties to the contract assume reciprocal obligations." Civil Code, Art. 1138, (S.A. 208). There is no similar rule for corporate bylaws, because they are organizational documents that "govern how a company functions," not bilateral contracts. J.A. 1561, 1563, ¶¶ 73, 77. As the Argentine National Court of Appeals for Commercial Matters has held, "both the rights and the obligations of the

_____

[3] This Court previously accepted, at the motion-to-dismiss stage, plaintiffs' general characterization of the Bylaws as a "contract governing the relationship among YPF, Argentina (in its capacity as a shareholder), and other YPF shareholders." *Petersen*, 895 F.3d at 199, 206. But, as the district court recognized, this Court never considered whether Argentine law permits a breach-of-contract suit under these circumstances, which was a legal question ruled on at summary judgment. S.A. 108.

[shareholders] revolve around their relations with the legal subject called the company, and not in relation to each one of the other [shareholders] individually considered."  National Court of Appeals in Commercial Matters, Chamber A, 1999/10/22, "Gatti, Ernesto Ignacio and other v. Bulad, Alfredo Ragueb s/ summary" E.D., Vol. 188, at 698 (S.A. 335); *see* J.A. 1563, ¶ 77 (quoting *Gatti*).

Thus, in Argentina, the mechanism for enforcing a breach of corporate bylaws is to seek relief through *the corporate-law system.*  Plaintiffs must bring their claims under the specific process outlined in Article 251 of the General Companies Law, not under the Civil Code.  That process requires an aggrieved shareholder first to move internally for a corporate resolution to enforce the bylaws—as other YPF shareholders did here during the expropriation process—and if that motion fails, to sue to nullify any resolution passed at a shareholders' meeting at which they claim the bylaws were violated.  *See* J.A. 1563-1566, ¶¶ 77-82; *see also* General Companies Law, Arts. 236, 251, 254 (S.A. 225-227).  This procedure deters violations of bylaws by providing a process for aggrieved shareholders to unwind actions taken in violation of them.

Following enactment of the YPF Expropriation Law, several YPF shareholders followed the prescribed Argentine procedure.  They first challenged the Republic's ability to participate in the June 4, 2012 shareholders' meeting, and then filed a claim in the Argentine courts to nullify certain resolutions, asserting that

Sections 7 and 28 of the Bylaws had been violated. *See* J.A. 1567-1568, ¶ 87 & n.115 (citing Complaint, *Repsol S.A. and others* v. *YPF S.A. s/ordinario*, First Instance Court on Commercial Matters No. 3, Court Secretary No. 6, Docket No. 103.144/2012).

Plaintiffs held their YPF shares subject to Argentine corporate law . But they sought contract damages rather than the remedies spelled out in the Bylaws, even though no Argentine court has *ever* awarded damages in a breach-of-contract action by one shareholder against another for violating corporate bylaws. Plaintiffs' expert conceded that he "ha[d]n't found a case" allowing a shareholder-versus-shareholder breach-of-contract action for an alleged breach of corporate bylaws. J.A. 3391 at 150:1-12. Nor did the district court cite any Argentine caselaw supporting its erroneous conclusion that such a claim exists under Argentine law.

To the contrary, Argentina's Capital Markets Law reinforces that Argentine law does not recognize shareholder-versus-shareholder damages actions for a bylaws violation like a failure to make a tender offer. The Capital Markets Law now imposes on all publicly traded companies in Argentina a tender-offer requirement in connection with acquiring a controlling stake in a company, comparable to the tender-offer requirement in YPF's Bylaws. *See* J.A. 1620, ¶ 29; Capital Markets Law, Arts. 86-90 (S.A. 215-222). It carries similar sanctions to those in the YPF Bylaws, but does not authorize a shareholder to bring a breach-of-contract action

45

against another shareholder for damages for failing to comply with bylaws. *Id.*, Art. 89 (S.A. 221-222).

In the United States, too, the general rule of corporate law is that one shareholder cannot sue another for damages over a violation of bylaws. *See* Am. Jur. Corps. § 270 ("[N]o right of action is created for damages for breach of contract" "against a [shareholder] for noncompliance with or violation of the bylaws."); *Weissman* v. *Birn*, 56 N.Y.S.2d 269, 271 (Sup. Ct. 1945), *aff'd*, 270 A.D. 757, 59 N.Y.S.2d 917 (App. Div. 1946) ("Failure to observe such by-law does not give rise to a right to bring an action at law for damages by an aggrieved [shareholder] . . . for breach of contract. The sole recourse . . . is by seeking the punishment of the offending member in the manner and to the extent authorized by the by-laws."); 14 N.Y. Jur. 2d Bus. Rels. § 129 (same).[4] On the rare occasions where shareholders of U.S. companies have actually tried to bring such claims, courts have rejected them. *See Quantum Tech. Partners II, L.P.* v. *Altman Browning & Co.*, 2009 WL 4826474, at *5-6 (D. Or. Dec. 8, 2009) (applying Delaware law), *aff'd*, 436 Fed. Appx. 792 (9th Cir. 2011).

---

[4] Florida is an exception that proves the general rule. In 2020, it enacted a statute that recognizes a cause of action by one shareholder directly against another. *See* Fla. Stat. § 607.0750.

2.    The district court should not have recognized these unprecedented claims under another nation's law.  As the court acknowledged, Argentine "bylaws are usually" focused on the relationship between shareholders and the company and, thus, are "not subject to breach of contract claims under Argentine law."  S.A. 125.

But the district court decided that YPF's Bylaws are different.  S.A. 125.  It observed that Section 28 addresses the obligations of a particular shareholder (the Republic) against "the remaining shareholders."  S.A. 126.  And it reasoned that such an obligation "*could* as easily have been created via a shareholder agreement or a simple contract."  *Id.*  As a result, the court concluded that this provision of the Bylaws created a bilateral agreement enforceable by a breach-of-contract suit against the Republic and presumably against any other shareholder who violated Section 7's corresponding tender-offer obligation.

The district court was wrong to read a bilateral agreement into YPF's Bylaws.  The Argentine Civil Code defines contracts as "bilateral" where the "parties to the contract assume reciprocal obligations."  Civil Code, Art. 1138 (S.A. 208).  Thus, to be bilateral under Argentine law, an agreement must contain specific promises from one party to another.  The identity of the parties to a bilateral contract then cannot change unless there is "novation"—that is, an agreement between the original parties to allow a new party to enter the contract.  J.A. 1559-1560, ¶ 71(ii).

47

Corporate bylaws establish rules of corporate governance for shifting populations of shareholders.  *See* J.A. 1735-1736, ¶ 90 (explaining that bylaws are "by definition . . . rules that govern how a company functions").  The theoretical possibility might exist for a bilateral promise to appear in corporate bylaws:  As the Republic's expert explained, that could be the case if a hypothetical covenant in corporate bylaws stipulated that a named Shareholder A had specific obligations to a named Shareholder B.  J.A. 1735-1736, ¶ 90 & n.173.  But, notably, neither side's experts identified any bilateral promises like that in YPF's, or in any other Argentine company's, bylaws.

In particular, Sections 7 and 28 of the YPF Bylaws create no such specific promises from one party to another.  To the contrary, they establish a general rule of corporate governance that applies (with varying trigger percentages) to *any* shareholder in the company "vis-à-vis all the other shareholders"—"the identity of which changes from one instant to another as they purchase or dispose of shares." J.A. 1693, 1739, ¶¶ 8(ii), 95 (emphasis omitted).  As noted, a comparable tender-offer obligation is now codified as a rule of corporate conduct in Argentine law for all companies.  Capital Markets Law, Arts. 86-90 (S.A. 215-222).  To construe a generic rule of corporate conduct, which applies to every shareholder and lacks a particular named beneficiary, as a bilateral promise to all other shareholders, present and future, would turn ordinary corporate-governance documents into a font of

48

breach-of-contract disputes for damages among shareholders. There is no precedent in Argentine (or U.S.) law for that breathtaking approach.

The district court also viewed the "promises in Sections 7 and 28" of the YPF Bylaws as bilateral because the Republic "both drafted the Bylaws and ordered YPF to adopt them." S.A. 125. But there is no rule in Argentina (or the United States) that a particular shareholder's role in drafting bylaws somehow converts the substance of those bylaws into a bilateral promise. Nor does the Republic's position as a shareholder before 1993 change the fact that YPF's Bylaws—both before and after privatization—are private corporate-governance instruments that may be (and have been) freely amended by YPF's shareholders. J.A. 3289-3290, ¶ 14.

## B. Even If a Breach-of-Contract Suit Were Permissible, Argentine Courts Would Not Award Damages.

After authorizing a breach-of-contract claim unknown in Argentine corporate law, the district court ignored the terms of the YPF Bylaws and the Argentine Civil Code to award plaintiffs $16.1 billion in damages. Even assuming plaintiffs could pursue a bilateral breach-of-contract claim, Argentine law disallows damages here, for two reasons.

### 1. The Bylaws' express penalty clause bars plaintiffs' claims for damages.

First, plaintiffs were not entitled to damages because the YPF Bylaws prescribe specific penalties for the violation of their tender-offer provisions, and

49

Argentine law makes those penalties exclusive.  Under the Argentine Civil Code, parties may include a *cláusula penal* ("penalty clause") in their contracts that specifies the consequences for breach.  *See* Civil Code, Arts. 652-655 (S.A. 204). The Civil Code spells out the content and consequences of such a clause, which is a broader and different concept than a "penalty clause" under U.S. contract law. Article 652 broadly defines a penalty clause as "one in which a person, to ensure the fulfillment of an obligation, subjects themselves to a penalty or fine in case of delay or non-performance of the obligation."  S.A. 204.  Article 653 further specifies that a penalty clause may "have as its object the payment of a sum of money, or any other [performance] that may be the subject of obligations, whether for the benefit of the [non-breaching party] or a third party."  *Id.*  And Article 655 provides that the specified penalty "replaces the compensation for damages and interest" in the event of a breach, "and the [non-breaching party] shall not be entitled to any other compensation."  *Id.*  Indeed, if a penalty is specified, the Code precludes damages, "*even if [the non-breaching party] prove[s] that the penalty is not sufficient compensation*."  *Id.* (emphasis added).

Assuming, as the district court erroneously did, that bilateral contract-law principles apply here, Section 7(h) of the YPF Bylaws constitutes a penalty clause

and thus the exclusive remedy for any breach of the tender-offer requirement.[5] Section 7(h) specifically provides that shares acquired in violation of the tender-offer requirement are ineligible to vote, collect dividends, and be counted toward a quorum.  J.A. 657 § 7(h); *see id.* 674 § 28(C) (applying the "*penalties* provided for in subsection (h) of Section 7" to breaches by the Republic) (emphasis added). Section 7(h) therefore specifies the "penalty" that applies to the breaching party to "ensure the fulfillment" of its tender-offer obligation.  Civil Code, Art. 652 (S.A. 204).  The penalty clause serves that objective in a straightforward way:  shares that are ineligible to vote and do not count toward a quorum deprive their owner of decision-making authority, and shares that cannot collect dividends lose their economic value.  As this Court previously recognized, "[t]he penalties for breaching [the tender-offer] provisions are drastic."  *Petersen*, 895 F.3d at 200.  Under Article 655, they are also exclusive as a matter of Argentine law.

The district court recognized that "the sanctions contained in Section 7(h), if enforced, would make it less desirable to breach the Bylaws and would certainly encourage compliance by an acquiror."  S.A. 131.  But the court nonetheless

---

[5] Even if the Bylaws are properly construed as a corporate-governance agreement, rather than a bilateral contract, Section 7(h) would still control. Argentine law also limits remedies under "collective" agreements such as corporate bylaws to those set forth in penalty clauses.  Andrés Sánchez Herrero, *La cláusula penal [The penalty clause]*, 42 (2016) (S.A. 383).

concluded—without any citation to Argentine caselaw or commentary—that Section 7(h) does not qualify as a penalty clause. The court created its own rule that a penalty clause must provide for either the "payment of a sum of money" or "substitute performance of the obligation at issue." S.A. 130-131. In the court's view, "the loss of some rights that might encourage compliance" is not enough. S.A. 131. That misreading of Article 653 is not supported by Argentine law.

As explained above, Article 652 broadly defines "penalty clause," and Article 653 allows the parties to select "*any* other [performance] that may be the subject of obligations" as the penalty. Civil Code, Arts. 652, 653 (S.A. 204) (emphasis added). The language "may be the subject of obligations" in Article 653 does not require a "substitute performance," in the district court's words. Rather, it simply means that the provided-for "other performance" may consist of "any type of lawful performance," including "the loss of rights or benefits." Pedro Cazeaux & Felix Trigo Represas, *Derecho de las Obligaciones [The Law of Obligations]* 408 (2d ed. 1975) (S.A. 379). Thus, "[i]t is common for clauses to be stipulated in which the penalty for non-compliance consists of the permanent or temporary loss of goods, rights, qualities or benefits, or their non-acquisition." Sánchez Herrero, *supra*, at 83 (S.A. 385). So, for example, "in a company, in the event of a breach of a [shareholder]," the "other performance" may consist of "the suspension" of his "exercise of his rights." *Id.* That was the case here. *See* J.A. 1578, ¶ 113.

52

The district court's determination that performance short of substitute performance is not fair or sufficient compensation rewrites multiple Argentine Civil Code provisions. For one, the imposition of a substitute-performance requirement ignores Article 653's contemplation that the "other performance" may be "for the benefit of . . . a third party." S.A. 204. After all, an act benefiting a third party is by definition not a direct substitute for the original performance owed to the non-breaching party. For another, Article 655 makes clear that "any other [performance]" specified in a penalty clause is exclusive, even if it "is not sufficient compensation." *Id.* In giving effect to its own judgments about the sufficiency of penalties, the district court imposed a damages remedy contrary to the express terms of the Bylaws and the Argentine Civil Code.[6]

## 2. Plaintiffs' failure to show that specific performance was impossible bars their claims for damages.

Unlike U.S. contract law, Argentine civil law has a strong preference for "in-kind" remedies over damages. As a result, it imposes a hierarchy of remedies, with specific performance at the top. A plaintiff may pursue damages only if (i) the

---

[6] Plaintiffs argued below that penalty clause remedies are not exclusive in cases of willful breach. *See* J.A. 3274. The district court did not address this argument, but, in any event, plaintiffs are wrong. The exception applies to a malicious breach, which requires "the specific intent to cause harm," J.A. 1660-1661, ¶ 111, a showing plaintiffs have not made.

breaching party has made specific performance impossible, or (ii) the contract has been terminated in response to breach.  Neither exception applies here.

a.    Argentine civil law and U.S. law take fundamentally different approaches to contract remedies.  Under U.S. law, "damages are always the default remedy for breach of contract," *United States* v. *Winstar Corp.*, 518 U.S. 839, 885 (1996), and the "'extraordinary' equitable remedy of specific performance" is disfavored, *Lucente* v. *Int'l Bus. Machines Corp.*, 310 F.3d 243, 262 (2d Cir. 2002).  The *opposite* is true in Argentine civil law.  As even plaintiffs' expert acknowledged, "there is a preference in the civil law for [] specific performance."  J.A. 3398 at 226:7-11.  That preference "is applicable to any breach of contract" and more broadly "to any non-performance of an obligation."  J.A. 1570-1571, ¶ 96.

As to contractual obligations, Article 1204 of the Argentine Civil Code and Article 216 of the Argentine Commercial Code codify Argentina's preference for specific performance.  *See* S.A. 205, 210.  Both provisions make clear that, in the event of breach, the non-breaching party has two options:   demand specific performance or seek termination.  *See* J.A. 1570-1571, ¶ 96 & n.122.  Article 1204 of the Civil Code states that "[i]n contracts with reciprocal obligations, . . . [i]f the obligation has not been performed, the [non-breaching party] may demand that the non-performing party fulfill their obligation," *i.e.*, demand specific performance, or may seek to "resolve the obligations," *i.e.*, terminate the contract.  Civil Code, Art.

1204 (S.A. 205); J.A. 1571, ¶ 96 n.122.   Article 216 of the Commercial Code contains identical language.  S.A. 210.  If a party unsuccessfully demands specific performance, then the claim converts into one for termination.  Civil Code, Art. 1204 (S.A. 205); Commercial Code, Art. 216 (S.A. 210).  Meanwhile, Article 889 of the Civil Code specifies the only relevant circumstance in which a claim for specific performance is directly "converted into an obligation to pay damages":  when the "performance becomes impossible due to the [breaching party]'s fault."  S.A. 205.

When Argentine civil law makes an exception to its default preference for specific performance, it says so expressly.  For tort claims, specifically, although restoring the *status quo ante* is the default remedy, "[t]he aggrieved party may also opt for monetary compensation."  Civil Code, Art. 1083 (S.A. 208).  The provision of the Civil Code governing contract actions, quoted above, contains no such language giving plaintiffs the option of seeking damages in the first instance.  *See* Civil Code, Art. 1204 (S.A. 205).  Nor does the Commercial Code.  *See* Commercial Code, Art. 216 (S.A. 210).

Applying the plain language of its Civil and Commercial Codes, Argentine courts have consistently rejected claims for damages for breach of contract where the plaintiff has not first sought specific performance or termination.  In *Lipnik, Alberto Teodoro* v. *Constructora San José Argentina S.A.*, for example, the Argentine National Court of Appeals for Commercial Matters dismissed a claim for

damages because "the plaintiff had no right in claiming damages" without having "served conclusive notice on [the defendant] demanding that it comply with its obligations," or "terminated the contract." National Court of Appeals in Commercial Matters, Chamber A, 2010/06/10, "Lipnik, Alberto Teodoro v. Constructora San José Argentina S.A.," L.L. Online, AR/JUR/32215/2010 at 24 (S.A. 369-370); *see* National Court of Appeals in Commercial Matters, Chamber A, 1999/08/31, "Lezcano, Juan C. v. Arismendi S.C.S.," L.L., Vol. 2000-D at 12 (rejecting claim for damages where plaintiff had not complied with the "procedures set forth" in the law—"requiring compliance in the first case or declaration of termination in the second") (S.A. 344). Indeed, in *L., G.L.* v. *D., O.R.*, which plaintiffs relied on below, J.A. 3275, the court made clear that neither party "may at their discretion substitute monetary damages for [specific performance]." National Court of Appeals in Civil Matters, Chamber E, 2014/05/06, "L., G.L. v. D., O.R.," L.L. Online, AR/JUR/19485/2014 at 4 (S.A. 325). Instead, damages "should only be resorted to where actual performance of the obligation is absolutely impossible." *Id.*

In granting summary judgment, the district court overrode Argentina's civil-law hierarchy of remedies and deemed specific performance and damages equally available to plaintiffs. In doing so, the court referred to Article 505 of the Argentine Civil Code, which says that legal remedies include (1) performance in-kind by the

breaching party, (2) performance in-kind from a third party at the expense of the breaching party, and (3) damages. S.A. 132; *see* S.A. 201. Because Article 505 lists three kinds of remedies, the court thought that a non-breaching party could choose among those remedies as it pleases. But that badly misunderstands Argentine law. Article 505 is a general provision that covers both contract and tort and lists all the remedies that *may* be available in a lawsuit; it does not state that every kind of remedy is available in every kind of case. The district court erred in not properly harmonizing Article 505 with the provisions specifically governing contractual obligations described above. *See* pp. 54-55, *supra*.

> b. Plaintiffs cannot obtain damages because they never established one of the two exceptions (impossibility of specific performance after making a demand, or termination of the Bylaws) to the requirement to seek specific performance.

*First*, plaintiffs never even attempted to obtain specific performance, nor did they show that performance was impossible in 2012, at the time of the alleged breach of the Bylaws—much less that the Republic made performance impossible then. *See* Civil Code, Art. 889 (S.A. 205). Notably, other YPF shareholders brought claims in Argentine court seeking specific performance of the tender-offer obligation. *See* p. 16, *supra*; *see also* J.A. 1568-1569, ¶ 89. Performance is impossible now, because neither Petersen nor Eton Park is a current YPF shareholder. S.A. 89. For that, though, plaintiffs have no one to blame but themselves: they deliberately elected

not to seek prompt relief in Argentine courts, and both waited years until after they no longer held YPF shares to take action.

*Second*, plaintiffs could not seek termination of the Bylaws. The Argentine General Companies Law specifies the circumstances justifying the termination of bylaws, and a shareholder's allegation of a bylaws violation by another shareholder is not one of them. *See* J.A. 1571, ¶ 97; General Companies Law, Art. 94 (S.A. 224). That just underscores why plaintiffs' claims do not work as a breach-of-contract claim to begin with. But if plaintiffs wanted to fit this square peg in a round hole, they were required to follow the legal rules in Argentina for contract claims and first seek to terminate the "contract" that their claim rests on.

### C. Under Argentine Law, Plaintiffs Were No Longer Shareholders When the Supposed Breach Occurred.

Even if Argentine law recognized plaintiffs' "breach of contract" claim for damages, plaintiffs had no right to bring that claim in 2015 and 2016, because they were no longer YPF shareholders when the alleged "breach" took place in 2014. Under Argentine law, plaintiffs may not sue to enforce corporate bylaws if they ceased to be shareholders prior to the alleged breach. J.A. 1556-1557, ¶ 65. The district court determined that the "breach" occurred when the Republic first exercised "control" over the shares (April 16, 2012), when plaintiffs were shareholders. But even under plaintiffs' theory of the case, the Bylaws provide for

a tender offer only upon "acquisition" of Repsol's shares (May 8, 2014), which occurred after plaintiffs were no longer shareholders.

1.     Under the plain terms of the Bylaws, any tender-offer obligation would not have been triggered until May 8, 2014, when the Republic "acqui[red]" Repsol's YPF shares.  Section 28(A) of the Bylaws states that the tender-offer requirements "shall apply to all *acquisitions* made by the National Government, whether directly or indirectly, by any means or instrument, of shares or securities of the Corporation . . . if, as a consequence of *such acquisition*, the National Government becomes the owner, or exercises the control of" shares which, in addition to any prior holdings, represent in the aggregate at least 49% of YPF's shares.  J.A. 674 § 28(A) (emphasis added).  Under that plain language, the tender-offer obligation arises only if an "acquisition" has occurred.  Both as a matter of ordinary Spanish usage and Argentine law, "acquisition" means to "obtain[] title or ownership of something."  J.A. 1703, ¶ 30; J.A. 1551-1552, ¶ 57.  As the Republic's Argentine-law expert explained: "Never in my more than half a century of professional experience have I read or heard the words [to acquire] or [acquisition] used in legal parlance to mean anything other than obtaining title, owning something."  J.A. 1703, ¶ 30.

59

It is undisputed that the Republic did not obtain title to Repsol's YPF shares until May 8, 2014.  J.A. 3310, ¶ 98.  Plaintiffs no longer owned shares at that time. J.A. 3307-3308, ¶¶ 84-91.  The district court's analysis should have ended there.

Instead, the district court read Section 28 to mean that the tender-offer obligation could be triggered by *either* the "acquisition of ownership" or the "acquisition of control" of the shares.  S.A. 116.  But the court ignored that, whether the Republic directly becomes the owner of 49% of shares or exercises control of 49% of shares, it must do so as "a *consequence of [an] acquisition*."  J.A. 674 § 28(A) (emphasis added).  The district court focused on Section 28's reference to "indirect" acquisitions and acquisitions completed "by any means," which may sound broad.  S.A. 115-116; *Petersen* Dkt. 392 at 24-25.  But the "indirect" language in the Bylaws merely makes clear that the tender-offer obligation is still triggered whenever a shareholder makes an acquisition through a related corporate entity, rather than directly.  That reading is confirmed by Sections 7(h) and (i) of the Bylaws, which define and use "indirectly" to mean through related companies or trusts.  J.A. 657 § 7(h), (i).  The phrase "by any means," in turn, reflects that an acquisition can be completed in a variety of legal ways, such as through a purchase, exchange, donation, or merger.  *See* J.A. 1706, ¶ 33.  Neither phrase overrules the threshold requirement that shares need to be acquired (that is, title needs to be obtained) to trigger a tender offer.

60

An Argentine court would have understood the legal import of Section 28's terms and their fatal consequences for plaintiffs' claims. But as this Court previously recognized, from the perspective of a U.S. court, the wording of Section 28(A) "is not a paragon of clarity, a defect that is no doubt exacerbated by the provision's translation into English from the Spanish language original." *Petersen*, 895 F.3d at 206. By misreading key terms in Section 28, the district court erred in holding that plaintiffs had the right to bring their claims in the first place.

### D.    Argentina's General Expropriation Law Separately Forecloses Plaintiffs' Claims.

If Argentina's civil-law system for resolving contract disputes seems like a poor fit for plaintiffs' claims, that is because it is. An Argentine court would not have analyzed these claims as ordinary civil-law claims at all. Argentina's General Expropriation Law provides the exclusive process under Argentine law for resolving claims by third parties affected by an expropriation. And because plaintiffs' claims relate to an expropriation, the only way that plaintiffs could have sought compensation from the Republic for the alleged loss of their tender-offer rights was through the expropriation process. Other YPF minority shareholders, whose rights were likewise governed by Argentine law, did just that, and their claims were resolved in connection with the settlement between the Republic and Repsol. But plaintiffs elected not to pursue their Argentine-law remedies.

61

### 1.    Argentina's General Expropriation Law required plaintiffs to seek compensation through the expropriation process.

The Argentine Constitution and Argentina's 1977 General Expropriation Law govern all national expropriations.  They displace the Civil Code and other rules governing private contracts (discussed above), as well as private contracts themselves.  *See* National Supreme Court of Justice, 1957/08/05, "Esquivillón de Igón et al. v. Nación Argentina," Fallos: 238:335 (S.A. 257); National Supreme Court of Justice, 1975/03/31, "Provincia de La Rioja v. Azzalini Luis," Fallos: 291:232 (S.A. 294) ("[E]xpropriation is not a matter governed by the Civil Code."); *see also* Civil Code, Art. 2611 (S.A. 206) ("Restrictions imposed on private ownership solely in the public interest are governed by Administrative Law.").

To initiate an expropriation, the Argentine Congress passes a law declaring an asset subject to expropriation in the public interest.  Constitution, Art. 17 (S.A. 195); Law 21,499, Arts. 1, 4 (S.A. 229).  The General Expropriation Law then charges the "expropriating entity" from the Argentine National Government with carrying out the taking, which includes providing compensation for the expropriation through settlement or judicial resolution.  Law 21,499, Arts. 10-32 (S.A. 230-233).  Affected third parties must seek compensation for claims arising out of the expropriation through the process provided by the General Expropriation Law.  *Id.*, Arts. 27, 28 (S.A. 233).  If the expropriator and the owner of the expropriated property cannot agree on the amount of compensation within two years, the expropriator must initiate

62

an action in an Argentine federal administrative-law court to fix the amount, or else the expropriation will be deemed "abandoned." *Id.*, Arts. 13, 15, 17, 18, 33 (S.A. 231, 233).

Article 28 of the General Expropriation Law makes clear that the process is exclusive for third parties seeking compensation. It forbids actions outside that process: "No action by third parties may impede the expropriation or its effects." S.A. 233. Even more specifically, it provides that "[t]he rights of the claimant shall be considered transferred from the [expropriated] thing to its price or to the compensation, leaving the thing free of any encumbrance." *Id.* That is, the expropriation extinguishes any claim against the expropriating entity related to the expropriation, and the claimant must seek a share of the compensation award instead. Plaintiffs have identified no instance of an Argentine court ever awarding damages for an expropriation-related claim against the expropriating entity outside the framework in the General Expropriation Law.

Argentina's comprehensive scheme ensures that the expropriating party has certainty when it pays for expropriated property, and that it will obtain "original title"—ownership unfettered by any potential encumbrances or claims relating to the

expropriated property.[7]  The Republic makes a single payment, which is then divided up among the owner of the expropriated property *and third parties* affected by the expropriation who have asserted claims.  *See* J.A. 1461-1462, ¶ 116 ("[I]n Argentine law, expropriation operates under a 'unique' or 'single compensation," not a 'multiple compensation,' system.").  That single payment covers both "the objective value of the asset" owned by the expropriated party *and* any "damages that are a direct and immediate consequence of the expropriation," including any damages owed to third parties.  Law 21,499, Art. 10 (S.A. 230).  As summarized in a treatise by "one of the most well-respected scholars of Argentine public law, the upshot" of the General Expropriation Law "is that the compensation paid by the expropriating entity is the amount over which not only the expropriated party, but all those affected by the expropriation, must assert their claims."  J.A. 1461-1462, ¶ 116 & n.72 (citing 4 Miguel S. Marienhoff, *Tratado de Derecho Administrativo [Treatise on Administrative Law]* 223 (5th updated ed. 1992) (S.A. 398)).

The Argentine Supreme Court has held that third-party claimants must "ensur[e] that their interest is taken into account for the appropriate estimation of the

---

[7] *See* National Supreme Court of Justice, 1957/08/05, "Esquivillón de Igón et al. v. Nación Argentina," Fallos: 238:335 at 24 (S.A. 258) ("In Argentine law, the acquisition of property by the expropriating authority . . . is pursuant to original title and not derivative title, as in the case of a sale."); *see also* J.A. 1457-1458, ¶ 107; J.A. 1512, ¶ 12.

asset subject to the [third-party encumbrance]."  National Supreme Court of Justice, 1911/02/16, "Puerto de San Nicolás v. Provincia de Buenos Aires," Fallos: 114:124 at 126 (S.A. 299); *see* J.A. 1460, ¶ 111.  That is because those third parties have "*no right to a compensation distinct and separate from that of the . . . owner*."  Fallos: 114:124 at 126 (S.A. 299) (emphasis added).  The General Expropriation Law's comprehensive compensation scheme thus eliminates the specter of uncapped potential liability to unknown third-party claimants years in the future (*i.e.*, precisely what happened here), which would "impede[]" expropriations or their effects.  Law 21,499, Art. 28 (S.A. 233).

In *De San Martín*, the case in which other YPF minority shareholders sought performance of the tender offer, the Argentine Supreme Court confirmed that the Argentine public-law regime controls here.  The *De San Martín* plaintiffs sued in Argentine federal civil and commercial court, and the Argentine Supreme Court transferred the suit to an Argentine federal administrative-law court on the grounds that "the aspects of administrative law [had] primary relevance to the resolution of" the dispute.  National Supreme Court of Justice, 2014/08/20, "De San Martín, José et al. v. EN – PEN," S.C. Comp. 731. L. XLIX (S.A. 252).  The claims of the *De San Martín* plaintiffs were ultimately resolved as part of the settlement between the

Republic and Repsol.  J.A. 781, 791-792.[8]  The same would have occurred with plaintiffs here, who bought their YPF shares subject to governing Argentine law, if they had timely brought their claims in Argentina under the expropriation laws, as they were required to do.

Under Argentine law, plaintiffs could not pursue a contractual claim related to the expropriation outside the expropriation process, because such a claim "impedes" or "encumbers" the expropriation in direct violation of Article 28.  In plaintiffs' telling, their right to a tender offer was triggered by the Republic's decision to expropriate Repsol's 51% stake.  And according to plaintiffs, they could demand that the Republic spend billions to buy minority shareholders' shares when it expropriated Repsol's shares.

Argentina's Supreme Court has rejected analogous claims.  In *Sociedad de Electricidad de Rosario*, the Argentine Supreme Court found that interpreting a

---

[8] Plaintiffs have repeatedly pointed to a speech by Axel Kicillof, the Republic's then-Secretary of Economic Policy and Development Planning, given the day after the Argentine President proposed expropriation.  In that speech, Mr. Kicillof assured Congress that the Republic would not fall into the "bear trap" of triggering the tender-offer provisions of the YPF Bylaws.  *See* J.A. 1254.  He was referring to his view that by expropriating shares instead of purchasing them on the open market, the Republic could ensure that the Article 28 expropriation process would determine any compensation owed to minority YPF shareholders.  His view is consistent with the February 2012 conclusion from the Argentine Ministry of Planning that an expropriation pursuant to a duly enacted law would preempt the Bylaws' tender-offer requirement.  J.A. 3376-3378.

contract provision to require the City of Rosario to provide five years' notice before expropriating a power utility's assets would render the provision an unconstitutional, though self-imposed, limit on the City's expropriation power. National Supreme Court of Justice, 1975/04/14, Fallos: 291:290 at 47, 54 (S.A. 305, 312); *see* J.A. 1449-1450, ¶ 31. Similarly, in *Hidronor, S.A.* v. *Provincia de Río Negro*, the Court held that a forum-selection clause in a third party's agreement with the expropriating entity would impermissibly impede the expropriation. National Supreme Court of Justice, 1991/11/05, Fallos: 314:1422 at 1423-24 (S.A. 286-287); *see also* J.A. 1450, ¶ 32; J.A. 1497-1498, ¶¶ 11-12. And in *Ferrocarril Central Argentino* v. *L. de Fusse*, the Court held that an obligation to build crossings and grant an easement— allegedly triggered by the government's expropriation of land to construct a railway—was unenforceable under Article 28's identical predecessor. National Supreme Court of Justice, 1911/11/21, Fallos: 115:59 at 60 (S.A. 283). *See* J.A. 1450, 1452, 1459, ¶¶ 32, 38, 110; J.A. 1497-1498, ¶¶ 11-12.

If a requirement to provide a specific notice period in *Rosario*, to litigate in a particular forum in *Hidronor*, or to build infrastructure on expropriated land in *Ferrocarril* was an impermissible encumbrance to an expropriation, then so is a corporate bylaw requiring (under plaintiffs' theory) the payment of billions of dollars in connection with an expropriation. Article 28 thus required plaintiffs to pursue their claims, if at all, in the expropriation process, after which the

expropriated 51% stake in YPF was acquired "free of any encumbrance."  Law 21,499, Art. 28 (S.A. 233).

### 2. The district court misconstrued Argentina's General Expropriation Law.

In ruling that Article 28 did not bar plaintiffs' claims, the district court adopted novel limits on Argentine law and ignored on-point Argentine precedent.

*First*, the court fashioned a new rule that Article 28 does not apply if the Republic, as opposed to a third party, "created" the encumbrance.  S.A. 137-138.  Without citing a single Argentine case, the court concluded that because "the Republic, and not a third party, drafted the Bylaws and ordered that they be implemented by the then-wholly-owned YPF," Article 28 does not preclude the enforcement of the tender-offer obligation in separate litigation.  *Id.*  But that exception has no support in Argentine law.  And for good reason.  In Argentina, public laws like the General Expropriation Law and the law authorizing the YPF expropriation take precedence over any private-law agreements, including private agreements to which the government is a party.  *See* J.A. 770 at 292:13-293:5 (plaintiffs' public-law expert stating that "it's obvious that an issue of public policy prevails over private law"); Civil Code, Art. 21 (S.A. 199) ("Private agreements may not render without effects laws the observance of which is in the interest of public order and good morals.").

Nor can the district court's exception to Article 28 be squared with the Argentine Supreme Court's decisions in *Rosario* and *Hidronor*. In *Rosario*, it made no difference to the Supreme Court that the expropriating government, the City of Rosario, was a party to the agreement to provide five years' notice in advance of any expropriation. National Supreme Court of Justice, 1975/04/14, Fallos: 291:290 at 47-48 (S.A. 305-306). The Supreme Court still held that, under Argentine law, "[t]o admit *any* kind of contractual restriction on [the expropriation power] . . . entail[s] the *manifest unconstitutionality* of the [contractual] agreement." *Id.* at 54 (S.A. 312) (emphases added). Likewise, in *Hidronor*, the fact that the expropriating entity was a party to the agreement containing the forum-selection clause did not change the Argentine Supreme Court's conclusion that the clause would impermissibly impede the expropriation. National Supreme Court of Justice, 1991/11/05, Fallos: 314:1422 at 1423 (S.A. 287). So too here: the then-Executive's role in drafting the Bylaws in 1993 cannot override the Argentine Constitution or the General Expropriation Law.

*Second*, the district court held that Article 28 did not apply at all because "the tender offer obligation is not attached to the shares that the Republic acquired." S.A. 138; *see* S.A. 141 (reasoning that "Repsol shares were not the source of the obligation"). Under the court's reasoning, the expropriated shares themselves were not encumbered, and any encumbrance "derives" instead "from the contractual

69

obligations the Republic undertook when it revised the Bylaws." S.A. 138. This second carve-out from Article 28 is no better than the first.

As an initial matter, the district court's reasoning runs directly contrary to the entire premise of Argentina's expropriation process, which is that completing an expropriation extinguishes all claims against the expropriating entity triggered by that sovereign act—not just those claims "derived from" or "based on" the expropriated property itself. S.A. 141; *see* pp. 63-68, *supra*. Again, that is why other minority shareholders with the same type of claims as plaintiffs—those "derived from" the Bylaws rather than directly from Repsol's shares—participated in the expropriation process. *See* J.A. 781, 791-792. Likewise, *Hidronor* and *Rosario* involved encumbrances (a forum-selection clause and notice requirement, respectively) that derived from *contracts*, not from the expropriated property. National Supreme Court of Justice, 1991/11/05, Fallos: 314:1422 at 1423 (S.A. 287); National Supreme Court of Justice, 1975/04/14, Fallos: 291:290 at 47, 54 (S.A. 305, 312).

In any event, as even plaintiffs' counsel recognized, on plaintiffs' theory the expropriated "*shares* were encumbered by this obligation not to vote without tendering," unless the Republic spent billions on a tender offer. J.A. 373 (emphasis added). Under that theory, those expropriated shares could not be voted, count for a quorum, or generate dividends. Those penalties, which this Court previously

70

characterized as "drastic," *Petersen*, 895 F.3d at 200, would clearly encumber the expropriated shares themselves.

When all is said and done, plaintiffs acquired shares in an Argentine company subject to Argentine law. But they elected not to bring any claims in Argentina during the two-year expropriation process. Instead, after the expropriation concluded, and after they no longer held YPF shares, plaintiffs brought claims in a U.S. court, where, as a result of rolling the dice, they obtained a combined $16.1 billion judgment that dwarfs the $5 billion paid to compensate majority-shareholder Repsol and other shareholders. Argentine law does not permit plaintiffs to sleep on their rights and then run to another nation's courts.

## III. AT A MINIMUM, PLAINTIFFS' DAMAGES MUST BE RECALCULATED.

Even if this Court were to conclude that plaintiffs' claims belong in a U.S. court, and that the district court correctly applied Argentine law, it should still vacate the district court's combined $16.1 billion award because the district court erred in calculating damages. *First*, the district court failed to apply New York's currency-conversion rule. *Second*, it used the wrong breach date and wrong prejudgment interest rate under Argentine law, each of which inflated plaintiffs' damages by billions of dollars.

71

## A.     The District Court Misapplied New York's Judgment-Day Rule for Currency Conversion.

Currency conversion is a substantive matter governed by the law of the forum, so all parties agree that New York law applies.  Under New York law, the district court should have calculated any damages in pesos, as did plaintiffs' own expert, and then converted that amount into dollars at the exchange rate in effect *on the day of the court's judgments in 2023*.  N.Y. Jud. Law § 27(b).  Instead, the court massively inflated plaintiffs' damages by converting them to dollars at the exchange rate in effect on the day of the Republic's supposed breach *in 2012*.  S.A. 146-148. The text of Section 27 of New York's Judiciary Law makes clear that the judgment-day rule is New York's exclusive currency-conversion method, and that the district court mistakenly applied the State's long-abrogated breach-day rule.

1.     Section 27 supplies the relevant rules.  Subsection (a) of that statute specifies the rule governing cases where no conversion is required: "Except as provided in subdivision (b) of this section, judgments and accounts must be computed in dollars and cents."  N.Y. Jud. Law § 27(a).  Subsection (b) specifies the rule for converting obligations that must be calculated in a foreign currency.  It provides:

> (b)  In any case in which the cause of action is based upon an obligation *denominated in a currency other than currency of the United States*, a court shall render or enter a judgment or decree in the foreign currency of the

72

> underlying obligation.   Such judgment or decree shall be
> converted into currency of the United States at the rate of
> exchange prevailing *on the date of entry of the judgment
> or decree*.

N.Y. Jud. Law § 27(b) (emphasis added).

New York added subsection (b) to the Judiciary Law in 1987, replacing the previous common-law rule that required all foreign-currency obligations to be converted using the exchange rate *on the day of breach*.  *See* 1987 N.Y. Sess. Laws 326 (McKinney); Jennifer Freeman, *Judgments in Foreign Currency—A Little Known Change in New York Law*, 23 International Lawyer 737, 750 (1989) ("[T]he amendment . . . changes the prior breach day conversion rule in New York.").  With this amendment, subsection (b) became New York's exclusive method for converting judgments in a foreign currency into dollars.

These are plainly cases where the judgments require conversion from a foreign currency to dollars.  The obligation here was "denominated in a [foreign] currency."  Although the YPF Bylaws do not set a fixed price, in pesos, for a tender offer, the Bylaws provide an express pricing formula that can be calculated only in pesos.  In particular, Formula D, the formula used in the district court's damages calculation, provides that the tender-offer price is YPF's "net income per class D share during the last four complete fiscal quarters immediately preceding the notice date," multiplied by the higher of "the price/income ratio for that period for class D

shares of stock" or "the highest price/income ratio for the Corporation during the two-year period immediately preceding the notice date." J.A. 652-655 § 7(f)(v)(D). Because YPF is an Argentine corporation doing business in pesos, its "net income" and "price/income ratios" must be calculated in pesos—and so too must the ultimate tender-offer price.[9]

Plaintiffs agree that conversion was required: their damages expert, whose calculation the district court specifically relied upon, calculated the tender-offer price *in pesos* before converting it to U.S. dollars. *See* J.A. 900-903, ¶¶ 34-39. For example, plaintiffs' expert testified that "for a notice date of February 13, 2012, the most recent four quarters of reported net income per share for YPF available publicly would have been 14.16 *pesos* per share." *Id.* ¶ 35 (emphasis added). He added that "the price/net income ratio under Alternative 1 is 10.84x—the price on November 2, 2011 of 153.50 *pesos* divided by 14.16 *pesos* per share." *Id.* ¶ 37 (emphases added). Plaintiffs' own method of calculating damages thus supports the straightforward application of Section 27(b)'s judgment-day rule.

_____

[9] The Bylaws also provide alternative tender-offer price formulas that likewise must be calculated in pesos. For example, Formula B is based on the share price of YPF on the Buenos Aires Stock Exchange, which is in pesos. J.A. 652-654 § 7(f)(v)(B).

2.    The district court erroneously declined to apply the judgment-day rule under Section 27(b).  The court reasoned that the tender-offer obligation was not "denominated" in a foreign currency because the Bylaws did not expressly set out "a sum certain denominated in pesos," and because plaintiffs were suing for "breach of the Republic's obligation to perform" its tender-offer obligation, rather than a specific payment amount.  S.A. 147.  Thus, having imposed a contractual damages remedy not found in YPF's Bylaws or authorized by Argentine law, the court applied the long-abrogated common-law rule "whereby the appropriate measure of damages is the equivalent of such foreign currency in terms of dollars . . . at the date of breach."  S.A. 147-148 (quoting *Nature's Plus Nordic A/S* v. *Natural Organics, Inc.*, 78 F. Supp. 3d 556, 557-558 (E.D.N.Y. 2015)).  But the court's invocation of this common-law breach-date rule applicable in New York before 1987 contradicts the plain text of the Judiciary Law and finds no support in precedent.

Starting with Section 27(b)'s text, the word "denominated" cannot in context be read as narrowly as the district court suggested.  To "denominate" can mean to express the specific value or type of something, but it can also mean "[t]o show, point out, or indicate."  *Black's Law Dictionary* (11th ed. 2019).  Thus, an obligation is "denominated" in a foreign currency either when it expressly names that currency, or when, as here, circumstances indicate that it must be calculated in that currency.

75

Here, the surrounding statutory text makes clear that Section 27(b) uses "denominate" to capture all obligations that necessarily must be calculated in a foreign currency, as plaintiffs' expert did here in calculating the tender-offer price, rather than to include only those obligations that on their face expressly list a foreign currency by name.  Most critically, subsections (a) and (b) cover the entire universe of money judgments:  subsection (a) sets out a general rule that applies "*[e]xcept as provided in subdivision (b)*," with no other exception.  N.Y. Jud. Law § 27(a) (emphasis added).  Thus, a judgment necessarily must be either "computed in dollars and cents" *or* "denominated in a" foreign currency.  But the district court's reading of "denominated" presumed a third bucket of cases in which damages cannot be "computed in dollars and cents," yet are not "denominated" in a foreign currency either.  Because one of the accepted, ordinary meanings of "denominated" would avoid that untenable result, basic principles of statutory construction require courts to apply that meaning.  *See Mestecky* v. *City of New York*, 88 N.E.3d 365, 367 (N.Y. 2017) ("[S]tatutory language . . . must be analyzed in context and in a manner that harmonizes the related provisions and renders them compatible.") (internal quotation marks and citation omitted).

To support its conclusion that Section 27(b) applies only where there is an obligation to pay a sum certain in an expressly stated currency, the district court cited *Nature's Plus Nordic A/S* v. *Natural Organics, Inc.*, 78 F. Supp. 3d 556, 557-558

76

(E.D.N.Y. 2015).  But *Nature's Plus Nordic* says nothing of the kind:  the obligation there was to provide notice and an opportunity to cure, not to make a payment calculable only in a foreign currency.  *See id.* at 557.  By contrast, the formula-determined tender-offer price here is a payment obligation that can be calculated only in pesos, as plaintiffs' expert did.  Indeed, at least one court has applied Section 27(b)'s judgment-day rule in analogous circumstances involving monetary obligations calculable only in a foreign currency.  *See, e.g.*, Report & Recommendation, *Ramgoolie* v. *Ramgoolie*, 2021 WL 8013769 (S.D.N.Y. Nov. 24, 2021) (applying judgment-day rule to obligation calculable only in Trinidad and Tobago Dollars because it was expressed in terms of 50% of a Trinidadian company's shares), *adopted*, 2022 WL 669868 (S.D.N.Y. Mar. 4, 2022).

3.     Plaintiffs complained below that applying the judgment-day rule here would inequitably reduce their damages, because the peso has declined in value since the time of breach.  But New York law mandates application of the judgment-day rule regardless of currency fluctuations, and it "leaves the Court with no discretion as to conversion."  *Comm'ns Imp. Exp. S.A.* v. *Republic of Congo*, 2020 WL 4040753, at *2 (S.D.N.Y. July 17, 2020).  The district court was not free to disregard Section 27(b) in response to plaintiffs' appeal to equity.  By choosing to litigate in New York, plaintiffs were able to bring a claim never before allowed in Argentina, for damages not recognized under Argentine law.  They have done their

forum shopping and now are at least bound by their selected forum's rules, including its rejection in 1987 of the currency-conversion rule they prefer.

### B.  The District Court Used the Wrong Breach Date and Prejudgment Interest Rate Under Argentine Law.

In calculating damages, the district court also misapplied Argentine law in determining the breach date and prejudgment interest rate.  Each of those two errors inflated plaintiffs' damages by several billion dollars.

1.  After the district court wrongly interpreted YPF's Bylaws to require a tender offer upon the exercise of "control" of the shares, rather than upon "acquisition" of the shares, the court compounded its error by finding that the Republic exercised control over the shares earlier than it actually did.  The court used April 16, 2012 as the date the Republic supposedly gained control of Repsol's YPF shares and was required to make a tender offer.  But under the Bylaws and as a matter of Argentine law, the earliest the Republic could have exercised control of those shares was May 7, 2012, when the YPF Expropriation Law went into effect.

At summary judgment, the district court held that the Republic's "acquisition of control of [Repsol's YPF] *shares*, not its intervention in or acquisition of control of *YPF*," triggered the tender-offer obligation.  S.A. 144 (emphasis added).  The Republic intervened in and acquired managerial control over *YPF* on April 16, 2012, the day the Argentine president issued the Intervention Decree and sent the YPF expropriation bill to Congress for consideration.  But the Argentine Congress, which

78

debated various proposals, did not authorize the Executive to begin the expropriation process until May 7, 2012—the point at which the Republic acquired control over Repsol's *YPF shares* and could "exercise all of the rights conferred upon the shares subject to expropriation." S.A. 242.

In determining that the tender-offer obligation was triggered on the earlier date, the district court ignored the settled distinction in Argentine law between managerial rights and shareholder rights. J.A. 3843 at 262:9-13, 3841 at 260:15-25. On the earlier date, the Republic appointed an intervenor to begin exercising only *managerial* rights to "ensure the continuity of the company," and "preserve[] its assets." J.A. 3840 at 259:6-9, 3787 at 108:5-10. But at that time, the Republic did not exercise any *shareholder* rights, such as voting.

Indeed, plaintiffs' expert Professor Bianchi admitted that the May 7, 2012 YPF Expropriation Law—*not* the April 16, 2012 Intervention Decree—gave the Republic control over Repsol's shares. Bianchi initially submitted a declaration stating that "[s]ince April 2012, . . . the Argentine state has been in charge of YPF's administration," but only "since May 2012" has it "exercised all rights carried by YPF's Class D Stock." J.A. 3741. And he declared that it was the YPF Expropriation Law that "triggered the obligation to carry out a TO [tender offer]." J.A. 3742. At trial, Bianchi was unable to explain away these earlier statements. *See* J.A. 3794-3795 at 115:14-116:5, 3797-3798 at 118:23-119:9; *see also* J.A. 3788 at

79

109:15-18 ("[B]y its terms, the [Intervention Decree] did not confer any powers on the Intervenor over Repsol's YPF shares."). The district court ignored Bianchi's concessions, never mentioning his name even once in its damages opinion, even though he was plaintiffs' lone Argentine-law expert at trial, and his testimony covered 68 pages of transcript. *See* J.A. 3748-3815.

Instead, the district court reasoned that the Republic must have gained control over the shares on April 16, 2012, because, "as a practical matter," the Republic's intervention in YPF's management had the effect of preventing *Repsol* from exercising certain shareholder rights. S.A. 166. But the district court's conclusion does not follow. Simply because the Republic could use its *managerial* rights to eliminate opportunities for Repsol to exercise certain shareholder rights does not mean the Republic instead possessed those shareholder rights. If anything, it means the opposite. For example, the court noted that Repsol could not vote its shares during the intervention period because the government-appointed intervenor suspended the scheduled shareholders' meeting. S.A. 166-167. But if the Republic had been in control of Repsol's shares, it would have had no need to suspend the meeting; it could have acted in its controlling-shareholder capacity.[10]

_____

[10] The three-week difference between the breach date the district court used and the date the Republic exercised control of YPF's shares amounts to $6.6 billion

2.      The district court separately erred in selecting its prejudgment interest rate.  The court correctly held that prejudgment interest is governed by Argentine law, but then failed to apply the prejudgment interest rate used by Argentine federal administrative-law courts.  S.A. 150-151.  As explained above, the Argentine Supreme Court held that the factually and legally analogous *De San Martín* case belonged in federal administrative-law courts because public-law issues predominated.  *See* pp. 65-66, *supra*.  These Argentine courts would have applied an interest rate of approximately 0.76%, rather than the 8% that the district court applied.  *See* J.A. 3875 at 374:1-9, 3972.  Using the correct rate would reduce plaintiffs' total damages by approximately $6.9 billion.  *See id.*

## CONCLUSION

For the foregoing reasons, this Court should reverse the judgments below.  At a minimum, the Court should vacate the judgments in light of the district court's miscalculation of damages and remand with instructions to recalculate plaintiffs' damages.

---

because the tender-offer formula relies on YPF earnings data reaching back several years.  By using the earlier tender-offer date, plaintiffs brought in earnings depressed by the 2008 financial crisis, which increased damages.  *See* J.A. 3630 n.3.

Respectfully submitted,

*/s/ Robert J. Giuffra, Jr.*
Robert J. Giuffra, Jr.
Sergio Galvis
Adam R. Brebner
Pedro José Izquierdo
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
(212) 558-4000
giuffrar@sullcrom.com

Amanda F. Davidoff
Thomas C. White
Morgan L. Ratner
SULLIVAN & CROMWELL LLP
1700 New York Avenue NW
Washington, DC 20006
(202) 956-7500

*Attorneys for the Argentine*
*Republic*

February 22, 2024

## CERTIFICATE OF COMPLIANCE

This Brief complies with Federal Rule of Appellate Procedure 32(a) and the Court's order of February 7, 2024, because it contains 18,693 words.

This Brief also complies with the requirements of Federal Rule of Appellate Procedure 32(a) because it was prepared in 14-point font using a proportionally spaced typeface.

*/s/ Robert J. Giuffra, Jr.*
Robert J. Giuffra, Jr.

September 6, 2024

## CERTIFICATE OF SERVICE

I hereby certify that on September 6, 2024, I filed the foregoing Brief with the Clerk of Court for the U.S. Court of Appeals for the Second Circuit through the ACMS system.  I certify that all participants in these cases are registered ACMS users and that service will be accomplished by the ACMS system.

*/s/ Robert J. Giuffra, Jr.*
Robert J. Giuffra, Jr.

September 6, 2024